ANDERLINI, FINKELSTEIN, EMERICK & SMOOT
Merrill G. Emerick (Bar. No. 117248)
400 South El Camino Real, Suite 700
San Mateo, California 94402
Tel: (650) 348-0102
Fax: (650) 348-0962

GRANT & EISENHOFER PA
Jay W. Eisenhofer
Michael J. Barry
Chase Manhattan Centre
1201 N. Market Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100

*Attorneys for Plaintiffs*

ADR
FILED
E-filing
MAR 0 6 2006
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

C06-01711
PVT

| | |
|---|---|
| INDIANA ELECTRICAL WORKERS PENSION TRUST FUND, IBEW; SEIU AFFILIATES' OFFICERS AND EMPLOYEES PENSION PLAN; SEIU NATIONAL INDUSTRY PENSION FUND; and PENSION PLAN FOR EMPLOYEES OF SEIU, on behalf of themselves and all others similarly situated, and derivatively on behalf of Hewlett-Packard Company, <br><br> Plaintiffs, <br><br> v. <br><br> PATRICIA C. DUNN, LAWRENCE T. BABBIO, RICHARD A. HACKBORN, GEORGE A. KEYWORTH II, ROBERT E. KNOWLING, JR. THOMAS PERKINS, ROBERT L. RYAN, LUCILLE SALHANY, and CARLETON S. FIORINA, <br><br> Defendants. <br><br> and <br><br> HEWLETT-PACKARD COMPANY, <br><br> Nominal Defendant. | Case No.: <br><br> **VERIFIED COMPLAINT** <br> Class Action |

VERIFIED COMPLAINT

1   Plaintiffs INDIANA ELECTRICAL WORKERS PENSION TRUST FUND, IBEW

2   ("IBEW"), and SEIU AFFILIATES' OFFICERS AND EMPLOYEES PENSION PLAN, SEIU

3   NATIONAL INDUSTRY PENSION FUND, and PENSION PLAN FOR EMPLOYEES OF

4   SEIU (collectively, the "SEIU Funds"), on behalf of themselves and all others similarly

5   situated, and derivatively on behalf of Hewlett-Packard Company, make the following

6   allegations upon information and belief, except to the allegations relating to themselves, which

7   they make upon personal knowledge.

8   **SUMMARY OF ALLEGATIONS**

9   1.   This is a class and derivative action by IBEW and the SEIU Funds on behalf of

10  themselves and other stockholders of Hewlett-Packard Company ("HP" or the "Company")

11  arising from Defendants' violation of Section 14(a) of the Securities Exchange Act of 1934,

12  15 U.S.C. § 78n(a), and SEC Rule 14a-9, by publishing false and misleading disclosures in

13  the HP proxy statements filed on January 23, 2004, and February 11, 2005, regarding certain

14  severance plans and policies adopted by the HP Board of Directors (the "Board").

15  Specifically, this action arises from a promise made to Plaintiffs and other stockholders by the

16  board of directors of HP (the "Board") that the Board would seek shareholder approval before

17  authorizing the payment of any severance benefits in excess of 2.99 times the salary and

18  target bonus of the terminated executive.   Unbeknownst to HP shareholders, however, the

19  Defendants freely disregarded the commitments they made to HP shareholders regarding the

20  payment of severance benefits to terminated employees.

21  2.   In the fall of 2002, in response to a $16 million severance payout to HP

22  president Michael Capellas, Service Employees International Union ("SEIU") submitted a

23  shareholder proposal to be included in HP's proxy statement urging the Board not to approve

24  future severance packages exceeding 2.99 times the sum of the executives current annual base

25  salary plus annual target bonus without first seeking shareholder approval (the "Proposal").

26  Although HP's Board and management opposed the proposal, and indeed sought permission

27  from the staff of the Securities and Exchange Commission to exclude the proposal (which

28  relief was denied), HP shareholders approved the resolution in April 2003.  In July 2003, just

2

1   months after the SEIU Proposal was approved by shareholders, HP's Board announced that it

2   was putting in place a severance policy (the "Severance Policy") making such shareholder

3   approval mandatory.  Thereafter, HP disclosed the Severance Policy in its 2004 and 2005

4   proxy statements.  In reliance upon the Board's agreement to seek shareholder approval for

5   future severance payments, HP shareholders twice voted-in the HP Board, approved a request

6   from the Board that the shareholders approve the Company's 2004 Stock Incentive Plan, and

7   approved a request from the Board to approve certain amendments to the Company's 2005

8   Employee Stock Purchase Plan..

9       3.      However, the Board breached the Severance Policy and its fiduciary duties by,

10  on February 8, 2005, without seeking or obtaining shareholder approval, awarding HP's

11  outgoing CEO, Carleton "Carly" Fiorina ("Fiorina") a severance package that exceeded the

12  2.99 threshold.  Fiorina was given between $21.4 million and $42.5 million, amounts

13  exceeding that permissible without shareholder approval by between $7.4 million and $28.5

14  million.

15      4.      Plaintiffs bring derivative claims against HP's Board for violating Section 14(a)

16  of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and SEC Rule 14a-9, by causing

17  the Company to publish false and misleading proxy statements in which the HP Board sought

18  and obtained shareholder approval for the election of directors, and for the adoption of certain

19  employee compensation plans.  In addition, Plaintiffs assert derivative claims under Delaware

20  state law against the HP Board for breaching their fiduciary duties that seeks to recover the

21  excessive severance paid to Fiorina.  Specifically, the Board granted Fiorina $21.4 million in

22  severance payments.  These payments, however, were *ultra vires* as they were contrary to

23  HP's express severance policies, including the Company's Long Term Performance

24  Compensation ("LTPC") program and the HP Severance Program for Senior Executives (the

25  "Severance Program"), and constituted corporate waste.  Moreover, upon her termination,

26  Fiorina received stock options and restricted stock worth approximately $19 million and will

27  receive annual pension payments of $200,000 per year.  This pension benefit alone had a

28  present value of approximately $2 million.  The total benefits Fiorina received upon her

3

1   termination, therefore, were worth in excess of $40 million, over *7 times* Fiorina's annual

2   base pay and bonus prior to her firing, and some $26 million more than permitted under the

3   Severance Policy.  Therefore, Plaintiffs seek an order invalidating the severance payment to

4   Fiorina.

5         5.    Plaintiffs also assert a direct class claim against Defendants for breaching their

6   fiduciary duty of disclosure.  As discussed below, Defendants represented that the LTPC

7   Program was a three-year, performance based program, and that (a) no payments would be

8   made under that program prior to the expiration of the three year period; and (b) no payments

9   would be made under that program to any employee who was terminated (other than for

10  reasons of workforce reduction, disability or death) prior to the expiration of that three-year

11  period.  Carly Fiorina was involuntarily terminated prior to the expiration of the three-year

12  period applicable to the LTPC Program, yet Defendants authorized a payment to her of almost

13  $7.4 million under the terms of that program.  Thus, Defendants either breached the terms of

14  the LTPC Program (and thus committed an *ultra vires* act), or lied to the HP shareholders

15  about the terms of that program and thus breached their fiduciary duty of disclosure.

16        6.    Finally, Plaintiffs seek the imposition of a constructive trust against $21.4

17  million in the possession of Carleton Fiorina on the grounds that Fiorina knew this excessive

18  severance payment was a product of the HP Board's violation of the federal securities laws

19  and breach of their fiduciary duties, but accepted the payment anyway.

## THE PARTIES

21        7.    Plaintiff Indiana Electrical Workers Pension Trust Fund, IBEW ("IBEW"), is an

22  unincorporated association whose members are citizens of the state of Indiana.  IBEW is

23  presently and has been a shareholder of HP at all times relevant to the allegations raised

24  herein.

