1  ANDERLINI, FINKELSTEIN, EMERICK & SMOOT
   Merrill G. Emerick (Bar No 117248)
2  400 South El Camino Real, Suite 700
   San Mateo, California 94402
3  Tel: (650) 348-0102
   Fax: (650) 348-0962
4

5  GRANT & EISENHOFER PA
   Jay W. Eisenhofer
6  Michael J. Barry
   Chase Manhattan Centre
7  1201 N. Market Street
   Wilmington, DE 19801
8  Tel: (302) 622-7000
   Fax: (302) 622-7100
9

10 *Attorneys for Plaintiffs*

11                **IN THE UNITED STATES DISTRICT COURT**
                **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
12
   INDIANA ELECTRICAL WORKERS              )
13 PENSION TRUST FUND, IBEW; SEIU          )   Case No : C06-01711 RMW
   AFFILIATES' OFFICERS AND EMPLOYEES      )
14 PENSION PLAN; SEIU NATIONAL             )
   INDUSTRY PENSION FUND; and PENSION      )   **VERIFIED AMENDED COMPLAINT**
15 PLAN FOR EMPLOYEES OF SEIU, on behalf   )   Class Action
   of themselves and all others similarly situated,  )
16 and derivatively on behalf of Hewlett-Packard  )
   Company,                                )
17                                         )
                                           )
18            Plaintiffs,                  )
                                           )
19       v.                                )
                                           )
20 PATRICIA C. DUNN, LAWRENCE T.           )
   BABBIO, RICHARD A. HACKBORN,            )
21 GEORGE A. KEYWORTH II, ROBERT E         )
   KNOWLING, JR THOMAS PERKINS,            )
22 ROBERT L RYAN, LUCILLE SALHANY,         )
   and CARLETON S. FIORINA,                )
23                                         )
                                           )
24            Defendants.                  )
                                           )
25       and                               )
                                           )
26 HEWLETT-PACKARD COMPANY,                )
                                           )
27            Nominal Defendant            )
                                           )
28

VERIFIED AMENDED COMPLAINT

Plaintiffs INDIANA ELECTRICAL WORKERS PENSION TRUST FUND, IBEW ("IBEW"), and SEIU AFFILIATES' OFFICERS AND EMPLOYEES PENSION PLAN, SEIU NATIONAL INDUSTRY PENSION FUND, and PENSION PLAN FOR EMPLOYEES OF SEIU (collectively, the "SEIU Funds"), on behalf of themselves and all others similarly situated, and derivatively on behalf of Hewlett-Packard Company, make the following allegations upon information and belief, except to the allegations relating to themselves, which they make upon personal knowledge.

## SUMMARY OF ALLEGATIONS

1. This is a class and derivative action by IBEW and the SEIU Funds on behalf of themselves and other stockholders of Hewlett-Packard Company ("HP" or the "Company") arising from Defendants' violation of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and SEC Rule 14a-9, by publishing false and misleading disclosures in the HP proxy statements filed on January 23, 2004, and February 11, 2005, regarding certain severance plans and policies adopted by the HP Board of Directors (the "Board"). Specifically, this action arises from a promise made to Plaintiffs and other stockholders by the board of directors of HP (the "Board") that the Board would seek shareholder approval before authorizing the payment of any severance benefits in excess of 2.99 times the salary and target bonus of the terminated executive. Unbeknownst to HP shareholders, however, the Defendants never intended to meet the commitments they made to HP shareholders regarding the payment of severance benefits to terminated employees.

2. In the fall of 2002, in response to a $16 million severance payout to HP president Michael Capellas, Service Employees International Union ("SEIU") submitted a shareholder proposal to be included in HP's proxy statement urging the Board not to approve future severance packages exceeding 2.99 times the sum of the executives current annual base salary plus annual target bonus without first seeking shareholder approval (the "Proposal"). Although HP's Board and management opposed the proposal, and indeed sought permission from the staff of the Securities and Exchange Commission to exclude the proposal (which relief was denied), HP shareholders approved the resolution in April 2003. In July 2003, just

2

months after the SEIU Proposal was approved by shareholders, HP's Board announced that it was putting in place a severance policy (the "Severance Policy") making such shareholder approval mandatory. Thereafter, HP disclosed the Severance Policy in its 2004 and 2005 proxy statements. In reliance upon the Board's agreement to seek shareholder approval for future severance payments, HP shareholders twice voted-in the HP Board, approved a request from the Board that the shareholders approve the Company's 2004 Stock Incentive Plan, and approved a request from the Board to approve certain amendments to the Company's 2005 Employee Stock Purchase Plan.

3. However, the Board breached the Severance Policy and its fiduciary duties by, on February 8, 2005, without seeking or obtaining shareholder approval, awarding HP's outgoing CEO, Carleton "Carly" Fiorina ("Fiorina") a severance package that exceeded the 2.99 threshold. Fiorina was given between $21.4 million and $42.5 million, amounts exceeding that permissible without shareholder approval by between $7.4 million and $28.5 million. Upon information and belief, Fiorina's termination and severance award presented the Board with its first opportunity to fulfill its obligations to Plaintiffs and HP's other shareholders regarding HP's severance awards.

4. Plaintiffs bring derivative claims against HP's Board for violating Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and SEC Rule 14a-9, by causing the Company to publish false and misleading proxy statements in which the HP Board sought and obtained shareholder approval for the election of directors, and for the adoption of certain employee compensation plans. In addition, Plaintiffs assert derivative claims under Delaware state law against the HP Board for breaching their fiduciary duties that seeks to recover the excessive severance paid to Fiorina. Specifically, the Board granted Fiorina $21.4 million in severance payments. These payments, however, were *ultra vires* as they were contrary to HP's Severance Policy, as well as the express terms of HP's compensation and severance plans, including the Company's Long Term Performance Compensation ("LTPC") program and the HP Severance Program for Senior Executives (the "Severance Program"), and constituted corporate waste. Moreover, upon her termination, Fiorina received stock options

3

1 and restricted stock worth approximately $19 million and will receive annual pension
2 payments of $200,000 per year. This pension benefit alone had a present value of
3 approximately $2 million. The total benefits Fiorina received upon her termination, therefore,
4 were worth in excess of $40 million, over *7 times* Fiorina's annual base pay and bonus prior
5 to her firing, and some $26 million more than permitted under the Severance Policy.
6 Therefore, Plaintiffs seek an order invalidating the severance payment to Fiorina.

7     5.     Plaintiffs also assert a direct class claim against Defendants for breaching their
8 fiduciary duty of disclosure. By misrepresenting the Board's compliance and intent to
9 comply with the express terms of the Company's severance programs and policies, and by
10 concealing the Board's violation of those programs and policies, Defendants breached their
11 duty of disclosure. As a result, their election as directors was void, the shareholder votes
12 solicited by the directors on matters relating to executive compensation were void, and the
13 Defendants' actions to implement executive compensation programs based on shareholder
14 votes that were the product of fraudulent and misleading solicitations by the Company are
15 voidable and should be rescinded.

16     6.     Finally, Plaintiffs seek the imposition of a constructive trust against $21.4
17 million in the possession of Carleton Fiorina on the grounds that Fiorina knew this excessive
18 severance payment was a product of the HP Board's violation of the federal securities laws
19 and breach of their fiduciary duties, but accepted the payment anyway.

20 **THE PARTIES**

21     7.     Plaintiff Indiana Electrical Workers Pension Trust Fund, IBEW ("IBEW"), is an
22 unincorporated association whose members are citizens of the state of Indiana. IBEW is
23 presently and has been a shareholder of HP at all times relevant to the allegations raised
24 herein.

25     8.     Plaintiffs SEIU Affiliates' Officers And Employees Pension Plan, SEIU
26 National Industry Pension Fund, and Pension Plan For Employees Of SEIU (the "SEIU
27 Funds") are unincorporated associations serving as pension funds whose beneficiaries are
28 members, officers and employees of the Service Employees International Union ("SEIU")

4

and their families. The SEIU Funds are presently and have been shareholders of HP at all times relevant to the allegations raised herein. SEIU's principal place of business is in Washington, D.C.

9. Nominal defendant HP is a Delaware Corporation with its principal executive offices located in Palo Alto, California. As of January 17, 2006, there were 2,820,994,034 shares outstanding of HP's common stock. According to the Company's profile, HP is a leading global provider of computing and imaging solutions and services.

10. Defendant Patricia C. Dunn ("Dunn") has been an HP director since 1998, and was elected Non-Executive of the Board on February 8, 2005. Ms. Dunn is a resident of the State of California.

11. Defendant Lawrence T. Babbio ("Babbio") has been a director of HP since 2002, and is member of the HP Human Resources and Compensation Committee. Babbio has been the Vice Chairman and President of Verizon Communications, Inc. ("Verizon") (formerly Bell Atlantic Corporation) since 2000. Mr. Babbio is a resident of the State of Virginia.

12. Defendant Richard A. Hackborn ("Hackborn") has been a director of HP since 1992. Mr. Hackborn served as HP's Chairman of the Board from January 2000 to September of 2000. Mr. Hackborn served as HP's Vice President, Computer Products Organization, from 1990 until his retirement in 1993, after a 33 year career with HP. Mr. Hackborn is a resident of the State of Idaho.

13. Defendant George A. Keyworth II ("Keyworth") is and has been a director of HP since 1986. Keyworth has been the chairman and senior fellow with The Progress and Freedom Foundation, a public policy research institute, since 1995. Mr. Keyworth is a resident of the State of California.

14. Defendant Robert E. Knowling, Jr. ("Knowling") was an HP director from 2000 until his retirement on September 23, 2005. Prior to his retirement, Mr. Knowling served on the HP Human Resources and Compensation Committee. Knowling was invited onto the Board by Fiorina and has been reported in the media as saying in 2005 "I didn't join HP. I

5

1  joined Carly. If she left tomorrow, I'd resign tomorrow." Knowling was opposed to
2  Fiorina's ouster in 2005. Mr. Knowling is a resident of the State of Colorado

3      15    Defendant Thomas J. Perkins ("Perkins") was a director of HP from 2002 until
4  March of 2004, and was re-elected to the Board on February 7, 2005. Perkins resigned from
5  HP's Board on May 18, 2006. Mr. Perkins is a resident of the State of California

6      16    Defendant Robert L. Ryan ("Ryan") is a director of HP and has been an HP
7  director since 2004. Ryan served as Senior Vice President and Chief Financial Officer of
8  Medtronic, Inc. ("Medtronic") from 1993 until his retirement in May 2005. Ryan is a director
9  of General Mills. Mr. Ryan is a resident of the State of Minnesota

10     17    Defendant Lucille S. Salhany ("Salhany") is a director of HP and has been an
11  HP director since 2002. Ms. Salhany is a resident of the Commonwealth of Massachusetts.

12     18    Defendant Carleton S. Fiorina ("Fiorina") was the Chairman of the Board and
13  Chief Executive Officer of HP prior to her involuntary termination by the Company on
14  February 8, 2005. Ms. Fiorina is a resident of the State of California

15     19    By virtue of the Defendants' positions as present or former directors, they have
16  been in a fiduciary relationship to HP, and the Company's public shareholders, and owed to
17  HP and its public shareholders the highest obligation of good faith, fair dealing, due care and
18  candor, and had an obligation to protect and preserve the assets and interests of HP

19                                    **JURISDICTION**

20     20    Jurisdiction is based on § 27 of the Securities Exchange Act of 1934 (the
21  "Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, as this case arises from
22  Defendants' violations of § 14 of the Exchange Act, 15 U.S.C. § 78n, and the rules
23  promulgated thereunder by the SEC.