25        8.    Plaintiffs SEIU Affiliates' Officers And Employees Pension Plan, SEIU

26  National Industry Pension Fund, and Pension Plan For Employees Of SEIU (the "SEIU

27  Funds") are unincorporated associations serving as pension funds whose beneficiaries are

28  members, officers and employees of the Service Employees International Union ("SEIU")

VERIFIED COMPLAINT

1     and their families.  The SEIU Funds are presently and have been shareholders of HP at all

2     times relevant to the allegations raised herein.

3         9.      Nominal defendant HP is a Delaware Corporation with its principal executive

4     offices located in Palo Alto, California.  As of January 17, 2006, there were 2,820,994,034

5     shares outstanding of HP's common stock.  According to the Company's profile, HP is a

6     leading global provider of computing and imaging solutions and services.

7         10.     Defendant Patricia C. Dunn ("Dunn") has been an HP director since 1998, and

8     was elected Non-Executive of the Board on February 8, 2005.

9         11.     Defendant Lawrence T. Babbio ("Babbio") has been a director of HP since

10    2002, and is member of the HP Human Resources and Compensation Committee.

11        12.     Defendant Richard A. Hackborn ("Hackborn") has been a director of HP since

12    1992. Mr. Hackborn served as HP's Chairman of the Board from January 2000 to September

13    of 2000.  Mr. Hackborn served as HP's Vice President, Computer Products Organization,

14    from 1990 until his retirement in 1993, after a 33 year career with HP.

15        13.     Defendant George A. Keyworth II ("Keyworth") is and has been a director of

16    HP since 1986.

17        14.     Defendant Robert E. Knowling, Jr. ("Knowling") was an HP director from 2000

18    until his retirement on September 23, 2005.  Prior to his retirement, Mr. Knowling served on

19    the HP Human Resources and Compensation Committee.  Knowling was invited onto the

20    Board by Fiorina and has been reported in the media as saying in 2005 "I didn't join HP.  I

21    joined Carly.  If she left tomorrow, I'd resign tomorrow."  Knowling was opposed to

22    Fiorina's ouster in 2005.

23        15.     Defendant Thomas J. Perkins ("Perkins") was a director of HP from 2002 until

24    March of 2004, and was re-elected to the Board on February 7, 2005.

25        16.     Defendant Robert L. Ryan ("Ryan") is a director of HP and has been an HP

26    director since 2004.

27        17.     Defendant Lucille S. Salhany ("Salhany") is a director of HP and has been an

28    HP director since 2002.

VERIFIED COMPLAINT

18.     Defendant Carleton S. Fiorina ("Fiorina") was the Chairman of the Board and Chief Executive Officer of HP prior to her involuntary termination by the Company on February 8, 2005.

19.     By virtue of the Defendants' positions as present or former directors, they have been in a fiduciary relationship to HP, and the Company's public shareholders, and owed to HP and its public shareholders the highest obligation of good faith, fair dealing, due care and candor, and had an obligation to protect and preserve the assets and interests of HP.

## JURISDICTION

20.     Jurisdiction is based on § 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, as this case arises from Defendants' violations of § 14 of the Exchange Act, 15 U.S.C. § 78n, and the rules promulgated thereunder by the SEC.

21.     This court may exercise supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. § 1367, as such claims arise from the same nucleus of operative facts as the federal claim asserted below.  *See, e.g., Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966); *Ruud v. U.S. Dept. of Labor*, 347 F.3d 1086, 1089 (9th Cir. 2003)("[U]nder the doctrines of pendent and ancillary jurisdiction, the courts have long held that a federal district court may decide claims that would otherwise be outside the scope of the judicial power set forth in Article III, § 2 of the United States Constitution, such as those involving state issues in non-diversity cases.").

22.     The claims asserted herein are not the product of any collusive conduct designed to confer jurisdiction on this Court which it otherwise would not have.

## FACTUAL BACKGOUND

23.     On May 3, 2002, Hewlett Packard finalized its merger with Compaq Computer Corporation.   Michael Capellas, CEO of Compaq, joined Hewlett Packard as President, reporting to HP CEO Carly Fiorina.

24.     Just seven months later, in November of 2002, Capellas stepped down as President of HP.  Upon his separation, Capellas received severance payments from HP worth

6

1    in excess of $16 million.   This massive payment, which together with his salary, gave

2    Capellas over $17 million for just seven months of work, caused an uproar among HP's

3    shareholders.

4         25.   On December 9, 2002, SEIU, submitted a shareholder proposal to HP, pursuant

5    to SEC Rule 14a-8, requesting that the Company include in its 2003 proxy statement a

6    proposal that "urge[d] the Board of Directors to seek shareholder approval for future

7    severance agreements with senior executives that provide benefits in an amount exceeding

8    2.99 times the sum of the executive's base salary plus bonus.  'Future severance agreements'

9    include agreements renewing, modifying or extending existing severance agreements or

10   employment agreements containing severance provisions" (the "Proposal").

11        26.   The HP Board vigorously opposed SEIU's Proposal, and sought permission

12   from the Division of Corporation Finance (the "Division") of the Securities and Exchange

13   Commission (the "SEC") to exclude the Proposal from its proxy statement.   The Division,

14   however, ultimately disagreed with the Company's arguments and declined to opine that HP

15   could, consistent with SEC Rule 14a-8, exclude SEIU's Proposal from the Company's 2003

16   proxy statement.   Thereafter, the HP Board relented and agreed to submit SEIU's Proposal to

17   shareholder vote, but nonetheless urged the HP shareholders to reject the Proposal.

18        27.   At HP's annual meeting on April 2, 2003, HP's shareholders approved SEIU's

19   Proposal.   Because the Proposal was advisory in nature, the HP Board announced that they

20   would consider the recommendation.

21        **A.     Hewlett Packard Adopts the Long Term Performance Cash Program**

22        28.   In May 2003, after the annual meeting, but before the Company announced the

23   results of the shareholder vote on the Proposal, the Company adopted a Long Term

24   Performance Cash Program (the "LTPC"), which the Company described as a three-year

25   program pursuant to which senior management, including the CEO, could earn cash payments

26   if HP met certain financial targets.

27        29.   Two aspects of the LTPC were critical.   First, the Company represented that any

28   payments pursuant to the LTPC would be distributed at the end of the three-year period.   As

7

1  set forth in HP's 2004 and 2005 proxy statements, under the LTPC:

2      annual milestones are set based on the performance metric of cash flow from
       operations as a percentage of revenue. At the end of each program year, if HP
3      achieves a threshold level of performance, a percentage will be applied to each
       participant's targeted cash amount and banked on the participants behalf. . . .  At
4      the end of the three-year performance period, the total banked amounts, if any,
       will be adjusted by applying a modifier based on HP's total shareholder return
5      ("TSR") . . . relative to the TSR of the S&P 500 for the three-year period. If HP
       does not achieve a certain threshold TSR relative to the TSR for the S&P 500,
6      then the modifier will be zero, no payout will occur and all banked amounts will
       be forfeited. *The ultimate payout under this program is dependent on HP's TSR*
7      *relative to the TSR for the S&P 500 over the three-year performance period, and,*
       *therefore, payouts, if any, generally will occur at the end of such three-year*
8      *period.*

9  HP 2004 Proxy Statement at 35 and HP 2005 Proxy Statement at 34 (emphasis added).

10     30.    Second, due to the long term nature of the program, the LTPC specifically

11 provided that amounts otherwise payable to employees would be *forfeited* if the employee

12 was terminated for any reason other than workforce reduction, disability, retirement or death,

13 before the expiration of the three-year period. HP's 2004 proxy statement stated: "Generally,

14 if a participant is no longer employed by HP due to being placed in a workforce reduction

15 program, disability, retirement or death, then targeted cash amounts are prorated. *In the event*

16 *of other terminations, any banked amounts will be forfeited*." HP 2004 Proxy at 35 (emphasis

17 added).