24     21    This court may exercise supplemental jurisdiction over the state law claims
25  asserted herein under 28 U.S.C § 1367, as such claims arise from the same nucleus of
26  operative facts as the federal claim asserted below. *See, e.g., Mine Workers v. Gibbs*, 383
27  U.S. 715, 725 (1966); *Ruud v. U.S. Dept. of Labor*, 347 F.3d 1086, 1089 (9th Cir.
28  2003)("[U]nder the doctrines of pendent and ancillary jurisdiction, the courts have long held

6

that a federal district court may decide claims that would otherwise be outside the scope of the judicial power set forth in Article III, § 2 of the United States Constitution, such as those involving state issues in non-diversity cases.").

22    Alternatively, this Court has jurisdiction over the subject matter of the state law claims pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy in this matter exceeds $75,000.

23    Venue is proper pursuant to 28 U.S.C. §1401, as the Company may properly sue the individual Defendants, and Plaintiffs may properly sue individual Defendants in this District, the location of HP's principal place of business.

24    The claims asserted herein are not the product of any collusive conduct designed to confer jurisdiction on this Court which it otherwise would not have

## **FACTUAL BACKGOUND**

25    On May 3, 2002, Hewlett Packard finalized its merger with Compaq Computer Corporation  Michael Capellas, CEO of Compaq, joined Hewlett Packard as President, reporting to HP CEO Carly Fiorina.

26    Just seven months later, in November of 2002, Capellas stepped down as President of HP  Upon his separation, Capellas received severance payments from HP worth in excess of $16 million.  This massive payment, which together with his salary, gave Capellas over $17 million for just seven months of work, caused an uproar among HP's shareholders.

27    On December 9, 2002, SEIU, submitted a shareholder proposal to HP, pursuant to SEC Rule 14a-8, requesting that the Company include in its 2003 proxy statement a proposal that "urge[d] the Board of Directors to seek shareholder approval for future severance agreements with senior executives that provide benefits in an amount exceeding 2.99 times the sum of the executive's base salary plus bonus. 'Future severance agreements' include agreements renewing, modifying or extending existing severance agreements or employment agreements containing severance provisions" (the "Proposal").

7

28    The HP Board vigorously opposed SEIU's Proposal, and sought permission from the Division of Corporation Finance (the "Division") of the Securities and Exchange Commission (the "SEC") to exclude the Proposal from its proxy statement. The Division, however, ultimately disagreed with the Company's arguments and declined to opine that HP could, consistent with SEC Rule 14a-8, exclude SEIU's Proposal from the Company's 2003 proxy statement. Thereafter, the HP Board relented and agreed to submit SEIU's Proposal to shareholder vote, but nonetheless urged the HP shareholders to reject the Proposal.

29    At HP's annual meeting on April 2, 2003, HP's shareholders approved SEIU's Proposal. Because the Proposal was advisory in nature, the HP Board announced that they would consider the recommendation.

A.    **Hewlett Packard Adopts the Long Term Performance Cash Program**

30    In May 2003, after the annual meeting, but before the Company announced the results of the shareholder vote on the Proposal, the Company adopted a Long Term Performance Cash Program (the "LTPC"), which the Company described as a three-year program pursuant to which senior management, including the CEO, could earn cash payments if HP met certain financial targets.

31    Two aspects of the LTPC were critical. First, under its express terms, an employee's entitlement to payments pursuant to the LPTC did not vest until the end of the three-year period, with the employee's continuous full-time employment during this three year period being an express condition precedent to such vesting. Specifically, the LTPC provided:

> The Employee's Cash Award shall vest on the third anniversary of the Grant Date. Notwithstanding the foregoing, *the Employee must remain in the employ of the Company on a continuous, full-time basis through the close of business on the third anniversary of the Grant Date, for such Cash Award to vest*, subject to paragraphs 6-9 of this Agreement. The period of time between the Grant Date and the date of the Employee's Cash Award becomes vested is referred to herein as the "Restriction Period."

LTPC ¶ 2 (emphasis supplied).

32    Second, due to the long-term nature of the program, the LPTC specifically provided that amounts otherwise payable to employees would be *forfeited* if the employee's

8

employment terminated for any reason other than retirement (LTPC ¶ 6), disability (LTPC ¶ 7), death (LTPC ¶ 8), or workforce reduction (LTPC ¶ 9), or before the expiration of the three-year period. Specifically, the LPTC provided:

> *Subject to paragraphs 6-9 of this Agreement, if the Employee's employment with the Company is terminated at any time prior to the expiration of the Restriction Period, this Agreement granted hereunder shall terminate and any interest in the Cash Award shall be forfeited by the Employee*, and full ownership will be retained by the Company

LTPC ¶ 4(b) (emphasis supplied)

33    The LTPC provided the Company with limited discretion to "increase or decrease" payments to employees. Specifically, the LTPC provided:

> The Committee shall have the discretion to increase or decrease cash payout subject to this Agreement for those Employees who terminate employment in situations covered by paragraphs 6-9 above during the Restriction Period, and for exceptional circumstances, except that such payout cannot be increased for Covered Employees as defined in Section 162(m) of the Internal Revenue Code of 1986, as amended

LTPC ¶ 14(c).

34.    By its terms, however, the authority to "increase or decrease" payments authorized under the LTPC plan did *not* include the authority to make payments to employees who "forfeited" the right to receive any such payments under Paragraph 4(b) of the plan

35.    Moreover, the authority to increase or decrease payments did *not* include the authority to increase such payments to the Company's CEO and its next four highest paid officers    Paragraph 14(c) of the LTPC, as set forth above, expressly provided that such "discretionary" increased payments "cannot be increased for Covered Employees as defined in Section 162(m) of the Internal Revenue Code of 1986, as amended." Section 162(m) of the Internal Revenue Code defines "Covered Employees" as follows:

> [T]he term "covered employees" means any employee of the taxpayer if—

> (A) as of the close of the taxable year, such employee is the *chief executive officer* of the taxpayer or is an individual acting in such a capacity, or

> (B) the total compensation of such employee for the taxable year is required to be reported to shareholders under the Securities Exchange Act of 1934 by reason of such employee being among the 4 highest compensated officers for the taxable year (other than the chief executive officer)

9

(Emphasis supplied).

36. The Company's 2004 and 2005 proxy statements reinforced that payments under the LTPC were to be made at the end of the three-year period. HP's 2004 and 2005 proxy statements described the LTPC as follows:

> annual milestones are set based on the performance metric of cash flow from operations as a percentage of revenue. At the end of each program year, if HP achieves a threshold level of performance, a percentage will be applied to each participant's targeted cash amount and banked on the participants behalf ... At the end of the three-year performance period, the total banked amounts, if any, will be adjusted by applying a modifier based on HP's total shareholder return ("TSR") ... relative to the TSR of the S&P 500 for the three-year period. If HP does not achieve a certain threshold TSR relative to the TSR for the S&P 500, then the modifier will be zero, no payout will occur and all banked amounts will be forfeited. *The ultimate payout under this program is dependent on HP's TSR relative to the TSR for the S&P 500 over the three-year performance period, and, therefore, payouts, if any, generally will occur at the end of such three-year period*

HP 2004 Proxy Statement at 35 and HP 2005 Proxy Statement at 34 (emphasis added).

37. Further, the 2004 proxy statement made clear that any payments under the LTPC would be automatically forfeited if an employee's relationship with HP were terminated before the end of the three-year period for any reason other than retirement, permanent disability, death or workforce reduction. HP's 2004 proxy statement stated: "Generally, if a participant is no longer employed by HP due to being placed in a workforce reduction program, disability, retirement or death, then targeted cash amounts are prorated. *In the event of other terminations, any banked amounts will be forfeited*." HP 2004 Proxy at 35 (emphasis added).

**B.  Hewlett Packard Adopts The Severance Policy**

38. On July 18, 2003, HP's Board agreed to implement SEIU's Proposal, and adopted a formal Severance Policy that the Company described in its 2004, 2005 and 2006 proxy statements as follows:

> HP will seek stockholder approval for future severance agreements, if any, with senior executives that provide specific benefits if an amount exceeding 2.99 times the sum of the executive's current annual base salary plus annual target bonus, in each case as in effect immediately prior to the time of such executive's termination

10

### C. Hewlett Packard Adopts The Severance Program

39    On January 20, 2004, the HP Board announced that the Company had adopted, effective October 31, 2003, a Severance Plan for Executives Officers of Hewlett-Packard Company (the "Severance Program"). Under the Severance Program, the CEO is entitled to 2.5 times her annual base salary and target cash bonus, in effect prior to employment termination.

40.    Like the LTPC, two aspects of the Severance Program were critical. First, the Severance Program precluded *any* severance payments to employees terminated for cause. Under the Severance Program, "[a] participant shall be deemed to have incurred a qualifying termination for this program if he or she is involuntarily terminated without case ... and executes a full release of claims, in a form satisfactory to HP, promptly following termination. For purposes of the program, cause means a participant's material neglect (other than as a result of illness or disability) of his or her duties or responsibilities to HP or conduct (including action or failure to act) that is not in the best interest of, or is injurious to, HP." HP 2005 Proxy at 40; HP 2006 Proxy at 50.

41.    Second, the Severance Program provided that any payments made thereunder would be *reduced* by any other cash payments provided to the terminated employee upon separation from the Company. HP's 2005 and 2006 proxy statements explained:

> Any payments under the severance program will be reduced by any cash severance benefit payable to the participant under any other HP plan, program or agreement, including cash amounts payable for the uncompleted portion of employment agreements and prorated cash bonuses under the applicable short-term bonus plan.

HP 2005 Proxy at 40; HP 2006 Proxy at 50.

### D. HP Shareholders Justifiably Rely On The Existence Of The HP Severance Policy And Severance Program In Electing Directors Nominated By The Board And In Approving Compensation Plans Recommended By The Board.

42.    The HP Severance Policy and Severance Program were published in the Company's proxy statements for 2004 and 2005. The Board published the Severance Policy and Severance Program in order to gain the support and trust of the HP shareholders

11

Because SEIU's Proposal was supported by a majority of HP shareholders, and was adopted over the strenuous objection of the Board, it was important that the Board demonstrate their compliance with the shareholders' demands by publishing the Severance Policy and Severance Program in order to prevent the HP shareholders from opposing the directors' candidacies in the future.

43    Based, in part, on the Board's adoption of the Severance Policy (and thus their acquiescence to the shareholders' demands) and the Severance Program, the HP shareholders voted in favor of the director candidates nominated by the Board in 2004, 2005 and 2006. Because HP does not have a classified Board, every Defendant named herein was up for election in 2004 and 2005 (except Perkins, who did not stand for election in 2004, but did in 2005, and Baldauf, who was elected in 2006). Each of the Defendants, therefore, personally benefited from the support engendered by the Board's adoption and publication of the Severance Policy and Severance Program.

44    In addition to seeking shareholder support for the candidacy of each of the Defendants (and other directors) in 2004 and 2005, the Board also sought and obtained shareholder approval for certain proposals for compensation and benefits for HP employees, and solicited and obtained shareholder opposition to certain proposals advocating the adoption of reforms that were opposed by the Board:

- At the Company's 2004 annual meeting, the Board sought and obtained shareholder approval for the Hewlett-Packard Company 2004 Stock Incentive Plan. The 2004 Stock Incentive Plan set aside 180 million shares of HP common stock for issuance to HP employees through the grant of stock options and stock awards, including stock units and cash awards.

- At the Company's 2005 annual meeting, the Board sought and obtained shareholder support for the issuance of an additional 75 million shares for the Hewlett-Packard Company 2000 Employee Stock Purchase Plan

45    The HP shareholders supported the compensation and benefits related proposals recommended by the Board at the Company's 2004 and 2005 annual meetings based, in part, on the fact that the Board had publicized its "voluntary" adoption of SEIU's Proposal, which was approved by the shareholders, through the adoption of the Severance Policy.