18     **B.     Hewlett Packard Adopts The Severance Policy**

19     31.    On July 18, 2003, HP's Board agreed to implement SEIU's Proposal, and

20 adopted a formal Severance Policy that the Company described in its 2004 and 2005 proxy

21 statements as follows:

22     HP will seek stockholder approval for future severance agreements, if any, with
       senior executives that provide specific benefits if an amount exceeding 2.99 times
23     the sum of the executive's current annual base salary plus annual target bonus, in
       each case as in effect immediately prior to the time of such executive's
24     termination.

25     **C.     Hewlett Packard Adopts The Severance Program**

26     32.    On January 20, 2004, the HP Board announced that the Company had adopted,

27 effective October 31, 2003, a Severance Plan for Executives Officers of Hewlett-Packard

28 Company (the "Severance Program"). Under the Severance Program, the CEO is entitled to

8

VERIFIED COMPLAINT

1  2.5 times her annual base salary and target cash bonus, in effect prior to employment

2  termination.

3      33.    Like the LTPC, two aspects of the Severance Program were critical.  First, the

4  Severance Program precluded *any* severance payments to employees terminated for cause.

5  Under the Severance Program, "[a] participant shall be deemed to have incurred a qualifying

6  termination . . . if he or she is involuntarily terminated without cause (as defined below) and

7  executes a full release. . . . [C]ause means a participant's material neglect (other than as a

8  result of illness or disability) of his or her duties or responsibilities to HP or conduct

9  (including action or failure to act) that is not in the best interest of, or is injurious to, HP."  HP

10  2005 Proxy at 40.

11      34.    Second, the Severance Program provided that any payments made thereunder

12  would be *reduced* by any other cash payments provided to the terminated employee upon

13  separation from the Company.  HP's 2005 proxy statement explained:

14          Any payments under the severance program will be reduced by any cash
    severance benefit payable to the participant under any other HP plan, program or
15          agreement, including cash amounts payable for the uncompleted portion of
    employment agreements and prorated cash bonuses under the applicable short-
16          term bonus plan.

17      **D.**    **HP Shareholders Justifiably Rely On The Existence Of The HP Severance
    Policy And Severance Program In Electing Directors Nominated By The**
18          **Board And In Approving Compensation Plans Recommended By The
    Board.**
19

20      35.    The HP Severance Policy was published in the Company's proxy statements for

21  2004 and 2005.  The Board published the Severance Policy in order to gain the support and

22  trust of the HP shareholders.  Because SEIU's Proposal was supported by a majority of HP

23  Shareholders, and was adopted over the strenuous objection of the Board, it was important

24  that the Board demonstrate their compliance with the shareholders' demands by publishing

25  the Severance Policy in order to prevent the HP shareholders from opposing the directors'

26  candidacies in the future.

27      36.    Based, in part, on the Board's adoption of the Severance Policy (and thus their

28  acquiescence to the shareholders' demands), the HP shareholders voted in favor of the

9

director candidates nominated by the Board in 2004 and 2005.  Because HP does not have a classified Board, every Defendant named herein was up for election in 2004 and 2005 (except Perkins, who did not stand for election in 2004, but did in 2005).  Each of the Defendants, therefore, personally benefited from the support engendered by the Board's adoption and publication of the Severance Policy.

37.   In addition to seeking shareholder support for the candidacy of each of the Defendants (and other directors) in 2004 and 2005, the Board also sought and obtained shareholder approval for certain proposals for compensation and benefits for HP employees:

- At the Company's 2004 annual meeting, the Board sought and obtained shareholder approval for the Hewlett-Packard Company 2004 Stock Incentive Plan.

- At the Company's 2005 annual meeting, the Board sought and obtained shareholder support for the issuance of an additional 75 million shares for the Hewlett-Packard Company 2000 Employee Stock Purchase Plan.

38.   The HP shareholders supported the compensation and benefits related proposals recommended by the Board at the Company's 2004 and 2005 annual meetings based, in part, on the fact that the Board had publicized its "voluntary" adoption of SEIU's Proposal, which was approved by the shareholders, through the adoption of the Severance Policy.

39.   The Company's 2006 annual meeting is scheduled to take place on March 15, 2006.  In the Company's 2006 proxy statement (filed January 24, 2006), the HP Board once again has publicized its adoption of the Severance Program, and seeks shareholder approval for the election of directors and for another compensation-related proposal entitled the Hewlett-Packard Company 2005 Pay-for-Results Plan.

**E.   The Hewlett Packard Board Pays Carly Fiorina Benefits Worth Over *Seven Times* Her Annual Compensation And Target Bonus Following Her Termination**

40.   On February 8, 2005, the HP Board fired Carly Fiorina.  As was widely reported in the press, Fiorina's termination followed the Company's dismal performance following the merger with Compaq.  Upon her termination, the HP Board awarded Fiorina severance payments of $21.4 million.  Fiorina received $7.4 million pursuant to the LTPC and $14 million pursuant to HP's Severance Program for Senior Executives (the "Severance

10

VERIFIED COMPLAINT

1  Program"). At the Company's annual meeting of shareholders on March 16, 2005

2  shareholder meeting, Patricia C. Dunn, the Chairman of the HP Board, described the entire

3  $21.4 million, including the LTPC payment, as a severance payment. Defendant Dunn stated:

4          The first [question] ... was on severance and what was the basis for -- the number
           -- $21.4 million payment to Carly Fiorina as severance. Carly did not have a
5          contract at HP. She worked under the same plan for severance as all executives,
           which was adopted by the board's compensation committee in 2003. That plan
6          was appropriately disclosed by the board's compensation committee in 2003.
           That plan was appropriately disclosed and the payments due and payable under
7          that plan were also made public since its adoption.

8  Joseph E. Bachelder III, *Carly Fiorina and Hewlett-Packard Severance Policy*, 3/24/2005

9  N.Y.L.J. 3 (col. 1).

10         41.   The Company's 2005 proxy statement (filed February 11, 2005), described this

11  $21.4 million severance payment as comprised of:

12    •    A cash payment of $14,000,000.00;

13    •    A cash payment of $5,880,000, "which represent[ed] Ms. Fiorina's award for
           the 2003-2004 program year of the LTPC Program"; and

14

15    •    A cash payment of $1,503,700, "which represent[ed] Ms. Fiorina's award for
           the 2004-2005 program year of the LTPC Program."

16         42.   The Company's 2005 proxy statement also disclosed that, in addition to

17  statutory COBRA benefits, Fiorina would receive the following additional benefits that were

18  negotiated as part of her termination agreement:

19    •    $50,000 for "financial counseling, legal and outplacement services";

20    •    personal computer equipment and three months of administrative support;

21    •    administrative support for six months;

22    •    home security for one year; and

23    •    a cash payment for the balance of Fiorina's unused vacation time.

24         43.   Finally, the Company's 2005 proxy statement disclosed that following her

25  termination, Fiorina would receive the following additional financial benefits following her

26  termination:

27    •    Fiorina's outstanding options to purchase 6,065,852 shares of HP common
           stock with a weighted average exercise price of $35.73 as of the date of the

28

11

VERIFIED COMPLAINT

Agreement vested prior to her termination, with a one-year post-termination exercise period; and

• Ms. Fiorina retained her vested rights under qualified HP retirement plans and under an HP excess benefit plan.