12

46 The Company's 2006 annual meeting took place on March 15, 2006 In the Company's 2006 proxy statement (filed January 24, 2006), the HP Board once again publicized its adoption of the Severance Policy and the Severance Program, and sought and obtained shareholder approval for the election of directors and for another compensation-related proposal entitled the Hewlett-Packard Company 2005 Pay-for-Results Plan. As described by the Company, the 2005 Pay-for-Results Plan permits the Board's Compensation Committee to "designate performance measures and a bonus formula with respect to a performance period for each [plan] participant. Utilizing those criteria and other factors that the Committee determines appropriate, the Committee uses the [plan] to reward accomplishments achieved or recognized during the performance period." HP 2006 Proxy at 23.

47. In the Company's 2006 proxy statement, the HP Board also solicited shareholder votes *against* certain reforms advocated by certain shareholders. Specifically, the HP Board solicited votes against the following proposals:

- A proposal requesting the Board to amend the Company's governing documents to require director nominees to be elected by the affirmative vote of the majority of votes cast at an annual meeting; and

- A proposal requesting the Board to adopt a policy whereby the Company would recoup performance-based bonuses paid to senior executives in the event a subsequent restatement or write-off revealed that the Company actually failed to achieve the specified performance targets upon which such bonuses were calculated and paid

On the Board's recommendations set forth in the Company's 2006 proxy statement, the shareholders voted against these proposals at the Company's 2006 annual meeting.

48 Unbeknownst to the HP shareholders, however, at the time the HP Board adopted and publicized the Severance Policy, they never intended to restrict severance payments to terminated employees as described in that plan. To the contrary, at the time the HP Board adopted and publicized the Severance Policy, the HP Board fully expected to avoid compliance with the terms and spirit of the Severance Policy by authorizing payments to terminated employees in excess of the limits imposed by the Severance Policy by characterizing such payments as something other than "severance" payments

13

49. As described more fully below, the Board's intent to disregard the terms and spirit of the Severance Policy is plainly evidenced by the fact that they did not even attempt to abide by the Policy. In fact, the HP Board ignored this Policy the very first time they had occasion to apply it, opting to award Carly Fiorina benefits far in excess of the amounts permitted under the Policy. The Board's utter failure to even attempt to honor the terms of the Severance Policy demonstrates their intent to avoid compliance therewith.

### E. The Hewlett Packard Board Pays Carly Fiorina Benefits Worth Over *Seven Times* Her Annual Compensation And Target Bonus Following Her Termination

50. On February 8, 2005, the HP Board fired Carly Fiorina. As was widely reported in the press, Fiorina's termination followed the Company's dismal performance following the merger with Compaq. Upon her termination, the HP Board awarded Fiorina severance payments of $21.4 million. Fiorina received $7.4 million pursuant to the LTPC and $14 million pursuant to HP's Severance Program for Senior Executives (the "Severance Program"). At the Company's annual meeting of shareholders on March 16, 2005 shareholder meeting, Patricia C. Dunn, the Chairman of the HP Board, described the entire $21.4 million, including the LTPC payment, as a severance payment. Defendant Dunn stated:

> The first [question] was on severance and what was the basis for -- the number -- $21.4 million payment to Carly Fiorina as severance. Carly did not have a contract at HP. She worked under the same plan for severance as all executives, which was adopted by the board's compensation committee in 2003. That plan was appropriately disclosed by the board's compensation committee in 2003. That plan was appropriately disclosed and the payments due and payable under that plan were also made public since its adoption.

Joseph E. Bachelder III, *Carly Fiorina and Hewlett-Packard Severance Policy*, 3/24/2005 N.Y.L.J. 3 (col. 1).

51. The Company's 2005 proxy statement (filed February 11, 2005), described this $21.4 million severance payment as comprised of:

- A cash payment of $14,000,000.00;

- A cash payment of $5,880,000, "which represent[ed] Ms. Fiorina's award for the 2003-2004 program year of the LTPC Program"; and

- A cash payment of $1,503,700, "which represent[ed] Ms. Fiorina's award for the 2004-2005 program year of the LTPC Program."

14

1    52.    The Company's 2005 proxy statement also disclosed that, in addition to
2    statutory COBRA benefits, Fiorina would receive the following additional benefits that were
3    negotiated as part of her termination agreement:

4    •    $50,000 for "financial counseling, legal and outplacement services";

5    •    personal computer equipment and three months of administrative support;

6    •    administrative support for six months;

7    •    home security for one year; and

8    •    a cash payment for the balance of Fiorina's unused vacation time.

9    53.    Finally, the Company's 2005 proxy statement disclosed that following her
10   termination, Fiorina would receive the following additional financial benefits following her
11   termination:

12   •    Fiorina's outstanding options to purchase 6,065,852 shares of HP common
         stock with a weighted average exercise price of $35.73 as of the date of the
13       Agreement vested prior to her termination, with a one-year post-termination
         exercise period; and
14
15   •    Ms. Fiorina retained her vested rights under qualified HP retirement plans and
         under an HP excess benefit plan.

16   54.    According to an article published by the New York Times, Fiorina's pension
17   benefits (which amount to $200,000 per year) have a present value of at least $2 million, and
18   her vested options had a value of approximately $1 million as of the date of her termination.
19   In addition, however, the New York Times reported that the restricted stock Fiorina received
20   upon her hiring and which vested upon her termination was worth approximately $18.2
21   million as of February of 2005. Eric Dash, *Fiorina Exiting Hewlett-Packard With More Than*
22   *$42 Million*, The New York Times (Feb. 12, 2005).

23   55.    The exact terms of Fiorina's severance agreement, including the payment of the
24   amounts set forth above and Fiorina's negotiated-for release against HP, however, were not
25   disclosed to the HP shareholders until February 22, 2005, when the Company filed Fiorina's
26   Severance Agreement and Release as Exhibit 99.1 on Form 8-K.

27   56.    In sum, therefore, upon her termination Fiorina received benefits worth in
28   excess of $40 million. Of this amount, $21.4 million was negotiated directly as part of

15

Fiorina's termination agreement. The fact that this $21.4 million was negotiated as part of Fiorina's termination and thus constituted "severance" benefits was not revealed until Defendant Dunn conceded that the entire $21.4 million constituted "severance" benefits at the Company's 2005 annual meeting on March 16, 2005.

57. The HP Board of Directors never sought a vote of the shareholders before authorizing the $21.4 million severance payment to Fiorina. Further, as discussed below, Fiorina's severance payment violated the LTPC, the Severance Program and the Severance Policy.

### 1. Fiorina's Severance Payment Violated The LTPC

58. As discussed above, upon her termination, Fiorina received $7.4 million under the LTPC. According to HP, approximately $5.8 million of this payment related to the Company's performance in 2003-2004, and the balance of $1.5 million related to the Company's performance in 2004-2005.

59. As an initial matter, the LTPC was a three-year performance based plan, and payments were not designed to be made prior to the expiration of the three-year period. Further, because Fiorina's employment with HP terminated before she had completed three years of service (and her terminated did not involve retirement, permanent disability, death or workforce reduction), any accumulated payments to which Fiorina otherwise would have been entitled were forfeited.

60. After Fiorina's termination, however, the HP Board made a disclosure purporting to adopt a new interpretation of the LTPC that conflicted both with the actual terms of the plan, and the terms of the plan as the Company previously had described them to the HP shareholders. The Company's 2004 proxy disclosed the following relating to the LTPC Program:

> "Generally, if a participant is no longer employed by HP due to being placed in a workforce reduction program, disability, retirement or death, then targeted cash amounts are prorated. *In the event of other terminations, any banked amounts will be forfeited.*"

16

(Emphasis supplied). However, the Company's 2005 proxy statement, filed on February 11, 2005, *after* Fiorina's termination, described the relevant portion of the LTPC Program as follows:

> "Notwithstanding the foregoing, if a participant is no longer employed by HP due to involuntary termination, disability, retirement or death, targeted awards are paid subject to certain adjustments. *In the event of voluntary terminations, any banked amounts will be forfeited and no payment is made*"

(Emphasis supplied).

61. The Company's description of the LTPC Program in the 2005 proxy statement was directly contrary to the actual terms of the LTPC Program, both as written and as previously described to HP shareholders. The actual terms of the LTPC Program provided that any payments otherwise payable thereunder would be *forfeited* if an employee terminated employment prior to the expiration of the three year period for reasons other than retirement, disability, death, or workforce reduction. LTPC ¶ 4(b)

62. Moreover, although Paragraph 14(c) of the LTPC Program permitted the plan administrator to "increase or decrease" payments made to employees who terminated employment for reasons of retirement, disability, death, or workforce reduction, "and for exceptional circumstances," the language of this provision did *not* permit any payments to employees whose rights to payment thereunder were "forfeited" pursuant to Paragraph 4(b) of the plan.

63. Further, Paragraph 14(c) of the LTPC Program *expressly forbade* the exercise of any "discretion" that would have the effect of increasing payments that might have been payable under the plan to the Company's CEO. It states, that "[t]he Committee shall have the discretion to increase or decrease cash payout subject to this agreement . . . *except that such payout cannot be increased for Covered Employees as defined in Section 162(m) of the Internal Revenue Code of 1986,* as amended." As discussed above, under Section 162(m) of the Internal Revenue Code, the term "Covered Employee" includes "any employee of the taxpayer if – (A) as of the close of the taxable year, such employee is the *chief executive*

17

*officer* of the taxpayer or is an individual acting in such a capacity." 26 U S C. § 162(m) (emphasis added)

64. Accordingly, any payment to Fiorina upon her termination from HP violated the terms of the LTPC because she left the Company within the three year period for reasons other than retirement, permanent disability, death or workforce reduction. Moreover, to the extent the Company had discretion to increase amounts otherwise payable under the LPTC pursuant to Paragraph 14(c) thereof, the plain terms of the LPTC Program *expressly forbade the exercise of such discretion in favor of Fiorina* Under these circumstances, any payment to Fiorina under the LTPC was *ultra vires*, constituted a gift of corporate assets and, accordingly, corporate waste.

65. Even if Fiorina otherwise was entitled to any payment under the LTPC following her involuntary termination, Fiorina still should not have been entitled to any payment based on the Company's performance in 2004-2005 until after November 2005, because until then, there could be no telling if HP would meet the targets under the LTPC. To explain, HP operates on a fiscal year beginning on November 1 and ending on October 31 of the following year. Fiorina was involuntarily terminated on February 8, 2005, just three months and one week into the 2004-2005 fiscal year. Because the LTPC grants awards based on annual targets, it was impossible, as of February 2005, to determine whether HP would meet its financial targets for the 2004-2005 fiscal year until November 1, 2005 at the earliest.

66 Accordingly, the Board acted *ultra vires* by awarding Fiorina any payments under the LTPC.

### 2. Fiorina's Severance Payment Violated The Severance Program

67. The Severance Program provided, in pertinent part, as follows:

Participants will be eligible for the following severance payment in the event of a Qualifying Termination . :

- For an Executive Officer who holds the title of Chief Executive Officer within 90 days of termination of HP employment, a lump sum severance payment in an amount equivalent, before deductions, to 2.5 times the sum of his or her annual base salary and annual target cash bonus under the applicable short-term bonus plan, both as in effect immediately prior to separation from employment.

18

Severance Plan for Executives Officers of Hewlett-Packard Company (attached as Exhibit 10(Z)(Z) to HP's 10-K for the fiscal year ended October 31, 2003, filed with the SEC on January 20, 2004)

68    Fiorina's base salary immediately prior to termination was $1.4 million and her target bonus was $4.2 million.

69.    Although the $14 million payment is 2.5 times Fiorina's base salary and target cash bonus, the $14 million payment should have been offset by the payments Fiorina received under the LTPC. The Company's 2004 and 2005 Proxy Statements stated as follows: "Any payments under the severance program will be reduced by any cash severance benefit payable to the participant under any other HP plan, program or agreement, including cash amounts payable for the uncompleted portion of employment agreements and prorated cash bonuses under the applicable short-term bonus plan."[1]

70    As conceded by HP Chairman Dunn at the Company's 2005 Annual Meeting, the entire $21.5 million payment to Fiorina – including the $7.4 million Fiorina received under the LTPC Program – was a "severance" payment.