44. According to an article published by the New York Times, Fiorina's pension benefits (which amount to $200,000 per year) have a present value of at least $2 million, and her vested options had a value of approximately $1 million as of the date of her termination. In addition, however, the New York Times reported that the restricted stock Fiorina received upon her hiring and which vested upon her termination was worth approximately $18.2 million as of February of 2005. Eric Dash, *Fiorina Exiting Hewlett-Packard With More Than $42 Million*, The New York Times (Feb. 12, 2005).

45. The exact terms of Fiorina's severance agreement, including the payment of the amounts set forth above and Fiorina's negotiated-for release against HP, however, were not disclosed to the HP shareholders until February 22, 2005, when the Company filed Fiorina's Severance Agreement and Release as Exhibit 99.1 on Form 8-K.

46. In sum, therefore, upon her termination Fiorina received benefits worth in excess of $40 million. Of this amount, $21.4 million was negotiated directly as part of Fiorina's termination agreement. The fact that this $21.4 million was negotiated as part of Fiorina's termination and thus constituted "severance" benefits was not revealed until Defendant Dunn conceded that the entire $21.4 million constituted "severance" benefits at the Company's 2005 annual meeting on March 16, 2005.

47. The HP Board of Directors never sought a vote of the shareholders before authorizing the $21.4 million severance payment to Fiorina. Further, as discussed below, Fiorina's severance payment violated the LTPC, the Severance Program and the Severance Policy.

### 1. Fiorina's Severance Payment Violated The LTPC

48. As discussed above, upon her termination, Fiorina received $7.4 million under the LTPC. According to HP, approximately $5.8 million of this payment related to the

12

VERIFIED COMPLAINT

Company's performance in 2003-2004, and the balance of $1.5 million related to the Company's performance in 2004-2005.

49.    As an initial matter, the LTPC was a three-year performance based plan, and payments were not designed to be made prior to the expiration of the three-year period. Further, because Fiorina was involuntarily terminated, any accumulated payments to which Fiorina otherwise would have been entitled were forfeited.

50.    After Fiorina's termination, however, HP Board made a disclosure that implied that the Board apparently had amended the terms of the LTPC to allow executives to collect under the plan even if they were involuntarily terminated. The Company's 2004 proxy disclosed the following relating to the LTPC Program:

> "Generally, if a participant is no longer employed by HP due to being placed in a workforce reduction program, disability, retirement or death, then targeted cash amounts are prorated. *In the event of other terminations, any banked amounts will be forfeited.*"

(Emphasis supplied). However, the Company's 2005 proxy statement, filed on February 11, 2005, *after* Fiorina's termination, described the relevant portion of the LTPC Program as follows:

> "Notwithstanding the foregoing, if a participant is no longer employed by HP due to involuntary termination, disability, retirement or death, targeted awards are paid subject to certain adjustments. In the event of voluntary terminations, any banked amounts will be forfeited and no payment is made."

51.    To date, the Board has not explained when, how or why they amended the terms of the LTPC Program. If the amendment was accomplished after Fiorina's termination, unquestionably such an amendment would not apply to her termination. But even if the amendment was technically accomplished prior to her termination, applying any such retroactive amendment to Fiorina when the Board already had determined to terminate her would have lacked any rational business justification. As such, any amendment to the LTPC simply to pay Fiorina upon her forced termination would have constituted a gift of corporate assets and, accordingly, corporate waste.

13

52.     But even if Fiorina otherwise was entitled to any payment under the LTPC following her involuntary termination, Fiorina still should not have been entitled to any payment based on the Company's performance in 2004-2005 until after November 2005, because until then, there could be no telling if HP would meet the targets under the LTPC.  To explain, HP operates on a fiscal  year beginning on November 1 and ending on October 31 of the following year.  Fiorina was involuntarily terminated on February 8, 2005, just three months and one week into the 2004-2005 fiscal year.  Because the LTPC grants awards based on annual targets, it was impossible, as of February 2005, to determine whether HP would meet its financial targets for the 2004-2005 fiscal year until November 1, 2005 at the earliest.

53.     Accordingly, the Board acted *ultra vires* by awarding Fiorina any payments under the LTPC.

### 2.      Fiorina's Severance Payment Violated The Severance Program

54.     The Severance Program provided, in pertinent part, as follows:

> Participants will be eligible for the following severance payment in the event of a Qualifying Termination ...:

> For an Executive Officer who holds the title of Chief Executive Officer within 90 days of termination of HP employment, a lump sum severance payment in an amount equivalent, before deductions, to 2.5 times the sum of his or her annual base salary and annual target cash bonus under the applicable short-term bonus plan, both as in effect immediately prior to separation from employment.

55.     Fiorina's base salary immediately prior to termination was $1.4 million and her target bonus was $4.2 million.

56.     Although the $14 million payment is 2.5 times Fiorina's base salary and target cash bonus, the $14 million payment should have been offset by the payments Fiorina received under the LTPC.  The Company's 2004 and 2005 Proxy Statements stated as follows: "Any payments under the severance program will be reduced by any cash severance benefit payable to the participant under any other HP plan, program or agreement, including cash amounts payable for the uncompleted portion of employment agreements and prorated

14

cash bonuses under the applicable short-term bonus plan."[1]

57. As conceded by HP Chairman Dunn at the Company's 2005 Annual Meeting, the entire $21.5 million payment to Fiorina – including the $7.4 million Fiorina received under the LTPC Program – was a "severance" payment.

58. By failing to offset Fiorina's payment under the Severance Program by the $7.4 million paid to her under the LTPC, the HP Board violated the Severance Program by awarding Fiorina $14 million under the Severance Program.

### 3. Fiorina's Severance Payment Violated The Severance Policy

59. As discussed above, in July of 2003, the HP Board adopted a Severance Policy to which they committed not to pay "severance benefits" to any terminated executive in an amount that exceeds 2.99 times the executive's base salary and annual target bonus immediately preceding the termination, without seeking shareholder approval. The Company has, however, explained that certain payments would not be subject to the Severance Policy, "either because they have been previously earned or accrued or because they are consistent with Company Practices:"

(a) compensation and benefits earned, accrued, deferred or otherwise provided for employment services rendered on or prior to the date of termination of employment pursuant to bonus, retirement, deferred compensation or other benefit plans, e.g., 401(k) plan distributions, payments pursuant to retirement plans, distributions under deferred compensation plans or payments for accrued benefits such as unused vacation days, and any amounts earned with respect to such compensation and benefits in accordance with the terms of the applicable plan;

(b) payments of prorated bonuses or prorated long-term incentive payments that are consistent with Company Practices;

(c) acceleration of the vesting of stock options, stock appreciation rights, restricted stock or long-term cash incentives that is consistent with Company Practices;

---

[1] The Company's 2006 proxy statement contains the exact same language regarding the Severance Program. However, in July of 2005, presumably in response to outrage over the excessive severance benefits paid to Carly Fiorina, the HP Board amended the Company's Severance Program "to reduce the cash severance benefits payable to the CEO, Executive Vice Presidents and Senior Vice Presidents, and to base payments upon a multiple of annual base salary and actual bonuses paid rather than a multiple of annual base salary and target bonuses." HP 2006 Proxy Statement (Form 14A), filed January 23, 2006, at 50.

15

(d)     payments or benefits required to be provided by law; and

(e)     benefits and perquisites provided in accordance with the terms of any benefit plan, program or arrangement sponsored by HP or its affiliates that are consistent with Company Practices.