71.    By failing to offset Fiorina's payment under the Severance Program by the $7.4 million paid to her under the LTPC, the HP Board violated the Severance Program by awarding Fiorina $14 million under the Severance Program.

### 3.    Fiorina's Severance Payment Violated The Severance Policy

72    As discussed above, in July of 2003, the HP Board adopted a Severance Policy pursuant to which they committed not to pay "severance benefits" to any terminated executive in an amount that exceeds 2.99 times the executive's base salary and annual target bonus immediately preceding the termination, without seeking shareholder approval. The Company

---

[1] The Company's 2006 proxy statement contains the exact same language regarding the Severance Program. However, in July of 2005, presumably in response to outrage over the excessive severance benefits paid to Carly Fiorina, the HP Board amended the Company's Severance Program "to reduce the cash severance benefits payable to the CEO, Executive Vice Presidents and Senior Vice Presidents, and to base payments upon a multiple of annual base salary and actual bonuses paid rather than a multiple of annual base salary and target bonuses." HP 2006 Proxy Statement (Form 14A), filed January 23, 2006, at 50.

19

has, however, explained that certain payments would not be subject to the Severance Policy, "either because they have been previously earned or accrued or because they are consistent with Company Practices:"

    (a)    compensation and benefits earned, accrued, deferred or otherwise provided for employment services rendered on or prior to the date of termination of employment pursuant to bonus, retirement, deferred compensation or other benefit plans, $e.g.$, 401(k) plan distributions, payments pursuant to retirement plans, distributions under deferred compensation plans or payments for accrued benefits such as unused vacation days, and any amounts earned with respect to such compensation and benefits in accordance with the terms of the applicable plan;

    (b)    payments of prorated bonuses or prorated long-term incentive payments that are consistent with Company Practices;

    (c)    acceleration of the vesting of stock options, stock appreciation rights, restricted stock or long-term cash incentives that is consistent with Company Practices;

    (d)    payments or benefits required to be provided by law; and

    (e)    benefits and perquisites provided in accordance with the terms of any benefit plan, program or arrangement sponsored by HP or its affiliates that are consistent with Company Practices.

HP 2005 Proxy, at 39 (filed February 11, 2005).

    73.    Fiorina's base salary immediately prior to termination was $1.4 million and her target bonus was $4.2 million. Accordingly, the Severance Policy precluded the payment of any severance benefits to Fiorina in excess of $16.74 million without approval by the shareholders.[2]

    74.    As HP Chairman Dunn acknowledged, Fiorina received "severance benefits," including the payment pursuant to the LTPC, in the amount of $21.4 million.

    75.    Because Fiorina was involuntarily terminated, any payment to her under the LTPC Program was not consistent with "Company Practices" as they existed as of the date of her termination. As such, the LTPC payment to Fiorina did not fall within any exception to the Severance Policy.

---

[2] ($1.4 million + $4.2 million) x 2.99 = $16.74 million

76    The HP Board never sought shareholder approval for the $21.4 million severance payment to Fiorina.

77    The Board, therefore, acted *ultra vires* by failing to put Fiorina's severance payments to a shareholder vote.

## CLASS ACTION ALLEGATIONS

78.    Plaintiffs bring Counts II, III and IV of this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all other persons who own common stock of HP. Excluded from the Class are Defendants, as well as their affiliates of assigns.

79.    Counts II, III and IV are properly maintainable as class action counts.

80    The Class is so numerous that joinder of all members is impracticable   As of January 17, 2006, there were 2,820,994,034 shares outstanding of HP's common stock, held by individuals and entities and entities too numerous to bring separate actions.   It is reasonable to assume that holders of the common stock are geographically dispersed throughout the United States.

81.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member.  The common questions include, *inter alia*, the following:

(a)    Whether Defendants entered into an enforceable agreement with the HP shareholders precluding the HP Board of Directors from approving or authorizing any payment pursuant to any severance agreement to any executive in an amount in excess of 2.99 times the annual compensation of that executive without shareholder approval.

(b)    Whether the Company's payment of benefits to Fiorina worth in excess of $40 million following Fiorina's termination in February of 2005 violated the Company's stated policies of not paying any executive severance payments or benefits in excess of 2.99 times the executive's annual compensation without shareholder approval.

(c)    Whether Defendants violated their commitment to HP shareholders not to authorize or pay any severance agreement in excess of 2.99 times the executive's annual compensation without shareholder approval.

(d)    Whether Plaintiffs and Class members suffered financial loss as a result of Defendants' payment of $40 million in benefits to Carly Fiorina following her termination.

21

82    IBEW and the SEIU Funds are committed to prosecuting the Class counts and has retained competent counsel experienced in litigation of this nature. IBEW's and the SEIU Funds' claims are typical of the claims of other members of the Class. Accordingly, IBEW and the SEIU Funds are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

83.   Plaintiffs anticipate that there will be no difficulty in the management of Counts I and III as a class action.

84.   Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

85.   The prosecution of separate actions would create the risk of:

(a)    Inconsistent or varying adjudications which would establish incompatible standards for conduct for the Defendants; and/or

(b)    Adjudications which would as a practical matter be dispositive of the interests of other members of the Class.

## DERIVATIVE ALLEGATIONS

86    Plaintiffs bring Counts I, V, VI, VII, VIII, IX, X and XI below derivatively pursuant to Federal Rule of Civil Procedure 23.1 for the benefit of HP to redress injuries suffered by HP as a direct result of Defendants' decision to award Fiorina a severance package that far exceeded HP's any payments authorized under the Severance Policy, the Severance Program or the LTPC plan, and that was tantamount to corporate waste.

87    IBEW and the SEIU Funds have owned HP stock during the wrongful course of conduct alleged herein and continue to own HP stock.

88.   IBEW and the SEIU Funds will adequately and fairly represent the interests of HP and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in stockholder derivative litigation.

## DEMAND ON THE HP BOARD IS EXCUSED AS FUTILE

89    Plaintiffs hereby reallege and incorporate the allegations set forth in the preceding paragraphs as if fully set forth herein.

22

90. No demand has been made by IBEW or the SEIU Funds on HP's Board because demand is excused as a matter of law on derivative claims alleging that the Defendants violated Section 14(a) by causing the Company to publish false and misleading proxy statements.

91. No demand has been made by IBEW or the SEIU Funds on HP's Board to rectify the excessive severance awarded to Fiorina because the severance award was *ultra vires* and demand is excused for *ultra vires* acts.

92. The severance package was *ultra vires* because it exceeded the express terms of HP's LTPC plan, the Severance Program and the Severance Policy.

93. No demand has been made by IBEW or the SEIU Funds on HP's Board because demand is excused as futile where a majority of the board of directors are not independent.

94. At the time Plaintiffs filed the Complaint, the HP Board consisted of the following directors: Patricia Dunn, Lawrence Babbio, Richard Hackborn, John Hammergren, George Keyworth, Thomas Perkins, Robert Ryan, Lucille Salhany, Mark Hurd and Robert Wayman. Mark Hurd and Robert Wayman are both employees of the Company and as such lack the requisite independence to consider a demand. Of the remaining directors,

95. Defendants Babbio, Keyworth, and Ryan not independent of HP by virtue of their positions as directors and officers of companies which rely upon HP for their continued success. These relationships prevent these Defendants from considering Plaintiffs' demand on is corporate merits, rather than on extraneous considerations or influences. These disabling ties are set forth below.

**Lawrence Babbio**

96. Babbio has been Verizon's Vice Chairman and President since 2000, earning lucrative compensation. Specifically, Babbio earned $1,035,000, $1,106,800, and $1,200,000 in salary in 2003, 2004, and 2005, respectively; earned $1,418,000, $1,760,000, and $1,800,000 in bonuses in 2003, 2004, and 2005, respectively; and holds performance shares and restricted shares of Verizon worth approximately $6,494,535. Accordingly, Babbio has a

1  strong interest in Verizon's continued success and is unlikely to take actions that might
2  impede this success

3     97.  HP and Verizon have an ongoing business relationship which Babbio has an
4  interest in protecting. Notably, Verizon partners with HP for certain critical aspects of its
5  business, including providing the infrastructure necessary for its business customers to create
6  and operate call centers (referred to at Verizon as "Contact Centers") for their customers' use
7  Verizon expressly attributes the superiority of its Contact Center projects in relation to those
8  of its competitors to its "partners[hips] with call center technology leaders" such as HP,
9  stating on its website, "Because of our close working relationships with providers of world
10  class technologies, Verizon [Contact Center] projects experience fewer problems." Without
11  HP's substantial assistance in this critical aspect of its business, Verizon would not be able to
12  set itself apart from its competitors in this critical area of its business   HP's continued
13  assistance to Verizon enables Babbio to continue to earn his lavish compensation.

14     **George Keyworth**

15     98.  Keyworth has been the chairman and senior fellow with The Progress and
16  Freedom Foundation (the "Foundation") since 1995. Due to his substantial involvement with
17  the Foundation, Keyworth has an interest in its continued success   As a non-for-profit entity,
18  the Foundation depends on donations for its continued existence and operation, including
19  donations from HP, which the Foundation explicitly references as a "Sponsor" on its website.

20     **Robert Ryan**

21     99.  Ryan was the Senior Vice President and Chief Financial Officer of Medtronic
22  until his retirement in May 2005   Upon information and belief, Ryan continues to hold
23  significant amounts of Medtronic stock and, accordingly, has a continued interest in that
24  company's ongoing success. Medtronic has provided services to HP. As a continued holder
25  of Medtronic stock, Ryan is unlikely to take any actions that could impede Medtronic's
26  continued ability to do business with HP.

27     100. In addition, Ryan is on the board of General Mills.  General Mills does
28  substantial business with HP. In fact, General Mills operates its entire global enterprise—

24

including supply chain, product lifecycle management, finance, human resources, business intelligence, and data warehousing-- on HP systems. On May 22, 2002, HP announced that General Mills had signed a three-year, multi-million dollar, worldwide agreement making HP its preferred IT vendor for all General Mills divisions in the 70 countries in which it operates.

101. On January 20, 2004, HP announced that General Mills had decided to standardize all of its operations worldwide on the HP ProCurve Switch 5300xl series at its network edge. General Mills senior director of Information Systems MCV Johnson noted that the company's "valued relationship" with HP "has lasted more than twenty years and is one of the reasons [General Mills] decided to standardize [its] network in the HP ProCurve Switch 5300xl series."

102. These relationships compromise the independence of a majority of HP's Board. Accordingly, demand is excused as futile.

**COUNT I**
**(Against all Defendants)**
**Derivative Claim for Violation of Section 14(a) Of The Securities Exchange Act Of 1934**

103. Plaintiffs hereby reallege and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

104. Plaintiffs bring this claim derivatively on behalf of Hewlett-Packard.

105. The proxy statements filed on Form 14A by Hewlett-Packard Company on January 23, 2004, February 11, 2005, and January 23, 2006, contained the following representations about the Severance Policy:

> HP will seek stockholder approval for future severance agreements, if any, with senior executives that provide specific benefits if an amount exceeding 2.99 times the sum of the executive's current annual base salary plus annual target bonus, in each case as in effect immediately prior to the time of such executive's termination.