HP 2005 Proxy, at 39 (filed February 11, 2005)

60.     Fiorina's base salary immediately prior to termination was $1.4 million and her target bonus was $4.2 million. Accordingly, the Severance Policy precluded the payment of any severance benefits to Fiorina in excess of $16.74 million without approval by the shareholders.[2]

61.     As HP Chairman Dunn acknowledged, Fiorina received "severance benefits," including the payment pursuant to the LTPC, in the amount of $21.4 million.

62.     Because Fiorina was involuntarily terminated, any payment to her under the LTPC Program was not consistent with "Company Practices" as they existed as of the date of her termination. As such, the LTPC payment to Fiorina did not fall within any exception to the Severance Policy.

63.     The HP Board never sought shareholder approval for the $21.4 million severance payment to Fiorina.

64.     The Board, therefore, acted *ultra vires* by failing to put Fiorina's severance payments to a shareholder vote.

## CLASS ACTION ALLEGATIONS

65.     Plaintiffs bring Counts II and IV of this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all other persons who own common stock of HP. Excluded from the Class are Defendants, as well as their affiliates of assigns.

66.     Counts II and IV are properly maintainable as class action counts.

67.     The Class is so numerous that joinder of all members is impracticable. As of January 17, 2006, there were 2,820,994,034 shares outstanding of HP's common stock, held by individuals and entities and entities too numerous to bring separate actions. It is

---

[2] ($1.4 million + $4.2 million) x 2.99 = $16.74 million

VERIFIED COMPLAINT

1 reasonable to assume that holders of the common stock are geographically dispersed

2 throughout the United States.

3     68.    There are questions of law and fact which are common to the Class and which

4 predominate over questions affecting any individual class member.  The common questions

5 include, *inter alia*, the following:

6     (a)   Whether Defendants entered into an enforceable agreement with the HP

7           shareholders precluding the HP Board of Directors from approving or
           authorizing any payment pursuant to any severance agreement to any executive
           in an amount in excess of 2.99 times the annual compensation of that executive

8           without shareholder approval.

9     (b)   Whether the Company's payment of benefits to Fiorina worth in excess of $40

10          million following Fiorina's termination in February of 2005 violated the
           Company's stated policies of not paying any executive severance payments or
           benefits in excess of 2.99 times the executive's annual compensation without

11          shareholder approval.

12    (c)   Whether Defendants violated their commitment to HP shareholders not to

13          authorize or pay any severance agreement in excess of 2.99 times the
           executive's annual compensation without shareholder approval.

14    (d)   Whether Plaintiffs and Class members suffered financial loss as a result of

15          Defendants' payment of $40 million in benefits to Carly Fiorina following her
           termination.

16    69.    IBEW and the SEIU Funds are committed to prosecuting the Class counts and

17 has retained competent counsel experienced in litigation of this nature.  IBEW's and the SEIU

18 Funds' claims are typical of the claims of other members of the Class.  Accordingly, IBEW

19 and the SEIU Funds are adequate representatives of the Class and will fairly and adequately

20 protect the interests of the Class.

21    70.    Plaintiffs anticipate that there will be no difficulty in the management of Counts

22 I and III as a class action.

23    71.    Defendants have acted on grounds generally applicable to the Class with respect

24 to the matters complained of herein, thereby making appropriate the relief sought herein with

25 respect to the Class as a whole.

26    72.    The prosecution of separate actions would create the risk of:

27    (a)   Inconsistent or varying adjudications which would establish incompatible

28          standards for conduct for the Defendants; and/or

17

VERIFIED COMPLAINT

(b)    Adjudications which would as a practical matter be dispositive of the interests of other members of the Class.

## DERIVATIVE ALLEGATIONS

73.    Plaintiffs bring Counts I, III, V and VI below derivatively pursuant to Federal Rule of Civil Procedure 23.1 for the benefit of HP to redress injuries suffered by HP as a direct result of Defendants' decision to award Fiorina a severance package that far exceeded HP's express severance policies, and that was tantamount to corporate waste.

74.    IBEW and the SEIU Funds have owned HP stock during the wrongful course of conduct alleged herein and continue to own HP stock.

75.    IBEW and the SEIU Funds will adequately and fairly represent the interests of HP and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in stockholder derivative litigation.

## DEMAND ON THE HP BOARD IS EXCUSED AS FUTILE

76.    Plaintiffs hereby reallege and incorporate the allegations set forth in the preceding paragraphs as if fully set forth herein.

77.    No demand has been made by IBEW or the SEIU Funds on HP's Board because demand is excused as a matter of law on derivative claims alleging that the Defendants violated Section 14(a) by causing the Company to publish false and misleading proxy statements.

78.    No demand has been made by IBEW or the SEIU Funds on HP's Board to rectify the excessive severance awarded to Fiorina because the severance award was *ultra vires* and demand is excused for *ultra vires* acts.

79.    The severance package was *ultra vires* because it exceeded HP's express severance programs and policies as described in HP's 2003, 2004, and 2005 proxy statements.

## COUNT I
### (Against all Defendants)
### Derivative Claim for Violation of Section 14(a) Of The Securities Exchange Act Of 1934

80.    Plaintiffs hereby reallege and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

18

VERIFIED COMPLAINT

81.   Plaintiffs bring this claim derivatively on behalf of Hewlett-Packard.

82.   The proxy statements filed on Form 14A by Hewlett-Packard Company on January 23, 2004, February 11, 2005, and January 23, 2006, contained the following representations about the Severance Policy:

> HP will seek stockholder approval for future severance agreements, if any, with senior executives that provide specific benefits if an amount exceeding 2.99 times the sum of the executive's current annual base salary plus annual target bonus, in each case as in effect immediately prior to the time of such executive's termination.

83.   The proxy statements filed on Form 14A by Hewlett-Packard Company on January 23, 2004, February 11, 2005, and January 23, 2006, contained the following representations about the Severance Policy:

> The following benefits are not subject to the Severance Policy, either because they have been previously earned or accrued by the employee or because they are consistent with Company Practices: (a) compensation and benefits earned, accrued, deferred or otherwise provided for employment services rendered on or prior to the date of termination of employment pursuant to bonus, retirement, deferred compensation or other benefit plans, *e.g.*, 401(k) plan distributions, payments pursuant to retirement plans, distributions under deferred compensation plans or payments for accrued benefits such as unused vacation days, and any amounts earned with respect to such compensation and benefits in accordance with the terms of the applicable plan; (b) payments of prorated bonuses or prorated long-term incentive payments that are consistent with Company Practices; (c) acceleration of the vesting of stock options, stock appreciation rights, restricted stock or long-term cash incentives that is consistent with Company Practices; (d) payments or benefits required to be provided by law; and (e) benefits and perquisites provided in accordance with the terms of any benefit plan, program or arrangement sponsored by HP or its affiliates that are consistent with Company Practices.

84.   The foregoing statements were false and misleading for the following reasons:

> (a)   Despite the Company's supposed commitment not pay severance benefits to senior executives in an amount in excess of 2.99 times the executive's annual salary plus bonus without shareholder approval, the HP Board, in fact, never intended to be bound by any such restriction and Defendants authorized the payment of $21.4 million in severance benefits to Carleton Fiorina without shareholder approval, even though such an amount was $4.656 million more than the limit set forth in the Severance Policy.

> (b)   Defendants failed to disclose that, when authorizing the severance benefits payable to Carleton Fiorina in February of 2005, they secretly amended the terms of the LTPC Program to permit payments to employees who were involuntarily terminated in an effort to justify paying severance benefits of $21.4 million to Fiorina without shareholder approval as "consistent with Company Practices," even

19

though prior to such amendment established "Company Practices" prohibited any payments under the LTPC Program to employees who were terminated for any reason other than death, disability or workforce reduction.