106. The proxy statements filed on Form 14A by Hewlett-Packard Company on January 23, 2004, February 11, 2005, and January 23, 2006, contained the following representations about the Severance Policy:

> The following benefits are not subject to the Severance Policy, either because they have been previously earned or accrued by the employee or because they are consistent with Company Practices: (a) compensation and benefits earned,

25

accrued, deferred or otherwise provided for employment services rendered on or prior to the date of termination of employment pursuant to bonus, retirement, deferred compensation or other benefit plans, e.g., 401(k) plan distributions, payments pursuant to retirement plans, distributions under deferred compensation plans or payments for accrued benefits such as unused vacation days, and any amounts earned with respect to such compensation and benefits in accordance with the terms of the applicable plan; (b) payments of prorated bonuses or prorated long-term incentive payments that are consistent with Company Practices; (c) acceleration of the vesting of stock options, stock appreciation rights, restricted stock or long-term cash incentives that is consistent with Company Practices; (d) payments or benefits required to be provided by law; and (e) benefits and perquisites provided in accordance with the terms of any benefit plan, program or arrangement sponsored by HP or its affiliates that are consistent with Company Practices.

107. The foregoing statements were false and misleading for the following reasons:

(a) Despite the Company's supposed commitment not pay severance benefits to senior executives in an amount in excess of 2.99 times the executive's annual salary plus bonus without shareholder approval, the HP Board, in fact, never intended to be bound by any such restriction and Defendants authorized the payment of $21.4 million in severance benefits to Carleton Fiorina without shareholder approval, even though such an amount was $4.656 million more than the limit set forth in the Severance Policy.

(b) Defendants failed to disclose that, when authorizing the severance benefits payable to Carleton Fiorina in February of 2005, they violated the express terms of the LTPC Program by making payments to Fiorina thereunder in an effort to justify paying severance benefits of $21.4 million to Fiorina without shareholder approval as "consistent with Company Practices," even though payments under the LTPC Program were prohibited to employees who were terminated for any reason other than retirement, death, disability or workforce reduction.

108. The proxy statements filed on Form 14A by Hewlett-Packard Company on January 23, 2004, and February 11, 2005, contained the following representations about the Severance Program:

Participants will be eligible for the following severance payment in the event of a Qualifying Termination . :

For an Executive Officer who holds the title of Chief Executive Officer within 90 days of termination of HP employment, a lump sum severance payment in an amount equivalent, before deductions, to 2.5 times the sum of his or her annual base salary and annual target cash bonus under the applicable short-term bonus plan, both as in effect immediately prior to separation from employment.

109. The proxy statements filed on Form 14A by Hewlett-Packard Company on January 23, 2004, February 11, 2005, and January 23, 2006, contained the following

26

representation about the Severance Program: "Any payments under the severance program will be reduced by any cash severance benefit payable to the participant under any other HP plan, program or agreement, including cash amounts payable for the uncompleted portion of employment agreements and prorated cash bonuses under the applicable short-term bonus plan."

110. The foregoing statements were false and misleading for the following reasons:

(a) The HP Board, in fact, never intended to be restricted in the payment of severance benefits by the Severance Program, and simply authorized payments under other HP compensation plans not formally denoted as "severance" plans in an effort to avoid compliance with the terms of the Severance Program;

(b) Defendants knew or should have known that the entire $21.4 million paid to Fiorina upon her involuntary termination, including the payment of $7.4 under the LTPC Program, constituted payment of negotiated severance benefits, yet Defendants failed to disclose that this $7.4 million payment was not set off against the $14 million payment to Fiorina authorized under the Severance Program.

111 The proxy statement filed on Form 14A by Hewlett-Packard Company on January 23, 2004, contained the following representation about the LTPC Program:

In May 2003, the HR and Compensation Committee approved a Long-Term Performance Cash ("LTPC") Program and granted awards under that program to selected senior managers, including the named executive officers. *The LTPC Program is designed to drive value creation and operational efficiency through balance sheet and total shareowner return ("TSR") performance measures, to retain top-performing and critical employees, and to reward senior managers for exceptional performance* The LTPC Program is also designed to reduce HP's use of option grants for senior executives and, therefore, its dilution levels. The total long-term incentive amount for each program participant is split between options and long-term performance cash.

The targeted LTPC cash award amount for each participant was divided roughly into thirds corresponding to the 3-year period of the LTPC Program (33% in the first and second years, 34% in the third) Annual milestones are set based on the performance metric of cash flow from operations as a percentage of revenue. At the end of each program year, if HP achieves a threshold level of performance, a percentage will be applied to each participant's targeted cash amount and banked on the participant's behalf. The percentage to be applied to each participant's targeted cash amount ranges from 0% to 150% based upon the extent to which performance goals are achieved Interest will be applied to banked amounts *If HP does not achieve a certain threshold level of performance for the year, the percentage applied will be zero and each participant's targeted cash amount for that program year will be forfeited*

27

At the end of the three-year performance period, the total banked amounts, if any, will be adjusted by applying a modifier based on HP's TSR (which includes reinvestment of dividends) relative to the TSR for the S&P 500 for the three-year period. The modifier to be applied to each participant's total banked amount ranges from 0% to 200%. *If HP does not achieve a certain threshold TSR relative to the TSR for the S&P 500, then the modifier will be zero, no payout will occur and all banked amounts will be forfeited. The ultimate payout under this program is dependent on HP's TSR relative to the TSR of the S&P 500 over the 3-year performance period, and therefore, payouts, if any, generally will occur at the end of the 3-year performance period.*

If cash flow from operations as a percentage of revenue is below the threshold, no amounts will be banked for the period. *Similarly, if TSR thresholds are not achieved for the three-year performance period, no payouts will be made and any banked amounts will be forfeited.* To achieve a modifier above 100%, HP's TSR must exceed the median of the TSR for the S&P 500 over the period, and, to achieve the maximum payout, HP's TSR must significantly exceed the median for S&P 500 companies.

*Generally, if a participant is no longer employed by HP due to being placed in a workforce reduction program, disability, retirement or death, then targeted cash amounts are prorated. In the event of other terminations, any banked amounts will be forfeited.*

(Emphasis supplied).

112. The foregoing statements were false and misleading because they failed to disclose that the HP Board intended to violate the terms of the LTPC Program without informing the shareholders in order to grant payments to HP employees terminated prior to the expiration of the three-year period following the adoption of the LTPC Program, including Fiorina, that otherwise would have been expressly prohibited under the terms of the LTPC Program as described to the HP shareholders. Specifically, the foregoing statements, and particularly the highlighted portions, gave the HP shareholders the belief that no payments would be made to any HP employees under the LTPC Program prior to the expiration of the three-year period following the adoption of the LTPC Program. Further, these statements caused the HP employees to believe that any amounts "banked" under the terms of the plan would be "forfeited" by any employee whose employment was terminated for any reason other than retirement, death, disability or workforce reduction prior to the expiration of the three-year period following the adoption of the LTPC Program. Finally, these statements caused the HP shareholders to believe that one of the primary purposes of the LTPC Program was "to retain top-performing and critical employees" and to provide an

28

incentive to those employees to maximize returns for shareholders. These statements were materially misleading, however, because at the time they were made, the Defendants did not inform the HP shareholders that the HP Board retained the right to violate the terms of the LTPC Program without informing the shareholders in order to authorize payments under the LTPC Program that would have been directly contrary to the express terms of the program, and the terms and purposes of the program as explained to the HP shareholders.

113. The proxy statement filed on Form 14A by Hewlett-Packard Company on February 11, 2005, contained the following representation about the LTPC Program:

> In May 2004, the HR and Compensation Committee granted awards under the Long-Term Performance Cash Program (the "LTPC Program") to selected senior managers, including the named executive officers. *The LTPC Program was established in fiscal 2003 to drive value creation and operational efficiency through balance sheet and total stockholder return ("TSR") performance measures, to retain top-performing and critical employees, and to reward senior managers for exceptional performance.* The LTPC Program also is designed to reduce HP's use of option grants for senior executives and, therefore, HP's dilution levels. The total target long-term incentive amount for each program participant is split between options and long-term performance cash, as follows. First, a target number of option equivalents for each participant is determined. Fifty percent (for executive officers and other higher level participants) or two-thirds (for remaining participants) of this target amount is then granted to the participant in the form of options, and the remaining value (as determined in accordance with a modified Black-Scholes valuation model) is used as the target long-term performance cash payout amount under the LTPC Program for such participant. Awards to the named executive officers under the LTPC Program were granted pursuant to the Hewlett-Packard Company 2004 Stock Incentive Plan, which has been approved by HP stockholders.

> The targeted long-term performance cash award amount for each participant was divided approximately into thirds corresponding to the three-year performance period of the LTPC Program (33% in the first and second years, 34% in the third). Annual milestones are set based on the performance metric of cash flow from operations as a percentage of revenue. At the end of each year, if HP achieves a threshold level of performance, a percentage will be applied to each participant's targeted cash amount and banked on the participant's behalf. The percentage to be applied to each participant's targeted cash amount ranges from 0% to 150% based upon the extent to which performance goals are achieved. Interest, using the applicable federal rates determined by the Internal Revenue Service (the "IRS"), will be applied to banked amounts. If HP does not achieve a certain threshold level of performance for the year, the percentage applied will be zero.

> At the end of the three-year performance period, the total banked amounts, if any, will be adjusted by applying a modifier based on HP's TSR (which includes reinvestment of dividends) relative to the TSR for the S&P 500 for the three-year performance period. The modifier to be applied to each participant's total banked amount ranges from 0% to 200%. If HP does not achieve a certain

29

threshold TSR relative to the TSR for the S&P 500, then the modifier will be
zero, and any banked amounts held by then current participants will be forfeited.
*The ultimate payout under this program is dependent on HP's TSR relative to the
TSR of the S&P 500 over the three-year performance period, and therefore,
payouts, if any, generally will occur at the end of such three-year period*

If cash flow from operations as a percentage of revenue is below the
threshold, no amounts will be banked for the year. Similarly, if TSR thresholds
are not achieved for the three-year performance period, any banked amounts held
by then current participants at the end of the period will be forfeited. To achieve a
modifier above 100%, HP's TSR must exceed the median of the TSR for the S&P
500 over the three-year performance period, and, to achieve the maximum payout,
HP's TSR must significantly exceed the median for S&P 500 companies

*Notwithstanding the foregoing, if a participant is no longer employed by
HP due to involuntary termination, disability, retirement or death, targeted
awards are paid subject to certain adjustments In the event of voluntary
terminations, any banked amounts will be forfeited and no payment is made*

(Emphasis supplied).

114. The foregoing statements were false and misleading because they failed to
disclose that the Defendants violated the terms of the LTPC Program by authorizing a $7.4
million payment to Fiorina that was barred under the express terms of the plan, and as the
terms of that plan were explained to the HP shareholders in the Company's 2004 proxy
statement. The statements were also false and misleading because they incorrectly
represented that "[t]he ultimate payout" under the program was dependent on the Company
meeting certain three-year projected goals, when the truth of the matter is that the Defendants
had authorized a $7.4 million payment to Fiorina just one year and three months into the
period, when it was impossible to determine whether such goals for the second and third years
would be met.

115. The Company's 2005 proxy statement contained the following representations
about the termination of Fiorina:

HP entered into a Severance Agreement and Release (together, the "Agreement"),
dated February 8, 2005, with Carleton S. Fiorina, who terminated as HP's
Chairman and Chief Executive Officer and resigned as a director of HP on
February 8, 2005. Pursuant to the Agreement, and in accordance with the terms of
the HP Severance Program for Senior Executives adopted in 2003 (as described
above), HP will make a cash payment of $14,000,000 to Ms Fiorina, which
represents 2.5 times her base salary and targeted annual cash bonus This amount
will be payable six months after the date of the Agreement, together with interest
at an annual rate of 2.78% In addition, Ms Fiorina will receive a payout of
$5,880,000, which represents Ms Fiorina's award for the 2003-2004 program

30

year of the LTPC Program, and a payout of $1,502,700, which represents a prorated amount of Ms. Fiorina's award for the 2004-2005 program year of the LTPC Program, in each case calculated to reflect cash flow and TSR performance metrics established under the LTPC Program with respect to each program year at target. ...

HP 2005 Proxy at 40.