85.     The proxy statements filed on Form 14A by Hewlett-Packard Company on January 23, 2004, and February 11, 2005, contained the following representations about the Severance Program:

Participants will be eligible for the following severance payment in the event of a Qualifying Termination …:

For an Executive Officer who holds the title of Chief Executive Officer within 90 days of termination of HP employment, a lump sum severance payment in an amount equivalent, before deductions, to 2.5 times the sum of his or her annual base salary and annual target cash bonus under the applicable short-term bonus plan, both as in effect immediately prior to separation from employment.

86.     The proxy statements filed on Form 14A by Hewlett-Packard Company on January 23, 2004, February 11, 2005, and January 23, 2006, contained the following representation about the Severance Program: "Any payments under the severance program will be reduced by any cash severance benefit payable to the participant under any other HP plan, program or agreement, including cash amounts payable for the uncompleted portion of employment agreements and prorated cash bonuses under the applicable short-term bonus plan."

87.     The foregoing statements were false and misleading for the following reasons:

(a)     The HP Board, in fact, never intended to be restricted in the payment of severance benefits by the Severance Program, and simply authorized payments under other HP compensation plans not formally denoted as "severance" plans in an effort to avoid compliance with the terms of the Severance Program;

(b)     Defendants knew or should have known that the entire $21.4 million paid to Fiorina upon her involuntary termination, including the payment of $7.4 under the LTPC Program, constituted payment of negotiated severance benefits, yet Defendants failed to disclose that this $7.4 million payment was not set off against the $14 million payment to Fiorina authorized under the Severance Program.

88.     The proxy statement filed on Form 14A by Hewlett-Packard Company on January 23, 2004, contained the following representation about the LTPC Program:

20

VERIFIED COMPLAINT

In May 2003, the HR and Compensation Committee approved a Long-Term Performance Cash ("LTPC") Program and granted awards under that program to selected senior managers, including the named executive officers. *The LTPC Program is designed to drive value creation and operational efficiency through balance sheet and total shareowner return ("TSR") performance measures, to retain top-performing and critical employees, and to reward senior managers for exceptional performance.* The LTPC Program is also designed to reduce HP's use of option grants for senior executives and, therefore, its dilution levels. The total long-term incentive amount for each program participant is split between options and long-term performance cash.

The targeted LTPC cash award amount for each participant was divided roughly into thirds corresponding to the 3-year period of the LTPC Program (33% in the first and second years, 34% in the third). Annual milestones are set based on the performance metric of cash flow from operations as a percentage of revenue. At the end of each program year, if HP achieves a threshold level of performance, a percentage will be applied to each participant's targeted cash amount and banked on the participant's behalf. The percentage to be applied to each participant's targeted cash amount ranges from 0% to 150% based upon the extent to which performance goals are achieved. Interest will be applied to banked amounts. *If HP does not achieve a certain threshold level of performance for the year, the percentage applied will be zero and each participant's targeted cash amount for that program year will be forfeited.*

At the end of the three-year performance period, the total banked amounts, if any, will be adjusted by applying a modifier based on HP's TSR (which includes reinvestment of dividends) relative to the TSR for the S&P 500 for the three-year period. The modifier to be applied to each participant's total banked amount ranges from 0% to 200%. *If HP does not achieve a certain threshold TSR relative to the TSR for the S&P 500, then the modifier will be zero, no payout will occur and all banked amounts will be forfeited. The ultimate payout under this program is dependent on HP's TSR relative to the TSR of the S&P 500 over the 3-year performance period, and therefore, payouts, if any, generally will occur at the end of the 3-year performance period.*

If cash flow from operations as a percentage of revenue is below the threshold, no amounts will be banked for the period. *Similarly, if TSR thresholds are not achieved for the three-year performance period, no payouts will be made and any banked amounts will be forfeited.* To achieve a modifier above 100%, HP's TSR must exceed the median of the TSR for the S&P 500 over the period, and, to achieve the maximum payout, HP's TSR must significantly exceed the median for S&P 500 companies.

*Generally, if a participant is no longer employed by HP due to being placed in a workforce reduction program, disability, retirement or death, then targeted cash amounts are prorated. In the event of other terminations, any banked amounts will be forfeited.*

(Emphasis supplied).

89. The foregoing statements were false and misleading because they failed to disclose that the HP Board retained the right to amend the terms of the LTPC Program without informing the shareholders in order to grant payments to HP employees terminated

VERIFIED COMPLAINT

1   prior to the expiration of the three-year period following the adoption of the LTPC Program,

2   including Fiorina, that otherwise would have been expressly prohibited under the terms of the

3   LTPC Program as described to the HP shareholders.  Specifically, the foregoing statements,

4   and particularly the highlighted portions, gave the HP shareholders the belief that no

5   payments would be made to any HP employees under the LTPC Program prior to the

6   expiration of the three-year period following the adoption of the LTPC Program.  Further,

7   these statements caused the HP employees to believe that any amounts "banked" under the

8   terms of the plan would be "forfeited" by any employee whose employment was terminated

9   for any reason other than death, disability or workforce reduction prior to the expiration of the

10   three-year period following the adoption of the LTPC Program.  Finally, these statements

11   caused the HP shareholders to believe that one of the primary purposes of the LTPC Program

12   was "to retain top-performing and critical employees" and to provide an incentive to those

13   employees to maximize returns for shareholders.   These statements were materially

14   misleading, however, because at the time they were made, the Defendants did not inform the

15   HP shareholders that the HP Board retained the right to amend the terms of the LTPC

16   Program without informing the shareholders in order to authorize payments under the LTPC

17   Program that would have been directly contrary to the terms and purposes of the program as

18   explained to the HP shareholders.

19        90.   The proxy statement filed on Form 14A by Hewlett-Packard Company on

20   February 11, 2005, contained the following representation about the LTPC Program:

21            In May 2004, the HR and Compensation Committee granted awards under
        the Long-Term Performance Cash Program (the "LTPC Program") to selected
22       senior managers, including the named executive officers. *The LTPC Program was
        established in fiscal 2003 to drive value creation and operational efficiency*
23       *through balance sheet and total stockholder return ("TSR") performance*
        *measures, to retain top-performing and critical employees, and to reward senior*
24       *managers for exceptional performance.* The LTPC Program also is designed to
        reduce HP's use of option grants for senior executives and, therefore, HP's
25       dilution levels. The total target long-term incentive amount for each program
        participant is split between options and long-term performance cash, as follows.
26       First, a target number of option equivalents for each participant is determined.
        Fifty percent (for executive officers and other higher level participants) or two-
27       thirds (for remaining participants) of this target amount is then granted to the
        participant in the form of options, and the remaining value (as determined in
28       accordance with a modified Black-Scholes valuation model) is used as the target

22

long-term performance cash payout amount under the LTPC Program for such participant. Awards to the named executive officers under the LTPC Program were granted pursuant to the Hewlett-Packard Company 2004 Stock Incentive Plan, which has been approved by HP stockholders.

The targeted long-term performance cash award amount for each participant was divided approximately into thirds corresponding to the three-year performance period of the LTPC Program (33% in the first and second years, 34% in the third). Annual milestones are set based on the performance metric of cash flow from operations as a percentage of revenue. At the end of each year, if HP achieves a threshold level of performance, a percentage will be applied to each participant's targeted cash amount and banked on the participant's behalf. The percentage to be applied to each participant's targeted cash amount ranges from 0% to 150% based upon the extent to which performance goals are achieved. Interest, using the applicable federal rates determined by the Internal Revenue Service (the "IRS"), will be applied to banked amounts. If HP does not achieve a certain threshold level of performance for the year, the percentage applied will be zero.