116. The Company's 2006 proxy statement contained the following representations about the termination of Fiorina:

> Carleton S. Fiorina terminated as HP's Chairman and CEO and resigned as a director of HP on February 8, 2005. In light of the then-current HP Severance Plan for Senior Executives, various plans in which Ms. Fiorina participated and past practice with respect to certain other employees whose employment with HP terminated, HP entered into a Severance Agreement and Release (together, the "Agreement") with Ms. Fiorina, dated February 8, 2005. Pursuant to the Agreement, and in accordance with the terms of the HP Severance Program for Senior Executives adopted in 2003, prior to its 2005 amendment (as described above), HP made a cash payment of $14,000,000 to Ms. Fiorina, which represented 2.5 times her base salary and targeted annual cash bonus. This amount was paid six months after the date of the Agreement, together with interest at an annual rate of 2.78%. In addition, Ms. Fiorina received a payout of $5,880,000, which represented Ms. Fiorina's award for the 2003-2004 program year of the LTPC Program, and a payout of $1,502,700, which represented a prorated amount of Ms. Fiorina's award for the 2004-2005 program year of the LTPC Program, in each case calculated to reflect cash flow and total shareholder return performance metrics established under the LTPC Program with respect to each program year at target

HP 2006 Proxy at 57.

117. The foregoing statements were false and misleading because they failed to disclose (1) that the payments to Fiorina under the LTPC plan violated the express provisions of that plan because Fiorina was terminated for reasons other than death, disability, retirement or workforce reduction prior to the expiration of the three year period following the adoption of the LTPC plan and thus forfeited any right to receive payment under that plan, and because the express terms of the plan precluded the Board from exercising any discretion to increase the amount that Fiorina otherwise would be entitled to under the terms of the plan (*i.e.*, $0.00); (2) that the payments to Fiorina under the LTPC were negotiated as part of her termination and as a result constituted "severance" payments; (3) that the payments to Fiorina violated the terms of the Severance Program because the payments under the LTPC program were required to have been set off against any payments that were otherwise authorized under

31

the Severance Program; and (4) that the total payments violated the terms of the Severance Policy because they exceeded 2.99 times Fiorina's annual pay and bonus immediately preceding her termination and the HP Board did not seek or obtain shareholder approval for any such payments.

118. Defendants caused the Company to make the false and misleading statements identified above in the Company's 2004 proxy statement in order (1) to elicit shareholder support for the election of directors, including the Defendants, and (2) to elicit shareholder support for the HP 2004 Stock Incentive Plan, as set forth above in Paragraphs 42-44.

119. Defendants, except Fiorina, caused the Company to make the false and misleading statements identified above in the Company's 2005 proxy statement in order (1) to elicit shareholder support for the election of directors, including the Defendants, (2) to elicit shareholder support certain for the issuance of an additional 75 million shares for the Hewlett-Packard Company 2000 Employee Stock Purchase Plan, as set forth above in Paragraphs 42-44.

120. Defendants, except Fiorina and Knowling, caused the Company to make the false and misleading statements identified above in the Company's 2006 proxy statement in order (1) to elicit shareholder support for the election of directors, including Defendants (except Fiorina), (2) to elicit shareholder support for the HP 2005 Pay-for-Results Plan, and (3) to elicit shareholder votes *against* shareholder proposals advocating the adoption policies opposed by the Board (*i e*, a majority voting policy for directors election, and a policy for the recovery of unearned performance-based bonuses), as set forth above in Paragraphs 46-47.

121. The foregoing statements were material to the HP shareholders' consideration of the election of directors, the approval of certain compensation-related proposals for which the HP Board sought shareholder approval, and the rejection of certain policies opposed by the Board, in 2004, 2005, and 2006 as set forth above in Paragraphs 42-47.

122. The proxy statement published by the Company on January 23, 2004, was an essential link in the Defendants' solicitation of shareholder approval for the election of

1 Babbio, Dunn, Fiorina, Hackborn, Keyworth, Knowling, Sanford M. Litvack, Ryan and
2 Salhany, and for shareholder approval of the Company's 2004 Stock Incentive Plan.

3     123. The proxy statement published by the Company on February 11, 2005, was an
4 essential link in the Defendants' (except Fiorina's) solicitation of shareholder approval for the
5 election of Babbio, Dunn, Hackborn, Keyworth, Knowling, Perkins, Ryan, Salhany and
6 Robert P. Wayman, and for shareholder approval of the issuance of an additional 75 million
7 shares for the Company's 2000 Employee Stock Purchase Plan.

8     124. The proxy statement published by the Company on January 23, 2006, was an
9 essential link in the Defendants' (except Fiorina's) solicitation of (1) shareholder approval for
10 the election of Dunn, Babbio, Baldauf, Hackborn, John H. Hammergren, Mark V. Hurd,
11 Keyworth, Perkins, Ryan, Salhany, and Wayman; (2) shareholder approval of the Company's
12 2005 Pay-for-Results Plan; and (3) shareholder opposition to shareholder proposals
13 advocating the adoption policies opposed by the Board (*i.e.*, a majority voting policy for
14 directors election, and a policy for the recovery of unearned performance-based bonuses)

15
16

**COUNT II**
**(Against all Defendants)**
**Class Claim For Breach Of Contract**

17     125. Plaintiffs hereby reallege and incorporate the allegations in the preceding
18 paragraphs as if fully set forth herein.

19     126. Plaintiffs bring this claim as a direct claim, on behalf of themselves and all
20 those similarly situated, against Defendants for breach of contract.

21     127. Defendants promised Plaintiffs and the Company's other shareholders that they
22 would be given a vote on any future severance payment that exceeded 2.99 times the sum of a
23 senior executive's base salary and target bonus in order to induce Plaintiffs and HP's other
24 shareholders to elect them to the Board, to vote in favor of the other compensation and
25 benefits related proposals, and to vote against shareholder resolutions advocating the adoption
26 of policies opposed by the Board, as set forth above in Paragraphs 42-47.

27     128. Plaintiffs and the other HP shareholders, relying on the promise that it would be
28 given a vote on future severance payments, voted in favor of the Board and approved the

33

compensation and benefits related proposals, and voted against the shareholder resolutions opposed by the Board, as set forth above in Paragraphs 42-47.

129. Defendants, having secured the support of HP shareholders, failed to honor their promise and awarded Fiorina a severance package that exceeded 2.99 times her base salary and target bonus without seeking or obtaining shareholder approval.

**COUNT III**
**(Against all Defendants)**
**Class Claim for Promissory Fraud**

130. Plaintiffs hereby reallege and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

131. Plaintiffs bring this claim as a direct claim on behalf of themselves and all those similarly situated, against Defendants for promissory fraud.

132. Defendants falsely promised Plaintiffs and the Company's other shareholders that they would be given a vote on any future severance payment that exceeds 2.99 times the sum of a senior executives' base salary and target bonus in order to induce Plaintiffs and HP's other shareholders to elect them to the Board, to vote in favor of the other compensation and benefits-related proposals proposed by the Board and against the shareholder proposals opposed by the Board, as set for the above in Paragraphs 42-47.

133. Defendants further falsely promised Plaintiffs and the Company's other shareholders that HP would not award the CEO a severance package that exceeded 2.5 times his base salary and target bonus in order to induce Plaintiffs and HP's other shareholders to elect them to the Board and to vote in favor of the other compensation and benefits-related proposals proposed by the Board and against the shareholder proposals opposed by the Board, as set for the above in Paragraphs 42-47.

134. Defendants made these promises knowing that they had no intent to meet the commitments they made to Plaintiffs and other HP shareholders regarding (i) affording shareholders the opportunity to vote on future severance payment that exceeded 2.99 times the salary and target bonus of terminated employees and (ii) not award the CEO severance payments that exceeds 2.5 times his base salary and target bonus.

34

135. Upon information and belief, Fiorina's termination and severance payments presented Defendants with the first opportunity to fulfill their commitment to Plaintiffs and HP's other shareholders regarding severance payments. Defendants did not even attempt to meet their commitments and instead, as set forth in Paragraphs 58-66 above, disguised severance payments to Fiorina as incentive payments under HP's LTPC Program.

136. Had Plaintiffs and HP's other shareholders understood that Defendants did not intend to fulfill their commitments to them, they would not have voted in favor of the Board, approved the compensation and benefits-related proposals recommended by the Board, or voted against the shareholder resolutions opposed by the Board, set forth in Paragraphs 42-47 above, and thus were injured as a result of Defendants' misrepresentations.

**COUNT IV**
**(Against all Defendants)**
**Class Claim For Breach Of The Duty Of Disclosure**

137. Plaintiffs hereby reallege and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

138. Plaintiffs bring this claim as a direct claim, on behalf of themselves and all those similarly situated, against Defendants for breach of their fiduciary duty of disclosure.

139. On January 23, 2004, Defendants caused the Company to publish the HP 2004 proxy statement. As set forth above, the Company's 2004 proxy statement was false and misleading because:

- Defendants falsely represented the terms of the LTPC program by failing to inform shareholders that the Board retained discretion to authorize payments that were otherwise precluded under the plan;

- Defendants failed to inform the shareholders that the Board never intended to be restricted by the limit set forth in the Severance Policy that the Company would not, in the absence of shareholder approval, pay severance benefits to any terminated employee in an amount in excess of 2.99 time the terminated employee's annual pay plus bonus immediately prior to termination; and

- Defendants failed to inform the shareholders that the Board never intended to be restricted by the limit set forth in the Severance Program regarding severance benefits payable to specific employees.

35

140. On February 11, 2005, Defendants, except Fiorina, caused the Company to publish the HP 2005 proxy statement. As set forth above, the Company's 2005 proxy statement was false and misleading because:

- Defendants falsely represented the terms of the LTPC program regarding payments authorized under the plan to employees terminated prior to the expiration of the three year period following the adoption of the plan, by falsely representing that payments under the plan would only be forfeited in the event of voluntary terminations;

- Defendants failed to inform the shareholders that the Board never intended to be restricted by the limit set forth in the Severance Policy that the Company would not, in the absence of shareholder approval, pay severance benefits to any terminated employee in an amount in excess of 2.99 time the terminated employee's annual pay plus bonus immediately prior to termination;

- Defendants failed to inform the shareholders that the Board never intended to be restricted by the limit set forth in the Severance Program regarding severance benefits payable to specific employees;

- Defendants concealed the fact that they had violated the terms of the LTPC plan by authorizing a payment to Fiorina that was expressly barred under the terms of that plan;

- Defendants concealed the fact that the payments authorized to Fiorina under the LTPC plan were structured as part of her termination, and as such constituted a "severance" payment;

- Defendants concealed the fact that they had approved a severance payment to Fiorina in excess of the 2.99 limit imposed by the Severance Policy without shareholder approval, by characterizing a portion of the total severance benefits paid to Fiorina as being paid pursuant to the LTPC plan; and

- Defendants concealed the fact that they had violated the terms of the Severance Program by failing to set off against the payment authorized to Fiorina under that plan by the amount paid to Fiorina under the LTPC plan.

141. On January 23, 2006, Defendants, except Fiorina and Knowling, caused the Company to publish the HP 2006 proxy statement. As set forth above, the Company's 2006 proxy statement was false and misleading because:

- Defendants failed to inform the shareholders that the Board never intended to be restricted by the limit set forth in the Severance Policy that the Company would not, in the absence of shareholder approval, pay severance benefits to any terminated employee in an amount in excess of 2.99 time the terminated employee's annual pay plus bonus immediately prior to termination;

- Defendants failed to inform the shareholders that the Board never intended to be restricted by the limit set forth in the Severance Program regarding severance benefits payable to specific employees;

36

- Defendants concealed the fact that they had violated the terms of the LTPC plan by authorizing a payment to Fiorina that was expressly barred under the terms of that plan;

- Defendants concealed the fact that the payments authorized to Fiorina under the LTPC plan were structured as part of her termination, and as such constituted a "severance" payment;

- Defendants concealed the fact that they had approved a severance payment to Fiorina in excess of the 2.99 limit imposed by the Severance Policy without shareholder approval, by characterizing a portion of the total severance benefits paid to Fiorina as being paid pursuant to the LTPC plan; and

- Defendants concealed the fact that they had violated the terms of the Severance Program by failing to set off against the payment authorized to Fiorina under that plan by the amount paid to Fiorina under the LTPC plan.