At the end of the three-year performance period, the total banked amounts, if any, will be adjusted by applying a modifier based on HP's TSR (which includes reinvestment of dividends) relative to the TSR for the S&P 500 for the three-year performance period. The modifier to be applied to each participant's total banked amount ranges from 0% to 200%. If HP does not achieve a certain threshold TSR relative to the TSR for the S&P 500, then the modifier will be zero, and any banked amounts held by then current participants will be forfeited. *The ultimate payout under this program is dependent on HP's TSR relative to the TSR of the S&P 500 over the three-year performance period, and therefore, payouts, if any, generally will occur at the end of such three-year period.*

If cash flow from operations as a percentage of revenue is below the threshold, no amounts will be banked for the year. Similarly, if TSR thresholds are not achieved for the three-year performance period, any banked amounts held by then current participants at the end of the period will be forfeited. To achieve a modifier above 100%, HP's TSR must exceed the median of the TSR for the S&P 500 over the three-year performance period, and, to achieve the maximum payout, HP's TSR must significantly exceed the median for S&P 500 companies.

*Notwithstanding the foregoing, if a participant is no longer employed by HP due to involuntary termination, disability, retirement or death, targeted awards are paid subject to certain adjustments. In the event of voluntary terminations, any banked amounts will be forfeited and no payment is made.*

(Emphasis supplied).

91.   The foregoing statements were false and misleading because they failed to disclose that the Defendants amended the terms of the LTPC Program to authorize a $7.4 million payment to Fiorina that would have been barred under the terms of the plan as explained to the HP shareholders in the Company's 2004 proxy statement.  The statements were also false and misleading because they incorrectly represented that "[t]he ultimate

23

payout" under the program was dependent on the Company meeting certain three-year projected goals, when the truth of the matter is that the Defendants had authorized a $7.4 million payment to Fiorina just one year and three months into the period, when it was impossible to determine whether such goals for the second and third years would be met.

92.   Defendants caused the Company to make the false and misleading statements identified above in the Company's 2004 proxy statement in order to elicit shareholder support for the election of directors, including the Defendants, and to support certain compensation-related proposals for which the HP Board sought shareholder approval, as set forth above in Paragraphs 35-39.

93.   Defendants, except Fiorina, caused the Company to make the false and misleading statements identified above in the Company's 2005 proxy statement in order to elicit shareholder support for the election of directors, including the Defendants, and to support certain compensation-related proposals for which the HP Board sought shareholder approval, as set forth above in Paragraphs 35-39.

94.   The foregoing statements were material to the HP shareholders' consideration of the election of directors, and the approval of certain compensation-related proposals for which the HP Board sought shareholder approval in 2004 and 2005, as set forth above in Paragraphs 35-39.

95.   The proxy statement published by the Company on January 23, 2004, was an essential link in the Defendants' solicitation of shareholder approval for the election of Babbio, Dunn, Fiorina, Hackborn, Keyworth, Knowling, Litvack, Ryan and Salhany, and for shareholder approval of the Company's 2004 Stock Incentive Plan.

96.   The proxy statement published by the Company on February 11, 2005, was an essential link in the Defendants' (except Fiorina's) solicitation of shareholder approval for the election of Babbio, Dunn, Hackboarn, Keyworth, Knowling, Perkins, Ryan, Salhany and Wayman, and for shareholder approval of the issuance of an additional 75 million shares for the Company's 2000 Employee Stock Purchase Plan.

VERIFIED COMPLAINT

## COUNT II
### (Against all Defendants)
### Class Claim For Breach Of Contract

97. Plaintiffs hereby reallege and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

98. Plaintiffs bring this claim as a direct claim, on behalf of themselves and all those similarly situated, against Defendants for breach of contract.

99. Defendants promised Plaintiffs and the Company's other shareholders that they would be given a vote on any future severance payment that exceeded 2.99 times the sum of a senior executive's base salary and target bonus in order to induce Plaintiffs and HP's other shareholders to elect them to the Board, and to vote in favor of the other compensation and benefits related proposals set forth above in Paragraphs 35-39.

100. Plaintiffs and the other HP shareholders, relying on the promise that it would be given a vote on future severance payments, voted in favor of the Board and approved the compensation and benefits related proposals set forth above in Paragraphs 35-39.

101. Defendants, having secured the support of HP shareholders, failed to honor their promise and awarded Fiorina a severance package that exceeded 2.99 times her base salary and target bonus without seeking or obtaining shareholder approval.

## COUNT III
### (Against all Defendants *except* Carleton Fiorina)
### Derivative Claim For *Ultra Vires* Acts In Connection With Fiorina's Severance Package

102. Plaintiffs hereby reallege and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

103. Plaintiffs bring this claim derivatively on behalf of Hewlett-Packard.

104. Defendants Dunn, Babbio, Hackborn, Keyworth, Knowling, Perkins, Ryan and Salhany were fiduciaries of HP's public shareholders at all times relevant to this Count. As such, they owed the shareholders the highest duties of good faith, fair dealing and loyalty and due care.

105. The award of an excessive severance package to Fiorina was *ultra vires* and was a breach of the Defendants' duty to HP's public shareholders. The award was contrary to

VERIFIED COMPLAINT

1    HP's express severance programs as set forth in HP's proxy statements. In particular, the

2    award was counter to the express terms of HP's LTPC program, Severance Program and

3    Severance Policy in that (i) payments to Fiorina were wrongly accelerated; (ii) the award

4    under the Severance Program was not set off against the moneys Fiorina received under the

5    LTPC program; and (iii) the award was required to be, but was not, put to a shareholder vote.

6        106.  As a result of Defendants breaches of fiduciary duties HP and its shareholders

7    were damaged.

### COUNT IV
### (Against all Defendants *except* Carleton Fiorina)
### Class Claim For Breach Of The Duty Of Disclosure

10       107.  Plaintiffs hereby reallege and incorporate the allegations in the preceding

11   paragraphs as if fully set forth herein.

12       108.  Plaintiffs bring this claim as a direct claim, on behalf of themselves and all

13   those similarly situated, against Defendants for breach of their fiduciary duty of disclosure.

14       109.  On January 23, 2004, Defendants published the HP 2004 Proxy Statement in

15   which they disclosed the terms of the LTPC Program, which was adopted by the HP Board in

16   May of 2003.  Defendants represented that the purpose of the program was "to drive value

17   creation and operational efficiency through balance sheet and total shareholder return ('TSR')

18   performance measures, to retain top-performing and critical employees, and to reward senior

19   managers for exceptional performance."  Further, Defendants represented that, because the

20   LTPC was designed to promote growth over a three year period "to retain top-performing and

21   critical employees," no payments would be made before the expiration of the three-year

22   period, and no payments would be made to *any* employee who was terminated prior to the

23   expiration of that period for any reason other than "being placed in a workforce reduction

24   program, disability, retirement or death."

25       110.  Defendants made these representations regarding the LTPC Program to solicit

26   shareholder support for the items submitted for shareholder approval at the Company's 2004

27   annual meeting, including the election of defendant directors Babbio, Dunn, Hackborn,

28   Keyworth, Knowling, Ryan and Salhany and former directors Carleton S. Fiorina and Sanford

VERIFIED COMPLAINT

1  Litvack ("Litvack") and the approval of the Hewlett-Packard Company 2004 Stock Incentive

2  Plan.

3      111.  In reliance on the Defendants' representations about the LTPC Program, at the

4  Company's 2004 annual meeting, the HP shareholders approved the election of directors

5  Babbio, Dunn, Hackborn, Keyworth, Knowling, Ryan, Salhany and former directors Fiorina

6  and Litvack, and the Hewlett-Packard Company 2004 Stock Incentive Plan.