142. The foregoing misleading statements and material omissions were material to the HP shareholders' consideration of the election of directors, the approval of certain compensation-related proposals for which the HP Board sought shareholder approval, and the rejection of certain policies opposed by the Board, in 2004, 2005, and 2006, as set forth above in Paragraphs 42-47.

143. Based on the misrepresentations contained in and the material disclosures omitted from the Company's 2004 proxy statement, HP's shareholders approved the election of Babbio, Dunn, Fiorina, Hackborn, Keyworth, Knowling, Litvack, Ryan and Salhany, and approved the Company's 2004 Stock Incentive Plan.

144. Based on the misrepresentations contained in and the material disclosures omitted from the Company's 2005 proxy statement, HP's shareholders approved the election of Babbio, Dunn, Hackborn, Keyworth, Knowling, Perkins, Ryan, Salhany and Wayman, and approved the issuance of an additional 75 million shares for the Company's 2000 Employee Stock Purchase Plan.

145. Based on the misrepresentations contained in and the material disclosures omitted from the Company's 2006 proxy statement, HP's shareholders (1) approved the election of Dunn, Babbio, Baldauf, Hackborn, John H. Hammergren, Mark V. Hurd, Keyworth, Perkins, Ryan, Salhany, and Wayman; (2) approved the Company's 2005 Pay-for-Results Plan; and (3) opposed shareholder proposals advocating the adoption policies opposed

37

by the Board (*i e*, a majority voting policy for directors election, and a policy for the recovery of unearned performance-based bonuses).

146. HP's shareholders were harmed as a result of the foregoing by being deprived of the opportunity to cast a fully informed vote on the matters considered at the Company's 2004, 2005 and 2006 annual meetings

## COUNT V
### (Against all Defendants)
### Derivative Claim For Breach Of The Duty Of Disclosure

147. Plaintiffs hereby reallege and incorporate the allegations in the preceding paragraphs as if fully set forth herein

148. Plaintiffs bring this claim derivatively on behalf of Hewlett-Packard

149. On January 23, 2004, Defendants caused the Company to publish the HP 2004 proxy statement. As set forth above, the Company's 2004 proxy statement was false and misleading because:

- Defendants falsely represented the terms of the LTPC program by failing to inform shareholders that the Board retained discretion to authorize payments that were otherwise precluded under the plan;

- Defendants failed to inform the shareholders that the Board never intended to be restricted by the limit set forth in the Severance Policy that the Company would not, in the absence of shareholder approval, pay severance benefits to any terminated employee in an amount in excess of 2.99 time the terminated employee's annual pay plus bonus immediately prior to termination; and

- Defendants failed to inform the shareholders that the Board never intended to be restricted by the limit set forth in the Severance Program regarding severance benefits payable to specific employees

150. On February 11, 2005, Defendants, except Fiorina, caused the Company to publish the HP 2005 proxy statement. As set forth above, the Company's 2005 proxy statement was false and misleading because:

- Defendants falsely represented the terms of the LTPC program regarding payments authorized under the plan to employees terminated prior to the expiration of the three year period following the adoption of the plan, by falsely representing that payments under the plan would only be forfeited in the event of voluntary terminations;

- Defendants failed to inform the shareholders that the Board never intended to be restricted by the limit set forth in the Severance Policy that the Company would not, in the absence of shareholder approval, pay severance benefits to any

38

terminated employee in an amount in excess of 2.99 time the terminated employee's annual pay plus bonus immediately prior to termination;

- Defendants failed to inform the shareholders that the Board never intended to be restricted by the limit set forth in the Severance Program regarding severance benefits payable to specific employees;

- Defendants concealed the fact that they had violated the terms of the LTPC plan by authorizing a payment to Fiorina that was expressly barred under the terms of that plan;

- Defendants concealed the fact that the payments authorized to Fiorina under the LTPC plan were structured as part of her termination, and as such constituted a "severance" payment;

- Defendants concealed the fact that they had approved a severance payment to Fiorina in excess of the 2.99 limit imposed by the Severance Policy without shareholder approval, by characterizing a portion of the total severance benefits paid to Fiorina as being paid pursuant to the LTPC plan; and

- Defendants concealed the fact that they had violated the terms of the Severance Program by failing to set off against the payment authorized to Fiorina under that plan by the amount paid to Fiorina under the LTPC plan

151    On January 23, 2006, Defendants, except Fiorina and Knowling, caused the Company to publish the HP 2006 proxy statement   As set forth above, the Company's 2006 proxy statement was false and misleading because:

- Defendants failed to inform the shareholders that the Board never intended to be restricted by the limit set forth in the Severance Policy that the Company would not, in the absence of shareholder approval, pay severance benefits to any terminated employee in an amount in excess of 2.99 time the terminated employee's annual pay plus bonus immediately prior to termination;

- Defendants failed to inform the shareholders that the Board never intended to be restricted by the limit set forth in the Severance Program regarding severance benefits payable to specific employees;

- Defendants concealed the fact that they had violated the terms of the LTPC plan by authorizing a payment to Fiorina that was expressly barred under the terms of that plan;

- Defendants concealed the fact that the payments authorized to Fiorina under the LTPC plan were structured as part of her termination, and as such constituted a "severance" payment;

- Defendants concealed the fact that they had approved a severance payment to Fiorina in excess of the 2.99 limit imposed by the Severance Policy without shareholder approval, by characterizing a portion of the total severance benefits paid to Fiorina as being paid pursuant to the LTPC plan; and

- Defendants concealed the fact that they had violated the terms of the Severance Program by failing to set off against the payment authorized to Fiorina under that plan by the amount paid to Fiorina under the LTPC plan.

39

152. The foregoing misleading statements and material omissions were material to the HP shareholders' consideration of the election of directors, the approval of certain compensation-related proposals for which the HP Board sought shareholder approval, and the rejection of certain policies opposed by the Board, in 2004, 2005, and 2006, as set forth above in Paragraphs 42-47.

153. Based on the misrepresentations contained in and the material disclosures omitted from the Company's 2004 proxy statement, HP's shareholders approved the election of Babbio, Dunn, Fiorina, Hackborn, Keyworth, Knowling, Litvack, Ryan and Salhany, and approved the Company's 2004 Stock Incentive Plan.

154. Based on the misrepresentations contained in and the material disclosures omitted from the Company's 2005 proxy statement, HP's shareholders approved the election of Babbio, Dunn, Hackborn, Keyworth, Knowling, Perkins, Ryan, Salhany and Wayman, and approved the issuance of an additional 75 million shares for the Company's 2000 Employee Stock Purchase Plan.

155. Based on the misrepresentations contained in and the material disclosures omitted from the Company's 2006 proxy statement, HP's shareholders (1) approved the election of Dunn, Babbio, Baldauf, Hackborn, John H Hammergren, Mark V Hurd, Keyworth, Perkins, Ryan, Salhany, and Wayman; (2) approved the Company's 2005 Pay-for-Results Plan; and (3) opposed shareholder proposals advocating the adoption policies opposed by the Board (*i e* , a majority voting policy for directors election, and a policy for the recovery of unearned performance-based bonuses)

156. HP was harmed as a result of the foregoing by the fact that it has incurred and will incur additional expense resulting from the compensation-related proposals approved by the shareholders based on false and misleading proxy solicitations by the Defendants

## COUNT VI
### (Against all Defendants)
### Derivative Claim For *Ultra Vires* Acts -- Violation of LTPC Plan

157. Plaintiffs hereby reallege and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

158. Plaintiffs bring this claim derivatively on behalf of Hewlett-Packard.

159. Defendants Dunn, Babbio, Hackborn, Keyworth, Knowling, Perkins, Ryan, Salhany and Fiorina were fiduciaries of HP's public shareholders at all times relevant to this Count. As such, they owed the shareholders the highest duties of good faith, fair dealing and loyalty and due care.

160. The award of $7.4 million to Fiorina under the LTPC violated the terms of the plan and was *ultra vires*.

161. The express terms of the LTPC precluded payments to employees who terminated employment with HP for reasons other than death, disability, retirement or workforce reduction, prior to the expiration of the three year period subsequent to the plan's adoption.

162. The express terms of the LTPC precluded the exercise of any "discretion" to increase any payments to the Company's CEO, including Fiorina.

163. Notwithstanding these provisions, Defendants approved, and Fiorina accepted, a payment to Fiorina of $7.4 million under the LTPC despite the fact that she was involuntarily terminated by HP prior to the expiration of the three year period following the adoption of the LTPC.

164. In addition, because Defendants Dunn, Babbio, Hackborn, Keyworth, Knowling, Perkins, Ryan, Salhany and Fiorina were elected to the Board based on false and misleading proxy statements, their elections are voidable, and any actions taken by these Defendants in their purported capacities as directors, including their authorization of the $7.4 million payment to Fiorina under the LTPC plan, were *ultra vires* and voidable.

41

165. Any effort taken by these Defendants to award payments in violation of the plain terms of the LTPC Program, following their election as directors pursuant to the false and misleading HP 2004 Proxy Statement, was *ultra vires* and void

166. As a result of Defendants breaches of fiduciary duties HP and its shareholders were damaged.

**COUNT VII**
**(Against all Defendants)**
**Derivative Claim For *Ultra Vires* Acts -- Violation of The Severance Program**

167. Plaintiffs hereby reallege and incorporate the allegations in the preceding paragraphs as if fully set forth herein

168. Plaintiffs bring this claim derivatively on behalf of Hewlett-Packard.

169. Defendants Dunn, Babbio, Hackborn, Keyworth, Knowling, Perkins, Ryan, Salhany and Fiorina were fiduciaries of HP's public shareholders at all times relevant to this Count. As such, they owed the shareholders the highest duties of good faith, fair dealing and loyalty and due care.

170. The award of $14 1 million to Fiorina under the Severance Program violated the terms of the plan and was *ultra vires*

171. The express terms of the Severance Program precluded the payment of any severance benefits to any terminated employee in an amount in excess of 2.5 times that employee's annual pay and target bonus prior to termination, and required any benefits payable under that plan to be "reduced by any cash severance benefit payable to the participant under any other HP plan, program or agreement, including cash amounts payable for the uncompleted portion of employment agreements and prorated cash bonuses under the applicable short-term bonus plan."

172. Defendant Dunn confirmed that Fiorina received severance payments in the amount of $21 4 million, which included $14 million paid under the Severance Program, and an additional $7 4 million paid under the LTPC.

42

173. Because the $7.4 million paid to Fiorina under the LTPC, as Defendant Dunn acknowledged, constituted a "severance" payment, the $14 million paid to Fiorina under the Severance Program should have been offset by that amount.

174. By failing to offset the $14 million paid to Fiorina under the Severance Program by the $7.4 million paid to her under the LTPC, Defendants violated the Severance Program.

175. In addition, because Defendants Dunn, Babbio, Hackborn, Keyworth, Knowling, Perkins, Ryan, Salhany and Fiorina were elected to the Board based on false and misleading proxy statements, their elections are voidable, and any actions taken by these Defendants in their purported capacities as directors, including their authorization of the $14 million payment to Fiorina under the Severance Program, were *ultra vires* and voidable.

176. Any effort taken by these Defendants to award payments in violation of the plain terms of the Severance Program, following their election as directors pursuant to the false and misleading HP 2004 Proxy Statement, was *ultra vires* and void.