7      112.  Despite these representations, however, on February 8, 2005, prior to the

8  expiration of the three year period following the adoption of the LTPC, HP involuntarily

9  terminated Fiorina, yet Defendants agreed to pay her $7,383,700 pursuant to the LTPC

10  Program.

11      113.  By misrepresenting the purpose and intent of the LTPC Program, Defendants

12  breached their duty of disclosure to the HP shareholders.

13                           **COUNT V**
                 **(Against all Defendants *except* Carleton Fiorina)**
14   **Derivative Claim for Breach of Fiduciary Duty – Corporate Waste**

15      114.  Plaintiffs hereby reallege and incorporate the allegations in the preceding

16  paragraphs as if fully set forth herein.

17      115.  Plaintiffs bring this claim derivatively on behalf of Hewlett-Packard.

18      116.  On February 11, 2005, Defendants published the HP 2005 Proxy Statement in

19  which it disclosed the terms of the LTPC Program had been changed to permit the payment of

20  benefits under the plan to employees who had been terminated involuntarily by the Company

21  prior to the expiration of the three year period following the adoption of the LTPC Program.

22      117.  Upon information and belief, if the LTPC Program was amended *before*

23  February 8, 2005, it was amended by the HP Board specifically to permit the payment of

24  benefits under the LTPC Program to Fiorina upon her termination.

25      118.  Because one of the purposes of the LTPC Program was to "retain" key

26  employees, there was no legitimate purpose whatsoever to paying LTPC benefits to Fiorina

27  when the decision had been made to terminate her involuntarily from her employment with

28  the Company.  Any payment to Fiorina pursuant to the LTPC not only violated the terms and

VERIFIED COMPLAINT

1   purpose of the LTPC Program, but constituted a gift of Company assets and corporate waste.

2                                       **COUNT VI**
                                  **(Against Carleton Fiorina)**
3            **Derivative Claim for The Imposition Of A Constructive Trust**

4        119.   Plaintiffs hereby reallege and incorporate the allegations in the preceding

5   paragraphs as if fully set forth herein.

6        120.   Plaintiffs bring this claim derivatively on behalf of Hewlett-Packard.

7        121.   During her tenure as a director and officer of HP, Defendant Fiorina was

8   familiar with the terms of the Company's Severance Policy, Severance Program, and LTPC

9   Program.

10       122.   Based on her familiarity with the LTPC Program, Fiorina knew that no

11  payments were authorized under that plan prior to the expiration of a three-year period

12  following the adoption of the program, and that employees who were involuntarily terminated

13  prior to the expiration of that three-year period were not eligible to receive any payments

14  under the LTPC Program.

15       123.   Based on her familiarity with the LTPC Program, Fiorina knew that any

16  payments under the LTPC Program authorized by the Board to any HP employee who was

17  involuntarily terminated prior to the expiration of the three-year period following the adoption

18  of the LTPC Program would be a breach of the HP directors' fiduciary duties and would

19  constitute an *ultra vires* act.

20       124.   Based on her familiarity with the LTPC Program, Fiorina knew that any

21  amendment to the terms of the LTPC Program to authorize payments to employees whom the

22  HP Board had previously determined to terminate involuntarily would constitute a gift of

23  corporate assets and corporate waste.

24       125.   Based on her familiarity with the Company's Severance Program, Fiorina knew

25  that any benefits paid to a terminated employee as a severance benefit under any HP plan

26  were required to be set off against any benefits payable under the Company's Severance

27  Program.

28

                                            28

VERIFIED COMPLAINT

126.   Based on her familiarity with the Company's Severance Program, Fiorina knew that any payments authorized by the HP Board that were not set off against any payments authorized under the Severance Program constituted a breach of the HP directors' fiduciary duties and would constitute an *ultra vires* act.

127.   Based on her familiarity with the Company's Severance Policy, Fiorina knew that any severance payments to terminated employees in excess of 2.99 times that employees' annual salary and target bonus immediately preceding termination required shareholder approval.

128.   Based on her familiarity with the Company's Severance Policy, Fiorina knew that any severance payment authorized by the HP Board without shareholder approval in an amount in excess of 2.99 times the terminated employees' annual salary and target bonus would constitute a breach of the HP directors' fiduciary duties and an *ultra vires* act.

129.   Based on her knowledge, as set forth above, Fiorina knew that the $21.4 million severance payment authorized by the HP Board, and accepted by Fiorina, was the product of the HP directors' breach of their fiduciary duties to the Company and its public shareholders.

130.   Notwithstanding her knowledge that the $21.4 million severance payment was the product of the HP directors' breach of fiduciary duties, Fiorina accepted the payment.

**WHEREFORE,** IBEW and the SEIU Funds pray that the Court enter judgment and relief in their favor on the Class counts and in favor of HP on the derivative counts, and against Defendants on all counts as follows:

(a)   Declaring that Defendants violated Section 14(a) of the Securities Exchange Act of 1934 by publishing false and misleading statements in the Company's proxy statements in 2004 and 2005;

(b)   Declaring that Defendants breached their contract with Plaintiffs and the other HP shareholders;

(c)   Declaring that Defendants acted *ultra vires* in awarding Fiorina her severance package;

(d)   Declaring that Defendants breached their fiduciary duty of disclosure by misrepresenting the terms and purposes of the LTPC Program, and by failing to disclose the timing of, reasons for, and circumstances surrounding any amendment to the LTPC Program regarding the payment of benefits under that plan to HP employees who were involuntarily terminated;

29

(e)  Declaring that Defendants breached their fiduciary duties and committed corporate waste by authorizing any payment to Carleton Fiorina under the LTPC Program after the HP Board determined to involuntarily terminate her employment;

(f)  Imposing a constructive trust on $21.4 million in the possession of Carleton Fiorina;

(g)  Awarding compensatory damages, together with pre- and post-judgment interest;

(h)  Awarding IBEW and the SEIU Funds the costs and expenses incurred in this action, including, but not limited to, reasonable experts' and attorneys' fees; and

(i)  Granting such other and further relief as may be just and proper.

Dated:

ANDERLINI, FINKELSTEIN,
EMERICK & SMOOT

By: _____
        Merrill G. Emerick
400 South El Camino Real, Suite 700
San Mateo, California 94402
Tel: (650) 348-0102
Fax: (650) 348-0962

GRANT & EISENHOFER PA
Jay W. Eisenhofer
Michael J. Barry
Chase Manhattan Centre
1201 N. Market Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100

*Attorneys for Plaintiffs*

VERIFIED COMPLAINT

1

### VERIFICATION

2    I, Ron Ehrgott, am the Administrative Manager of the Indiana Electrical Workers

3 Pension Trust Fund, IBEW. I have read the foregoing Verified Complaint and, pursuant to

4 28 U.S.C. § 1746, verify, under penalty of perjury, that the foregoing is true and correct.

5

6    Executed on this _24_ day of _FEB_ , 2006

7

8                                                      _____
                                                         Ron Ehrgott
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

31

VERIFIED COMPLAINT

**VERIFICATION**

I, Stephen Abrecht, am the Executive Director of Benefit Funds and Director of the Capital Stewardship Program of the Service Employees International Union.  I have read the foregoing Verified Complaint and, pursuant to 28 U.S.C § 1746, verify, under penalty of perjury, that the foregoing is true and correct.

Executed on this  6th day of March, 2006

_____
Stephen Abrecht

32

VERIFIED COMPLAINT