177. As a result of Defendants breaches of fiduciary duties HP and its shareholders were damaged.

### COUNT VIII
**(Against all Defendants)**
**Derivative Claim For *Ultra Vires* Acts -- Violation of The Severance Policy**

178. Plaintiffs hereby reallege and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

179. Plaintiffs bring this claim derivatively on behalf of Hewlett-Packard.

180. Defendants Dunn, Babbio, Hackborn, Keyworth, Knowling, Perkins, Ryan, Salhany and Fiorina were fiduciaries of HP's public shareholders at all times relevant to this Count. As such, they owed the shareholders the highest duties of good faith, fair dealing and loyalty and due care.

181. The Severance Policy precluded, in the absence of shareholder approval, the payment of any severance benefits to any terminated employee in an amount in excess of 2.99 times the terminated employee's annual salary plus target bonus immediately prior to termination.

43

182  Immediately prior to Fiorina's termination, Fiorina's base salary immediately was $1.4 million and her target bonus was $4.2 million.  Accordingly, the Severance Policy precluded the payment of any severance benefits to Fiorina in excess of $16.74 million without approval by the shareholders.

183.  Defendants authorized, and Fiorina accepted, the payment of $21.4 million in severance benefits to Fiorina without seeking shareholder approval.

184  By failing to seek and obtain shareholder approval prior to authorizing (and in Fiorina's case, accepting) the $21.4 million in severance benefits paid to Fiorina, Defendants violated the Severance Policy.

185.  In addition, because Defendants Dunn, Babbio, Hackborn, Keyworth, Knowling, Perkins, Ryan, Salhany and Fiorina were elected to the Board based on false and misleading proxy statements, their elections are voidable, and any actions taken by these Defendants in their purported capacities as directors, including their authorization of the payment of $21.4 million in severance benefits to Fiorina, were *ultra vires* and voidable.

186.  Any effort taken by these Defendants to award payments in violation of the Severance Policy, following their election as directors pursuant to the false and misleading HP 2004 Proxy Statement, was *ultra vires* and void.

187  As a result of Defendants breaches of fiduciary duties HP and its shareholders were damaged.

**COUNT IX**
**(Against all Defendants)**
**Derivative Claim For *Ultra Vires* Acts -- Void Acts As Directors**

188.  Plaintiffs hereby reallege and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

189.  Plaintiffs bring this claim derivatively on behalf of Hewlett-Packard.

190.  Defendants Dunn, Babbio, Hackborn, Keyworth, Knowling, Perkins, Ryan, Salhany and Fiorina were fiduciaries of HP's public shareholders at all times relevant to this Count.  As such, they owed the shareholders the highest duties of good faith, fair dealing and loyalty and due care.

44

191. Because Defendants Dunn, Babbio, Hackborn, Keyworth, Knowling, Perkins, Ryan, Salhany and Fiorina were elected to the Board based on false and misleading proxy statements, their elections are voidable, and any actions taken by these Defendants in their purported capacities as directors were *ultra vires* and voidable.

192. Based on the false and misleading statements set forth above, at the Company's 2004 annual meeting, the Board sought and obtained shareholder approval for the Hewlett-Packard Company 2004 Stock Incentive Plan.

193. Based on the false and misleading statements set forth above, at the Company's 2005 annual meeting, the Board sought and obtained shareholder support for the issuance of an additional 75 million shares for the Hewlett-Packard Company 2000 Employee Stock Purchase Plan.

194. Based on the false and misleading statements set forth above, at the Company's 2006 annual meeting took, the Board sought and obtained shareholder approval for the election of directors and for another compensation-related proposal entitled the Hewlett-Packard Company 2005 Pay-for-Results Plan.

195. Defendants' actions to implement the 2004 Stock Incentive Plan, the issuance of an additional 75 million shares for the Hewlett-Packard Company 2000 Employee Stock Purchase Program, and the amendments to the Hewlett-Packard Company 2005 Pay-for-Results Plan, were taken in their capacities as directors elected pursuant to false and misleading proxy statements, and as a result were *ultra vires* and voidable

196. As a result of Defendants breaches of fiduciary duties HP and its shareholders were damaged

45

**COUNT X**
**(Against all Defendants *except* Carleton Fiorina)**
**Derivative Claim for Breach of Fiduciary Duty – Corporate Waste**

197  Plaintiffs hereby reallege and incorporate the allegations in the preceding paragraphs as if fully set forth herein

198.  Plaintiffs bring this claim derivatively on behalf of Hewlett-Packard.

199.  Defendants authorized a payment to Fiorina pursuant to the LTPC Program in violation of its plain terms.  Accordingly, this award constituted a gift of corporate assets and amounts to corporate waste.

200  Moreover, because one of the purposes of the LTPC Program was to "retain" key employees, there was no legitimate purpose whatsoever to paying LTPC benefits to Fiorina when the decision had been made to terminate her involuntarily from her employment with the Company.  Any payment to Fiorina pursuant to the LTPC not only violated the terms and purpose of the LTPC Program, but constituted a gift of Company assets and corporate waste.

**COUNT XI**
**(Against Carleton Fiorina)**
**Derivative Claim for The Imposition Of A Constructive Trust**

201.  Plaintiffs hereby reallege and incorporate the allegations in the preceding paragraphs as if fully set forth herein

202.  Plaintiffs bring this claim derivatively on behalf of Hewlett-Packard.

203  During her tenure as a director and officer of HP, Defendant Fiorina was familiar with the terms of the Company's Severance Policy, Severance Program, and LTPC Program.

204.  Based on her familiarity with the LTPC Program, Fiorina knew that no payments were authorized under that plan prior to the expiration of a three-year period following the adoption of the program; that employees who were involuntarily terminated prior to the expiration of that three-year period were not eligible to receive any payments under the LTPC Program; and that any discretion the Company had to increase amounts otherwise payable under the LTPC Program could not be exercised in favor of the CEO

46

205. Based on her familiarity with the LTPC Program, Fiorina knew that any payments under the LTPC Program authorized by the Board to any HP employee who was involuntarily terminated prior to the expiration of the three-year period following the adoption of the LTPC Program (and any exercise of its discretion to increase amounts otherwise payable under the Program in favor of the CEO) would be a breach of the HP directors' fiduciary duties and would constitute an *ultra vires* act

206. Based on her familiarity with the Company's Severance Program, Fiorina knew that any benefits paid to a terminated employee as a severance benefit under any HP plan were required to be set off against any benefits payable under the Company's Severance Program

207. Based on her familiarity with the Company's Severance Program, Fiorina knew that any payments authorized by the HP Board that were not set off against any payments authorized under the Severance Program constituted a breach of the HP directors' fiduciary duties and would constitute an *ultra vires* act.

208. Based on her familiarity with the Company's Severance Policy, Fiorina knew that any severance payments to terminated employees in excess of 2.99 times that employees' annual salary and target bonus immediately preceding termination required shareholder approval.

209. Based on her familiarity with the Company's Severance Policy, Fiorina knew that any severance payment authorized by the HP Board without shareholder approval in an amount in excess of 2.99 times the terminated employees' annual salary and target bonus would constitute a breach of the HP directors' fiduciary duties and an *ultra vires* act.

210. Based on her knowledge, as set forth above, Fiorina knew that the $21.4 million severance payment authorized by the HP Board, and accepted by Fiorina, was the product of the HP directors' breach of their fiduciary duties to the Company and its public shareholders

211. Notwithstanding her knowledge that the $21.4 million severance payment was the product of the HP directors' breach of fiduciary duties, Fiorina accepted the payment

**WHEREFORE,** IBEW and the SEIU Funds pray that the Court enter judgment and relief in their favor on the Class counts and in favor of HP on the derivative counts, and against Defendants on all counts as follows:

(a) Declaring that Defendants violated Section 14(a) of the Securities Exchange Act of 1934 by publishing false and misleading statements in the Company's proxy statements in 2004, 2005 and 2006;

(b) Declaring that Defendants breached their contract with Plaintiffs and the other HP shareholders;

(c) Declaring that Defendants acted *ultra vires* in awarding Fiorina her severance package;

(d) Declaring that Defendants breached their fiduciary duty of disclosure by making false and incomplete disclosures in the Company's proxy statements for 2004, 2005 and 2006;

(e) Rescinding (1) the Hewlett-Packard Company 2004 Stock Incentive Plan; (2) the issuance of an additional 75 million shares for the Hewlett-Packard Company 2000 Employee Stock Purchase Plan, pursuant to the shareholder vote taken at the Company's 2005 annual meeting; and (3) the Hewlett-Packard Company 2005 Pay-for-Results Plan;

(f) Declaring that Defendants breached their fiduciary duties and committed corporate waste by authorizing any payment to Carleton Fiorina under the LTPC Program after the HP Board determined to involuntarily terminate her employment;

(g) Imposing a constructive trust on $21.4 million in the possession of Carleton Fiorina;

(h) Awarding compensatory and punitive damages, together with pre- and post-judgment interest;

(i) Awarding IBEW and the SEIU Funds the costs and expenses incurred in this action, including, but not limited to, reasonable experts' and attorneys' fees; and

(j) Granting such other and further relief as may be just and proper

Dated: June 23, 2006                    ANDERLINI, FINKELSTEIN,
                                        EMERICK & SMOOT


                                    By:    /s/ Merrill G. Emerick
                                           Merrill G. Emerick
                                    400 South El Camino Real, Suite 700
                                    San Mateo, California 94402
                                    Tel: (650) 348-0102
                                    Fax: (650) 348-0962

48

GRANT & EISENHOFER PA
Jay W. Eisenhofer
Michael J. Barry
Chase Manhattan Centre
1201 N. Market Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100

*Attorneys for Plaintiffs*

49

## VERIFICATION

I, Robert Cadwell, am the Administrative Manager of the Indiana Electrical Workers Pension Trust Fund, IBEW. I have read the foregoing Verified Amended Complaint and, pursuant to 28 U.S.C. § 1746, verify, under penalty of perjury, that the foregoing is true and correct.

Executed on this _20_ day of June, 2006

Robert Cadwell

VERIFIED AMENDED COMPLAINT

<u>**VERIFICATION**</u>

I, Stephen B. Abrecht, am the Executive Director, Benefits Fund Director, Capital Stewardship Program, of Service Employees International Union. I have read the foregoing Verified Amended Complaint and, pursuant to 28 U.S.C. § 1746, verify, under penalty of perjury, that the foregoing is true and correct.

Executed on this __20__ day of June, 2006

_____
Stephen B. Abrecht

# CERTIFICATE OF SERVICE

I, Michael J. Barry, hereby certify that on this 23rd day of June 2006, I caused a true and correct copy of the foregoing Verified Amended Complaint to be served electronically and by first-class mail, postage prepaid, upon the following:

**Gibson Dunn & Crutcher LLP**
Dean J. Kitchens
Jonathan C. Dickey
Jeffrey A. Minnery
333 So Grand Avenue
49th Floor
Los Angeles, CA 90071-3197
213-229-7000
Fax: 213-229-7520
dkitchens@gibsondunn.com
jdickey@gibsondunn.com
jminnery@gibsondunn.com

**Keker & Van Nest, LLP**
Christopher C. Kearney
Laurie Carr Mims
710 Sansome Street
San Francisco, CA 94111-1704
415-391-5400
Fax: 415-397-7188
ckearney@kvn.com
lmims@kvn.com

**Williams & Connolly, LLP**
David E. Kendall
Beth Stewart
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
dkendall@wc.com
bstewart@wc.com

**Wilson Sonsini Goodrich & Rosati**
Gideon A. Schor
Bahram Seyedin-Noor
12 East 49th Street
30th Floor
New York, NY 10017
212-999-5800
gschor@wsgr.com
bnoor@wsgr.com

**Wilson Sonsini Goodrich & Rosati**
Boris Feldman
Steven M. Schatz
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304-1050
650-493-9300
Fax: 650-565-5100
boris.feldman@wsgr.com
sschatz@wsgr.com

_____/s/ Michael J. Barry_____