ANDERLINI, FINKELSTEIN, EMERICK & SMOOT
Merrill G. Emerick (Bar. No. 117248)
400 South El Camino Real, Suite 700
San Mateo, California 94402
Tel: (650) 348-0102
Fax: (650) 348-0962

GRANT & EISENHOFER PA
Jay W. Eisenhofer
Sidney S. Liebesman
Michael J. Barry
Chase Manhattan Centre
1201 N. Market Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| INDIANA ELECTRICAL WORKERS PENSION TRUST FUND, IBEW; SEIU AFFILIATES' OFFICERS AND EMPLOYEES PENSION PLAN; SEIU NATIONAL INDUSTRY PENSION FUND; and PENSION PLAN FOR EMPLOYEES OF SEIU, on behalf of themselves and all others similarly situated, and derivatively on behalf of Hewlett-Packard Company, <br><br> Plaintiffs, <br><br> v. <br><br> PATRICIA C. DUNN, LAWRENCE T. BABBIO, RICHARD A. HACKBORN, GEORGE A. KEYWORTH II, ROBERT E. KNOWLING, JR., THOMAS PERKINS, ROBERT L. RYAN, LUCILLE SALHANY, and CARLETON S. FIORINA, <br><br> Defendants. <br><br> And <br><br> HEWLETT-PACKARD COMPANY, <br><br> Nominal Defendant. | CASE NO.: C06-01711 RMW <br><br> **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DIRECTOR DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' VERIFIED AMENDED COMPLAINT** <br><br> Date: November 17, 2006 <br> Time: 9:00 a.m. <br> Before: Hon. Ronald M. Whyte |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................................... iii

PRELIMINARY STATEMENT .................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................. 2

I.    The Applicable Plans ........................................................................................................ 2

    A.    Long Term Performance Cash Program .............................................................. 2

    B.    The Severance Policy ........................................................................................... 3

    C.    The Severance Program ....................................................................................... 5

II.    Fiorina's Severance Payment ........................................................................................... 5

ARGUMENT ................................................................................................................................. 6

I.    THE COMPLAINT ADEQUATELY ALLEGES THAT THE $21.4 MILLION CASH PAYMENT FIORINA RECEIVED UPON HER TERMINATION VIOLATED THE LTPC PROGRAM, THE SEVERANCE POLICY, AND THE SEVERANCE PROGRAM ........................................................................................................................ 6

    A.    The $7.4 Million Payment To Fiorina Was Not Authorized Under The LTPC Program ............................................................................................................... 6

    B.    The $21.4 Million Payment Violated The Severance Policy ............................... 10

    C.    The $21.4 Million Payment Violated The Severance Program ........................... 11

II.    Plaintiffs' Section 14(a) Claim Should Not Be Dismissed .............................................. 11

    A    The Section 14(a) Claim Is Not Barred by the Statute of Limitations ................. 11

    B.    The Complaint States A Valid Claim Under Section 14(a) ................................... 14

        1.    Plaintiffs Have Identified The False and Misleading Statements Contained In the Company's Proxy Statements ......................................................... 14

        2.    Plaintiffs Sufficiently Plead Defendants' Negligence In Permitting the Issuance of the False and Misleading Proxy Statements ........................... 16

III.    Plaintiffs State Law Claims Should Not Be Dismissed ................................................... 17

    A.    Plaintiffs' State Law Claims Are Not Barred By Delaware General Corporation Law §102(b)(7) ................................................................................................... 17

    B.    Defendants Are Not Entitled to the Protections of the Business Judgment Rule . 19

    C.    Plaintiffs Have Stated A Claim for Promissory Fraud .......................................... 20

D.     Plaintiffs Have Stated Claims for *Ultra Vires* Actions ........................................... 21

E.     The Breach of Contract Claim Is Adequately Stated ............................................. 22

F.     Plaintiffs Have Adequately Stated A Waste Claim ............................................... 23

G.     Plaintiffs Have Stated a Claim for Breach of Duty of Disclosure ........................ 24

CONCLUSION ........................................................................................................................ 25

# TABLE OF AUTHORITIES

**CASES**                                                                PAGE

*In re Archer Commc'ns Sec. Litig.,*
    *No. Civ. 91-6964*, 1992 U.S. Dist. LEXIS 22636 (C.D.Cal. Oct. 29, 1992) .................... 12

*Barroso v. Gonzales,*
    429 F.3d 1195 (9th Cir. 2005) ............................................................................... 7

*Beanstalk Group, Inc. v. AM Gen'l Corp.,*
    283 F.3d 856 (7th Cir. 2002) ............................................................................... 7

*Bernhardt v. County of Los Angeles,*
    279 F.3d 862 (9th Cir. 2002) ........................................................................ 6, 10

*Blau v. Harrison,*
    No. 04-Civ. 6592, 2006 WL 850959 (N.D. Ill. Mar. 24, 2006).......................... 14

*Brehm v. Eisner,*
    746 A.2d 244 (Del. 2000) .................................................................................... 24

*California Public Employees Ret. v. Coulter,*
    No. Civ. A. 19191, 2002 WL 31888343 (Del. Ch. Dec. 18, 2002) ................................ 8, 22

*Carmoody v. Toll Bros., Inc.,*
    723 A.2d 1180 (Del. Ch. 1998).......................................................................... 19

*Cox v. Hutchinson,*
    204 F. Supp. 442 (D. Ind. 1962) ........................................................................ 20

*In re DaimlerChrysler AG Sec. Litig.,*
    216 F.R.D. 291 (D. Del. 2003) ............................................................................ 20

*In re eSpeed, Inc. Sec. Litig.,*
    No. 05-Civ.-2091, 2006 WL 880045 ................................................................... 13

*Fradkin v. Ernst,*
    571 F. Supp. 829 (N.D. Ohio 1983)..................................................................... 15

*Hanon v. Dataproducts Corp.,*
    976 F.2d 497 (9th Cir. 1992) .............................................................................. 16

*In re MDC Holdings Sec. Litig.,*
    754 F. Supp. 785 (S.D. Cal. 1990)...................................................................... 21

*Malpiede v. Townson,*
    780 A.2d 1075 (Del. 2001) .................................................................................. 17

*In re McKesson HBOC, Inc. Sec. Litig.,*
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) .............................................................. 14

*Michelson v. Duncan,*
    407 A.2d 211 (Del. 1979) .................................................................................... 24

*Nassau Gallery, Inc. v. Nationwide Mut. Fire Ins. Co.,*
    No. Civ.A 00C-05-034, 2003 WL 21223843 (Del. Super. Apr. 17, 2003) ......................... 7

*Paraschos v. YBM Magnex Int'l,*
    No. Civ. A. 98-6444, 2000 WL 325945 (E.D. Pa. Mar. 29. 2000).................................. 14

*In re Reliance Sec. Litig.,*
    91 F. Supp. 2d 706 (D. Del. 2000)............................................................. 14,16

*In re Reliance Sec. Litig.,*
    135 F. Supp. 2d 480 (D. Del. 2001)................................................................ 16

*Rosenblatt v. Getty Oil Co.,*
    493 A.2d 929 (Del. Super. Ct. 1985) ............................................................. 25

*Rosser v. New Valley Corp.,*
    No. 17272, 2000 WL 1206677 (Del. Ch. Aug. 5, 2000) ................................................. 25

*Russell v. Landrieu,*
    621 F.2d 1037 (9th Cir. 1980) .................................................................... 11

*SEC v. Falstaff Brewing Corp.,*
    629 F.2d 62 (D.C. Cir. 1980)...................................................................... 15

*Sanders v. Wang,*
    No. 16640, 1999 WL 1044880 (Del. Ch. Nov. 8, 1999) .......................................... 19, 24

*In re Secure Computing Corp., Sec. Litig.,*
    120 F. Supp. 2d 810 (N.D. Cal. 2000) ........................................................... 21

*Sedona Corp. v. Landenberg Thalmann & Co.,*
    No. 03 Civ. 3120, 2005 U.S. Dist. LEXIS 16382 (S.D.N.Y. Aug. 9, 2005) .................... 13

*Shaev v. Saper,*
    320 F.3d 373 (3d Cir. 2003)....................................................................... 15

*In re Sybase Inc. Sec. Litig.,*
    48 F. Supp. 2d 958 (N.D. Cal. 1999) ............................................................. 16

*In re Textainer P'ship Sec. Litig.,*
    No. C-05-0969, 2005 WL 3801596 (N.D. Cal. Dec. 12, 2005)...................................... 17

*Thorpe v. CERBCO, Inc.,*
    Civ. A. No. 11713, 1993 WL 35967 (Del. Ch. Jan. 26, 1993) ....................................... 25

*Unisuper Ltd. v. News Corp.,*
    No. 1699-N, 2005 WL 3529317 (Del. Ch. Nov. 7, 2005) ........................................... 23

*In re Walt Disney Co. Derivative Litig.,*
    No. Civ.A. 15452, 2005 WL 2056651 (Del. Ch. Aug. 9, 2005)...................................... 19

*Weeks v. Bareco Oil Co.,*
    125 F.2d 84 (7th Cir. 1941) ....................................................................... 20

PLAINTIFFS' MEMORANDUM OF LAW IN         iv
OPPOSITION TO DIRECTOR DEFENDANTS' MOTION TO
DISMISS PLAINTIFFS' VERIFIED AMENDED COMPLAINT
CASE NO: C06-01711 RMW

*Zelman v. JDS Uniphase Corp.*,
    376 F. Supp. 2d 956 (N.D. Cal. 2005) ............................................................ 22

**STATUTES**

26 C.F.R. § 1.162-27(c)(2)(ii) ............................................................................. 8

17 C.F.R. § 229.402(3) ....................................................................................... 8

**MISCELLANEOUS**

*Celia R. Taylor, "A Delicate Interplay': Resolving the Contract and Corporate Law*
*Tension in Mergers,"* 74 Tul. L. Rev. 561 (Dec. 1992) ........................................ 19

Plaintiffs respectfully submit this memorandum in opposition to the Director Defendants (the "Defendants") motion to dismiss the verified amended complaint.

## PRELIMINARY STATEMENT

> If it looks like a duck, walks like a duck and quacks like a duck,
> *then it just may be a duck.*
>
> - attributed to Walter Reuther,
> American labor leader (1907-1970)

This case is about definitions. As alleged in the Verified Amended Complaint,[1] Plaintiffs allege that the Board of Directors (the "Board" or "Defendants") of Hewlett-Packard Company ("HP" or the "Company") violated the Company's severance plan, violated an express agreement with the shareholders, and violated the terms of a long-term incentive plan, by paying Carleton Fiorina ("Fiorina") $21.4 million in severance benefits when she was fired from the Company on February 8, 2005. Defendants do not deny that they caused the Company to pay $21.4 million to Fiorina. They also do not dispute the terms of the relevant plans and agreements as outlined by Plaintiffs in the Complaint. What Defendants *do* dispute, however, is the characterization of the $21.4 million as a "severance" payment. Defendants claim that notwithstanding that the Severance Plan for Executive Officers of Hewlett-Packard (the "Severance Program") prohibited the payment of any severance benefits to Fiorina in excess of $14 million (2.5 times her annual salary and bonus), and that the HP Board expressly had committed to the Company's shareholders that they would not pay severance benefits to any terminated employee in excess of 2.99 times the employee's annual salary and bonus without shareholder approval ($16.74 million in the case of Fiorina) (the "Severance Policy"), they nonetheless were free to pay Fiorina $21.4 million simply by characterizing $7.4 million of the funds paid to Fiorina upon her firing as an incentive-based payment under the terms of a long term compensation plan (the "Long Term Performance Compensation Program," or "LTPC Program"). But, in fact, the LTPC Program, both by its terms and in how it was described to shareholders, *precluded* any payment to employees who were involuntarily terminated prior to the expiration of the three year term of the plan (such as Fiorina), and any effort to change the terms in order to structure a payment to

---

[1] Citations to the Verified Amended Complaint (the "Complaint") will appear herein as "¶___."
PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO DIRECTOR DEFENDANTS' MOTION TO
DISMISS PLAINTIFFS' VERIFIED AMENDED COMPLAINT

Fiorina upon her firing constitutes a "severance" payment, regardless of what the Defendants now want to call it. Indeed, the former Chairman of the Board, Patricia Dunn, admitted as such when she conceded that the entire $21.4 million payment to Fiorina constituted a "severance" benefit in response to shareholder questions last year. Despite Defendants' arguments to the contrary, if it looks like a severance payment, and it sounds like a severance payment, and particularly if the Company's Chairman of the Board comes out and *admits* it's a severance payment, then it's pretty certain that it *is* a severance payment.

## STATEMENT OF FACTS

**I.    The Applicable Plans**

**A.    Long Term Performance Cash Program**

The HP Board adopted the LTPC Program in May of 2003, which the Company described as a three-year plan pursuant to which certain HP employees, including the CEO, would be entitled to cash payments *if* the Company met certain financial targets over and by the end of that three year period. ¶ 30. Under the express terms of the LTPC, which are not in dispute here, an employee's entitlement to payments pursuant to the LPTC did not vest until the end of the three-year period, with the employee's continuous full-time employment during this three year period being an express condition precedent to such vesting.[2] ¶ 31. In addition, due to the long-term nature of the program, the LPTC specifically provided that amounts otherwise payable to employees would be *forfeited* if the employee's employment terminated for any reason other than retirement (LTPC ¶ 6), disability (LTPC ¶ 7), death (LTPC ¶ 8), workforce reduction (LTPC ¶ 9), or before the expiration of the three-year period.[3] ¶ 32.

---

[2] Specifically, the LTPC provided:
> The Employee's Cash Award shall vest on the third anniversary of the Grant Date . . . Notwithstanding the foregoing, *the Employee must remain in the employ of the Company on a continuous, full-time basis through the close of business on the third anniversary of the Grant Date, for such Cash Award to vest,* subject to paragraphs 6-9 of this Agreement. The period of time between the Grant Date and the date of the Employee's Cash Award becomes vested is referred to herein as the "Restriction Period."

¶ 31, LTPC ¶ 2 (emphasis supplied).

[3] Specifically, the LPTC provided:
> Subject to paragraphs 6-9 of this Agreement, if the Employee's employment with the Company is terminated at any time prior to the expiration of the Restriction Period, this Agreement granted

1    In their motion to dismiss, Defendants do not dispute these terms, and they also do not
2    dispute that, because Fiorina was fired in February 2005, before the expiration of the LTPC
3    Program's three-year term, she would not have been entitled to any payment under the program
4    pursuant to these terms.    Instead, Defendants point to two additional provisions that they
5    maintain gave them considerable discretion to ignore these terms. *First*, Defendants point to a
6    provision in the LTPC Program that permitted the HP Board to "increase or decrease" payments
7    under the LTPC plan "for exceptional circumstances," and subject to the restriction that "such
8    payout cannot be increased for Covered Employees as defined in Section 162(m) of the Internal
9    Revenue Code of 1986, as amended." LTPC ¶ 14(c). *Second*, Defendants argue that the LTPC
10   Program must be read in conjunction with the 2000 Stock Plan, and "Section 4(b)(iv) of the
11   Stock Plan grants the Plan Administrator the full right to *waive* forfeiture restrictions in
12   connection with any award." Def.'s Br. at 12.[4] Defendants argue that these provisions provided
13   them with absolute discretion to freely disregard the terms of the LTPC Program as it was
14   explained to the HP shareholders so as to authorize a $7.4 million payment to Fiorina upon her
15   termination.    Defendants' reliance on these provisions, however, is mistaken, and the $7.4
16   violated both the terms and the spirit of that plan.

17       **B.    The Severance Policy**

18       The Severance Policy arose out of HP's merger with Compaq Computer Corporation
19   ("Compaq").    Michael Capellas ("Capellas"), CEO of Compaq, joined Hewlett Packard as
20   President, reporting to HP CEO Fiorina. ¶ 25. Just seven months later, Capellas stepped down

---

21       *hereunder shall terminate and any interest in the Cash Award shall be forfeited by the Employee,*
22       *and full ownership will be retained by the Company.*
     ¶ 32 (quoting LTPC ¶ 4(b)) (emphasis supplied).

23   [4]  Section 4(b)(iv) of the Stock Plan, attached to Defendants' Request for Judicial Notice ("RJN") as Ex. F, states
24   that the "Administrator" has the discretion:
             (iv)      to determine the terms and conditions, not inconsistent with the terms of the Plan, of any
25           Awards granted hereunder. Such terms and conditions include, but are not limited to, the exercise
             price, the time or times when an Award may be exercised (which may or may not be based on
26           performance criteria), any vesting acceleration or waiver of forfeiture restrictions, and any
             restriction or limitation regarding any restriction or limitation regarding any Award or the Shares
27           relating thereto, based in each case on such factors as the Administrator, in its sole discretion, shall
             determine.
28   2000 Stock Plan, § 4(b)(iv); Def. RJN Ex. F, at 5.

as President of HP and received a $16 million severance payment. ¶ 26. In response to this massive payment, Plaintiff Service Employees International Union ("SEIU"), submitted a shareholder proposal to HP requesting that the Company include in its 2003 proxy statement a proposal that "urge[d] the Board of Directors to seek shareholder approval for future severance agreements with senior executives that provide benefits in an amount exceeding 2.99 times the sum of the executive's base salary plus bonus" (the "Proposal"). ¶ 27.

Although the HP Board vigorously opposed SEIU's Proposal, HP's shareholders approved the Proposal at the April 2003 annual meeting. Because the Proposal was advisory in nature, the HP Board announced that they would consider the recommendation. ¶ 28. On July 18, 2003, understanding that they needed to assuage stockholder concerns regarding HP's severance awards if they hoped to be re-elected to the board, Defendants agreed to implement SEIU's Proposal, and adopted a formal Severance Policy that the Company described in its 2004, 2005 and 2006 proxy statements as follows (¶ 38):

> HP will seek stockholder approval for future severance agreements, if any, with senior executives that provide specific benefits if an amount exceeding 2.99 times the sum of the executive's current annual base salary plus annual target bonus, in each case as in effect immediately prior to the time of such executive's termination.

In adopting the policy, however, HP explained that certain payments would not be subject to the Severance Policy, "either because they have been previously earned or accrued or because they are consistent with Company Practices." This includes "payments of prorated bonuses or prorated long-term incentive payments that are consistent with Company Practices." ¶ 72 (quoting HP 2005 Proxy at 39) (filed February 11, 2005).

Although Fiorina unquestionably received well over 2.99 times her annual salary and bonus upon her termination, and despite the fact that HP's shareholders were never given the opportunity to vote on Fiorina's severance package, Defendants claim technical compliance with the Severance Policy. They argue that Fiorina received only $14 million as a "severance" payment, and an additional $7.4 million as a prorated bonus under a long-term incentive plan – *i.e.*, the LTPC Program. Defendants' argument in this regard hinges on their *assertion* that Fiorina's LTPC payment was "consistent with Company Practices." As discussed below,

however, based on the reasonable inferences drawn from the allegations of the Complaint, Defendants' argument in this regard fails.

## C. The Severance Program

On January 20, 2004, the HP Board announced that the Company had adopted, effective October 31, 2003, a Severance Plan for Executives Officers of Hewlett-Packard Company (the "Severance Program"). ¶ 39. Under the Severance Program, the CEO is entitled to 2.5 times her annual base salary and target cash bonus, in effect prior to employment termination. *Id.* The Severance Program also provided that any payments made thereunder would be *reduced* by any other cash payments provided to the terminated employee upon separation from the Company. ¶ 41; HP's 2005 and 2006 proxy statements explained (¶ 41 ):

> Any payments under the severance program will be reduced by any cash severance benefit payable to the participant under any other HP plan, program or agreement, including cash amounts payable for the uncompleted portion of employment agreements and prorated cash bonuses under the applicable short-term bonus plan.

Defendants argue that they complied with the terms of the Severance Program because Fiorina only received $14 million as a "severance" payment, which equals 2.5 times Fiorina's annual salary and bonus immediately before her termination. They were not required to offset from this payment the $7.4 million paid to Fiorina and designated under the LTPC Program, Defendants argue, because the LPTC payment was not a "cash severance benefit." This argument, however, hinges on Defendants' assertion that this payment was, in fact, authorized under the LTPC Program. And as discussed below, Defendants' argument fails.

## II. Fiorina's Severance Payment

HP fired Carly Fiorina on February 8, 2005. ¶ 50. In total, Fiorina walked away from her position at HP with benefits worth in excess of $40 million. ¶ 56. For purposes of this case, the cash payment Fiorina received in the amount of $21.4 million is relevant. In the Company's 2005 Proxy statement (filed February 11, 2005), HP described this $21.4 million payment as comprised of: (1) a cash payment of $14,000,000.00; (2) a cash payment of $5,880,000, "which represent[ed] Ms. Fiorina's award for the 2003-2004 program year of the LTPC Program"; and

1    (3) a cash payment of $1,503,700, "which represent[ed] Ms. Fiorina's award for the 2004-2005

2    program year of the LTPC Program." ¶ 51.

3         At HP's annual meeting on March 16, 2005, however, HP Chairman Patricia Dunn

4    conceded that the entire $21.4 million -- including the $7.4 million "LTPC payment" -- was, in

5    fact, a "severance" payment.  She stated (¶ 50):

6           The first [question] . . . was on severance and what was the basis for -- the number
             -- $21.4 million payment to Carly Fiorina as severance.  Carly did not have a
7           contract at HP.  She worked under the same plan for severance as all executives,
             which was adopted by the board's compensation committee in 2003.  That plan
8           was appropriately disclosed by the board's compensation committee in 2003.  That plan
             was appropriately disclosed and the payments due and payable under that plan were
9           also made public since its adoption.

10                                    **ARGUMENT**

11         In considering a motion to dismiss, the Court must "accept all factual allegations of the

12   complaint as true, and draw all reasonable inferences in favor of the nonmoving party."

13   *Bernhardt v. County of Los Angeles*, 279 F.3d 862, 867 (9th Cir. 2002) (internal citations

14   omitted).   Defendants' motion here, however, depends on *rejecting* the allegations on the

15   Complaint, and drawing inferences that are not only contradicted by the facts are but skewed in

16   Defendants' favor.  As discussed below, based on the allegations of the Complaint and the

17   reasonable inferences drawn therefrom, Defendants' motion should be denied.

18   **I.    THE COMPLAINT ADEQUATELY ALLEGES THAT THE $21.4 MILLION**
19        **CASH PAYMENT FIORINA RECEIVED UPON HER TERMINATION**
          **VIOLATED THE LTPC PROGRAM, THE SEVERANCE POLICY, AND THE**
20        **SEVERANCE PROGRAM**

21        **A.    The $7.4 Million Payment To Fiorina Was Not Authorized Under The LTPC**
               **Program**

22        As an initial matter, the $7.4 million payment to Fiorina was *not*, as Defendants would

23   have this Court believe, authorized under the LTPC Program.  Defendants do not dispute that

24   under the express terms of that plan, any benefits otherwise payable to an employee under that

25   plan would be forfeited if his or her employment terminated for reasons other than death,

26   disability or workforce reduction prior to the expiration of the three year period following the

27

28   PLAINTIFFS' MEMORANDUM OF LAW IN             6
     OPPOSITION TO DIRECTOR DEFENDANTS' MOTION TO
     DISMISS PLAINTIFFS' VERIFIED AMENDED COMPLAINT
     CASE NO:  C06-01711 RMW

1  plan's adoption in May of 2003. ¶ 32. As Fiorina was fired in February of 2005, any benefits
2  that otherwise might have been payable to her thereunder were forfeited.

3      Defendants, however, argue the Board retained "discretion" to "increase or decrease" the
4  benefits payable to Fiorina under that plan. *First*, Defendants argue that although the LTPC
5  Program specifically precluded the Board from exercising any "discretion" to increase any
6  payment to a "Covered Employee" within the meaning of Section 162(m) of the Internal
7  Revenue Code of 1986, because Fiorina was fired in February of 2005 and was not the
8  Company's CEO as of October 31, 2005, this express restriction did not apply and they were free
9  to pay Fiorina whatever they wanted. Def.'s Br. at 6. This argument is absurd. Defendants
10 cannot dispute that Fiorina was a "Covered Employee" *at the time she was fired, and thus at the*
11 *time Defendants apparently exercised their "discretion" to pay her $7.4 million.* To argue that
12 Fiorina was not a "Covered Employee" within the meaning of the terms of the LTPC Program
13 because she was fired prior to October 31, 2005, would render the express restriction on the
14 Board's ability to exercise "discretion" with respect to the plan's application to senior executives
15 meaningless. After all, if this interpretation were correct, there would be no circumstance in
16 which a terminated CEO could qualify as a "Covered Employee" – other than where such
17 employee is terminated on the last day of the Company's taxable year. This would eviscerate the
18 effect of the express limitation on the ability to increase awards to "Covered Employees" under
19 the LTPC Program. Such an interpretation is entirely unreasonable. *See, e.g., Beanstalk Group,*
20 *Inc. v. AM Gen'l Corp.*, 283 F.3d 856, 860 (7th Cir. 2002) ("a contract will not be interpreted
21 literally if doing so would produce absurd results"); *Nassau Gallery, Inc. v. Nationwide Mut.*
22 *Fire Ins. Co.*, No. Civ.A 00C-05-034, 2003 WL 21223843, at *3 (Del. Super. Apr. 17, 2003)
23 ("As with any contract, this Court's interpretation of the Extra Expense clause cannot create an
24 'absurd' result.") (internal citations omitted); *see also Barroso v. Gonzales*, 429 F.3d 1195, 1207
25 (9th Cir. 2005) ("We reject agency interpretation [of a statute] that would produce absurd
26 results.") (internal quotations and citations omitted).

27

28

This argument also ignores the fact that Fiorina remained one of the four highest paid employees of HP during 2005 (notwithstanding the fact that she was fired in February), and was, in fact, identified in the "Summary Compensation Table" of HP's 2006 Proxy statement. *See* Def. RJN Ex. C at 46 (HP 2006 Proxy). Treasury Regulation 1.162-27, which by its terms "provides rules for the application of the $1 million deduction limit under section 162(m) of the Internal Revenue Code" defines "Covered Employees" to include any individual whose compensation is required to be disclosed in the "Summary Compensation Table" by applicable regulations of the SEC. 26 C.F.R. § 1.162-27(c)(2)(ii).[5] And under Item 402 of Regulation S-K, a company's required disclosures in the "Summary Compensation Table" include disclosures relating to terminated employees who, but for their not serving as executive officers at the end of the fiscal year, would otherwise qualify as one of the company's four highest paid individuals:

> (3) Persons covered. Disclosure shall be provided pursuant to this item for each of the following (the "named executive officers"):
> (i) All individuals serving as the registrant's chief executive officer or acting in a similar capacity during the last completed fiscal year ("CEO"), regardless of compensation level;
> (ii) The registrant's four most highly compensated executive officers other than the CEO who were serving as executive officers at the end of the last completed fiscal year; and
> (iii) Up to two additional individuals for whom disclosure would have been provided pursuant to paragraph (a)(3)(ii) of this item but for the fact that the individual was not serving as an executive officer of the registrant at the end of the last completed fiscal year.

17 C.F.R. § 229.402(3). Accordingly, even though Fiorina was fired in February 2005, because her compensation was required to be listed in the "Summary Compensation Table" under Item 402 of Regulation S-K, she qualified as a "Covered Employee" under Section 162(m) of the Internal Revenue Code and under the terms of the LTPC Program.

---

[5] Regulation 1.162-27 states, in pertinent part, as follows:
> (2) Covered employee--(i) General rule. A covered employee means any individual who, on the last day of the taxable year, is--
> (A) The chief executive officer of the corporation or is acting in such capacity; or
> (B) Among the four highest compensated officers (other than the chief executive officer).
> (ii) Application of rules of the Securities and Exchange Commission. Whether an individual is the chief executive officer described in paragraph (c)(2)(i)(A) of this section or an officer described in paragraph (c)(2)(i)(B) of this section is determined pursuant to the executive compensation disclosure rules under the Exchange Act.

*Second*, Defendants argue that regardless of the actual terms of the LTPC Program, the Hewlett-Packard Company 2000 Stock Plan (the "Stock Plan") vested in the Board the ability to "modify or amend" any compensation award under the LTPC Program. But if the HP Board acted to "modify or amend" the terms of the LTPC Program specifically to permit a payment to Fiorina because she was fired (and Defendants deny that they ever, in fact, amended the plan), any such action clearly would reveal the "severance" nature of the payment, regardless of its label. (It would also demonstrate that any payment to Fiorina under the LTPC Program was not "consistent with Company Policies" as they existed as of the date of her termination, which is relevant to evaluating the payment under the Severance Policy, discussed below).

*Finally,* even if Defendants otherwise were entitled to exercise "discretion" to pay a fired CEO millions of dollars under the LTPC Program, such discretion would have been inconsistent with the purposes of the Program as explained to the Company's shareholders in HP's proxy statements. Specifically, the proxy statements repeatedly made clear that the LTPC was designed to provide rewards the based on Company's performance *over a three-year period*:

> *The ultimate payout under this program is dependent on HP's TSR relative to the TSR for the S&P 500 over the three-year performance period, and, therefore, payouts, if any, generally will occur at the end of such three-year period.*

¶ 36; 2004 Proxy at 35; 2005 Proxy at 34 (emphasis added). To drive this point home, HP's proxy statement represented that if someone left the employ of the Company prior to the expiration of that three year period, any benefits payable thereunder would be forfeited. ¶ 37. Further, HP's proxies also represented that the LTPC Program was designed to "retain top-performing" personnel and to reward senior executives for "exceptional performance": "The LTPC Program is designed to drive value creation and operational efficiency through balance sheet and total shareowner return ("TSR") performance measures, to retain top-performing and critical employees, and to reward senior managers for exceptional performance." ¶ 111; 2004 Proxy at 35; 2005 Proxy at 34. Any "discretion" exercised by the Defendants to award Fiorina $7.4 million was flatly inconsistent with the goals and purposes of the LTPC Program, as explained to HP's shareholders because: (1) Fiorina was fired, so the $7.4 million payment

1  could not have been intended to "retain" her; (2) awarding Fiorina $7.4 million in February of
2  2005 contradicted the LTPC Program's goal of promoting growth over a three year period; and
3  (3) Fiorina could not possibly have exhibited "exceptional performance" when the Company had
4  fired her based on her performance.

5  **B.   The $21.4 Million Payment Violated The Severance Policy**

6  As discussed above, under the Severance Policy, Defendants committed not to pay *any*
7  severance benefits to terminated employees in excess of 2.99 times the employee's salary and
8  bonus, without first seeking shareholder approval.   As explained to shareholders in the
9  Company's proxies, for purposes of the Severance Program, the HP Board represented that
10  "payments of prorated bonuses or prorated long-term incentive payments" would not be
11  considered a severance payment *to the extent that such payments "are consistent with Company*
12  *Practices."* ¶ 72.

13  As alleged in the Complaint, the $7.4 million payment under the LTPC Program was *not*
14  "consistent with Company Practices" because the payment was expressly barred under the terms
15  of the plan, as explained to shareholders and as explained above.  ¶ 75.  Plaintiffs have not
16  "concocted" these Company Practices, but merely base their allegations on the Company's own
17  proxy statements.  Indeed, to the extent that the HP Board exercised "discretion" under the Stock
18  Plan, as Defendants suggest, to "modify or amend" the LPTC Program to permit a payment to
19  Fiorina, this demonstrates that prior to such "modification" the payment was not "consistent"
20  with "Company Practices" as they existed prior to the Defendants' decision to change those
21  practices.  Otherwise, no such "modification" would have been necessary.

22  Defendants' argument that they complied with the terms of the Severance Policy depends
23  on rejecting the logical inference that HP's "Company Policy," as it existed as of the date Fiorina
24  was fired, did not permit payments under the LTPC Program to employees who were
25  involuntarily terminated prior the expiration of the three year period of the plan.  This would be
26  inappropriate in the context of a motion to dismiss.  *Bernhardt*, 279 F.3d at 867.  At the very
27  least, this raises a factual dispute that also should not be resolved in the context of a motion to

28

dismiss. *See Russell v. Landrieu*, 621 F.2d 1037, 1042 (9th Cir. 1980) ( "we must resolve all factual disputes in favor of the plaintiffs in a motion to dismiss under Fed.R.Civ.P. 12(b)(6)...").

**C. The $21.4 Million Payment Violated The Severance Program**

Finally, because the $7.4 million payment was not authorized under the LTPC Program and was structured as part of Fiorina's termination, the total $21.4 million payment to Fiorina violated the terms of the Severance Program. Not only did the Severance Program limit the severance benefits payable to Fiorina to $14 million, but it required that amount to be offset by any cash severance benefits paid under any other plan. Because the $7.4 million "LTPC payment" was structured as part of Fiorina's termination, it should have been deducted from her $14 million payment under the Severance Plan.

Defendants' only argument to the contrary is that the $7.4 million payment did not constitute a "severance" payment, but a payment under the LTPC Program. As discussed above, however, the $7.4 million payment was not authorized under the terms of the LTPC Program, but was simply structured as part of the cash benefit paid to Fiorina upon her termination. As Dunn admitted at HP's 2005 annual meeting, the entire $21.4 million constituted a "severance payment," regardless of what Defendants want to call it now.

**II. Plaintiffs' Section 14(a) Claim Should Not Be Dismissed**

**A. The Section 14(a) Claim Is Not Barred by the Statute of Limitations**

As an initial matter, Plaintiffs' § 14(a) claim is premised on the false and misleading statements contained in HP's proxy statements for 2004 (*e.g.*, ¶¶ 105-111,118), 2005 (*e.g.*, ¶¶ 105-110, 113-115, 119), *and 2006* (*e.g.*, ¶¶ 105-6, 109, 116-117 ). HP's 2006 proxy statement was filed on January 23, 2006 (¶ 105; *see* Defendants' RJN, Ex. C). The suggestion that Plaintiffs' § 14(a) claim based on the disclosures in HP's 2006 proxy is barred by a one year statute of limitations, when the case was filed in March of 2006, is plainly absurd.

Plaintiffs' § 14(a) claims based on the 2004 and 2005 proxy statements are timely as well. As an initial matter, the question of inquiry notice raises factual issues that preclude dismissal as a matter of law. *See, e.g., In re Archer Commc'ns Sec. Litig.*, No. Civ. 91-6964,

1992 U.S. Dist. LEXIS 22636, at *3 (C.D. Cal. Oct. 29, 1992) (denying motion for summary judgment on ground that "[w]hat investors may have inferred from [newspaper articles] presents a question of fact that generally may not be determined as a matter of law on defendants' motion for summary judgment"). In any event, Defendants' argument that Plaintiffs' § 14(a) claims are time barred because the terms of Fiorina's severance package was disclosed on February 8, 2005, misapprehends the nature of Plaintiffs' claim. Plaintiffs' claims in Count I are *not* based on the mere fact that the Defendants caused the Company to pay Fiorina upwards of $40 million when she was unceremoniously dismissed in February of 2005. As a result, news articles recounting the *amount* Fiorina was paid – such as those identified both in the Complaint and in Defendants' RJN – did nothing to provide notice to HP's shareholders with respect to the existence of a § 14(a) claim. Rather, Plaintiffs' § 14(a) claims are based on the fact that Defendants affirmatively *misrepresented* the terms of, their agreement to be bound by, and their alleged compliance with the LTPC Program, the Severance Policy, and the Severance Program. And in this regard, Plaintiffs were not put on "notice" of a potential § 14(a) claim until, at the earliest, on March 16, 2005, when Patricia Dunn, Chair of HP's Board, finally admitted that the $21.4 million paid to Fiorina upon her involuntary termination was "severance." ¶ 56.

Prior to this date, in its public filings, HP's Board maintained that Fiorina received $14 million in "severance," and gave no hint that any portion of the remaining $26-plus million in benefits she pocketed upon her dismissal as CEO was negotiated as part of her dismissal. Indeed, in HP's 2005 proxy statement (filed February 11, 2005), Defendants explained:

> HP entered into a Severance Agreement and Release (together, the 'Agreement'), dated February 8, 2005, with Carleton S. Fiorina, who terminated as HP's Chairman and Chief Executive Officer and resigned as a director of HP on February 8, 2005. Pursuant to the Agreement, and in accordance with the terms of the HP Severance Program for Senior Executives adopted in 2003 (as described above), HP will make a cash payment of $14,000,000 to Ms. Fiorina, which represents 2.5 times her base salary and targeted annual cash bonus. This amount will be payable six months after the date of the Agreement, together with interest at an annual rate of 2.78%.

¶ 115; RJN Ex. B. at 40. Indeed, one of the very articles upon which Defendants rely in arguing that Plaintiffs should have been on "inquiry notice" of a § 14(a) claim reported that "[Fiorina] will receive $14 million in severance pay, or two and a half times her 2004 salary and bonus,

according to terms of the agreement submitted yesterday in regulatory filings." Eric Dash, *Fiorina exiting Hewlett-Packard With More Than $42 Million*, THE NEW YORK TIMES (Feb. 12, 2005) (RJN Ex. J); *see also* ¶ 54 (describing content of article). Regarding the LTPC payments, the 2005 proxy disclosed that Fiorina received a cash payment of $5,880,000 "which represent[ed] Ms. Fiorina's award for the 2003-2004 program year of the LTPC Program," and a cash payment of $1,503,700 "which represent[ed] Ms. Fiorina's award for the 2004-2005 program year of the LTPC Program." ¶ 51; RJN Ex. B at 53. Plaintiffs cannot be deemed to have been on inquiry notice that Defendants had misrepresented the terms of, their intent to be bound by, and their compliance with the applicable severance and compensation plans where, as here, Defendants reaffirmed their compliance with those plans. *See, e.g., In re eSpeed, Inc. Sec. Litig.*, No. 05-Civ.-2091, 2006 WL 880045, at *11 (S.D.N.Y. Apr. 3, 2006) ("courts often decline to find that plaintiffs were on inquiry notice in the face of such reliable words of comfort designed to counter information that might otherwise give rise to inquiry notice") (internal citations omitted); *Sedona Corp. v. Ladenberg Thalmann & Co.*, No. 03 Civ. 3120, 2005 U.S. Dist. LEXIS 16382, at *8 (S.D.N.Y. Aug. 9, 2005) (duty of inquiry not triggered when storm warnings contradicted by denials of wrongdoing).

Only on March 16, 2005, when Patricia Dunn, in response to a question from a concerned shareholder at the Company's 2005 annual meeting, conceded that Fiorina received a "severance" payment of $21.4 million did HP's shareholders have reason to doubt that the Company's public representations that $7.4 million paid to Fiorina under the label of an LTPC payment were, in fact, true. And it was only upon diligent investigation, comparing the terms of the various plans, policies, and programs, that were Plaintiffs able to discover that Defendants' representations that the payments were authorized under the LTPC Program were false. In other words, Dunn's acknowledgement on March 16, 2005, that the entire $21.4 million represented a "severance" benefit was the first time shareholders would have had reason to believe that Defendants had violated or manipulated the terms of the LTPC Program in order to justify an additional "severance" payment to Fiorina and to avoid compliance with the Severance Policy

PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO DIRECTOR DEFENDANTS' MOTION TO
DISMISS PLAINTIFFS' VERIFIED AMENDED COMPLAINT
CASE NO: C06-01711 RMW

1  and the Severance Plan.  As such, Plaintiffs can not be deemed to have been on "inquiry notice"

2  of potential § 14(a) claims prior to March 16 of last year.

3  **B.    The Complaint States A Valid Claim Under Section 14(a)[6]**

4     Defendants contend that Plaintiffs have failed to state a claim under § 14(a) due to their

5  purported failure (1) to identify the false and misleading statements contained in HP's proxy

6  statements and (2) to allege facts giving rise to a strong inference that Defendants acted

7  negligently in permitting such materially false and misleading statements to be made.[7]

8  Defendants are wrong on both counts.

9  **1.    Plaintiffs Have Identified The False and Misleading
Statements Contained in the Company's Proxy Statements**

10     As recounted above, and as set forth in Count I, the Complaint identifies, with specificity,

11  the particular statements in HP's 2004, 2005 and 2006 proxy statements in which the Defendants

12  described the LTPC Program, the Severance Plan and the Severance Policy, and explains how

13  Fiorina's $21.4 million cash payment violated these plans.  *See* ¶¶ 105-124.   Defendants'

14  argument that the proxy statements were neither false nor misleading centers on their assertion

15  that the $7.4 million payment was authorized under the LTPC Plan and did not constitute a

16  "severance" benefit under the Severance Plan or the Severance Policy.  Def.'s Br. at 4-5; 14.  As

17  discussed above, Defendants' argument in this regard is just wrong, and thus the disclosures in

18  the proxies regarding Defendants' alleged compliance with and intent to be bound by the terms

19  of those plans were just downright false.  But even if Defendants can plead technical compliance

---

20

21  [6] Plaintiffs hereby incorporate Section I: "Plaintiffs Have Stated A Valid § 14(a) Claim" of Plaintiffs' Memorandum Of Law In Opposition To Nominal Defendant Hewlett-Packard Company's Motion To Dismiss Plaintiffs' Verified

22  Amended Complaint, at pages 7 to 11.

23  [7] Defendants erroneously contend that this Court is required to apply the PSLRA's heightened pleading standard to Plaintiffs' § 14(a) claim but fail to cite any controlling authority that would require this Court to apply these

24  heightened pleading standards to a negligence-based § 14(a) claim.  Indeed, whether the PSLRA applies to negligence-based § 14(a) claims is the subject of much debate in the courts. *Compare Blau v. Harrison*, No. 04-Civ.

25  6592, 2006 WL 850959 (N.D. Ill. Mar. 24, 2006) (holding that negligence-based § 14(a) claims need not be pled with particularity); *In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 728 (D. Del. 2000) (same); *Paraschos v. YBM*

26  *Magnex Int'l*, No. Civ. A. 98-6444, 2000 WL 325945 (E.D. Pa. Mar. 29, 2000) (same) *with In re Textainer P'ship Sec. Litig.*, No. C-05-0969, 2005 WL 3801596, at *8 (N.D. Cal. Dec. 12, 2005) (holding that negligence-based §

27  14(a) claims must be pled with particularity); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1268 (N.D. Cal. 2000) (same).   Nevertheless, even if the PSLRA's heightened pleading requirements apply, Plaintiffs

28  have satisfied this standard.

1   with the plans – and they cannot – Plaintiffs still have stated a § 14(a) claim because the proxies

2   were, at the very least, misleading. *See e.g., Shaev v. Saper,* 320 F.3d 373 (3d Cir. 2003)

3   (finding that shareholder stated § 14(a) claim based on allegations that proxy statement failed to

4   disclose existence and material terms of executive incentive compensation plan); *Fradkin v.*

5   *Ernst,* 571 F. Supp. 829 (N.D. Ohio 1983) (shareholder stated § 14(a) claim based on allegations

6   that proxy statement made incomplete disclosures concerning pension benefits).

7          The proxy statements deliberately led shareholders to believe that (a) the cash severance

8   payment to a terminated CEO would not exceed 2.5 times the CEO's annual salary and target

9   bonus; and (b) that in no case would the Company authorize any severance payment in excess of

10  2.99 times a terminated employee's salary and target bonus without shareholder approval. ¶¶ 105-

11  110. And with regard to the LTPC Program, the proxies repeatedly touted the three-year term of

12  the program (¶¶ 111, 113) and represented that individuals who terminated employment prior to

13  the expiration of that three-year period for reasons other than death, disability, retirement or

14  workforce reduction would forfeit any payments to which they otherwise might have been entitled

15  under the program. ¶¶ 32-34; 111, 113. Defendants argue, however, that these disclosures cannot

16  be considered false or misleading because shareholders should have realized that the HP Board

17  retained "discretion" to pay Fiorina and to waive the forfeiture provision under the LTPC

18  Program. *See* Def.'s Br. at 11-12. To this end, they argue that HP disclosed *in other public filings*

19  that the Board was vested with the discretion to waive the plan's forfeiture provision. But

20  Defendants' alleged disclosure of their purported right to waive the forfeiture provision in an

21  unrelated document cannot cure defects *in the proxy statement itself. See, e.g., SEC v. Falstaff*

22  *Brewing Corp.,* 629 F.2d 62, 67 n. 4 (D.C. Cir. 1980) ("Although 'corporations are not required to

23  address their stockholders as if they were children in kindergarden,' *disclosure may not be buried*

24  *in a mass of information that, when pieced together, might give the correct impression.*") (quoting

25  *Richland v. Crandall,* 262 F. Supp. 538, 554 (S.D.N.Y. 1967)) (emphasis added). And Defendants

26  cannot point to *anything* in the proxy statements informing shareholders that, despite the

27  restriction in the LTPC Plan which prevented the exercise of any "discretion" to increase

28

1  payments to the Company's CEO, the HP Board could, in fact, exercise such discretion if they
2  fired the CEO prior to October 31 of any given year.

3  Citing *In re Sybase Inc. Securities Litigation*, 48 F. Supp. 2d 958, 963 (N.D. Cal. 1999),
4  Defendants also argue that the proxy statements were not false and misleading because they
5  purported to disclose only the "general[]"conditions of the LTPC payout. Def.'s Br. at 12. But
6  the court in *In re Sybase* merely held that an issuer had no duty to disclose all of the minute details
7  of its operations, such as its internal budgets, because "the securities laws do not require
8  management to bury shareholders in an avalanche of trivial information – a result that is hardly
9  conducive to informed decisionmaking." *Id.* at 963 (internal citations and quotations omitted).[8]
10  Here, in contrast, the possibility that the Board could waive the forfeiture provision or exercise
11  "discretion" to deviate from the terms of the LTPC Program as explained to shareholders was by
12  no means trivial to an understanding of the program itself. As such, the considerations driving the
13  *Sybase* decision are inapplicable.

14        **2.    Plaintiffs Sufficiently Plead Defendants' Negligence In Permitting**
             **the Issuance of the False and Misleading Proxy Statements**
15
16  "To demonstrate the requisite state of mind, [P]laintiffs must show that [D]efendants
17  acted negligently with respect to the facts in the proxy statement . . . In enforcing that standard,
18  courts should apply the standard of due diligence rather than the standard of actual knowledge or
19  gross negligence." *In re Reliance Sec. Litig.*, 135 F. Supp. 2d 480, 511 (D. Del. 2001) (internal
20  citation omitted). Defendants, as members of HP's Board, plainly knew the terms of the
21  Company's severance policies and knew whether or not they intended to comply therewith.
22  Plaintiffs' allegations that Defendants knowingly violated these policies in formulating Fiorina's
23  severance payment are sufficient to demonstrate that, at the very least, Defendants were
24  negligent with regard to the disclosures in the proxy statements. *See, e.g., In re Reliance Sec.*
25  *Litig.*, 91 F. Supp. 2d 706 (D. Del. 2000) (finding that investors satisfied negligence requirement

26  ---
[8] Defendants' reliance on *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 506 (9th Cir. 1992) is similarly misplaced.
27  *Hanon* merely found that an issuer was under no obligation to disclose that it was considering shutting down a
facility in three to five years time as the potential shut down was speculative. There is nothing speculative about the
28  material terms of the LTPC Program.

for § 14(a) claim where they averred that parties responsible for statements were aware that reserves for corporation engaged in automobile loan financing of high risk buyers were declining, while loss rates were increasing, and did not disclose situation).[9]

### III. Plaintiffs State Law Claims Should Not Be Dismissed

#### A. Plaintiffs' State Law Claims Are Not Barred by Delaware General Corporation Law § 102(b)(7)

Defendants argue that the Company's § 102(b)(7) provision bars Plaintiffs' state law claims. [10] In reaching this erroneous conclusion, Defendants misstate both the scope of § 102(b)(7) and the impact of such a provision at the motion to dismiss stage. Contrary to Defendants' assertion that § 102(b)(7) "authorizes Delaware corporations to limit the liability of any of the directors for claims for monetary relief" (Def.'s Br. at 16), § 102(b)(7), in fact, merely authorizes Delaware corporations to insulate directors from liability for monetary damages flowing from their breaches of the fiduciary duty of care. *See, e.g., Malpiede v. Townson*, 780 A.2d 1075, 1094 (Del. 2001) (holding that § 102(b)(7) bars a complaint at the motion to dismiss stage only if it states "an unambiguous, residual" duty of care claim and nothing else). Plaintiffs, however, allege much more than a simple breach of the duty of care. Specifically, Plaintiffs allege that the Board committed *ultra vires* acts by awarding Fiorina severance far in excess of what was authorized under the Policies; committed corporate waste by awarding Fiorina $7.4 million under

---

[9] The decision in *In re Textainer does not* stand for the proposition that Plaintiffs must comply with the PSLRA's heightened pleading standards with respect to allegations of state of mind. To the contrary, the *Textainer* court expressly declined to address this issue. *In re Textainer*, 2005 WL 3801596 at *4 n.2. Although Defendants correctly note that the court in *In re McKesson* held that plaintiffs must plead facts that give rise to a strong inference of negligence, they are incorrect that Plaintiffs have failed to do so here. In *McKesson*, plaintiffs claimed that a proxy statement soliciting votes on a merger failed to disclose that the target had engaged in massive accounting fraud. Noting that the target's outside auditors had not uncovered the accounting fraud, the *McKesson* court found that the plaintiffs had not adequately alleged that McKesson's officers and directors were negligent in failing to disclose it. *McKesson* stands in stark contrast to Plaintiffs' allegations that Defendants knew the terms of HP's severance policies, yet knowingly violated those policies and permitted the dissemination proxies that, at the very least, mislead HP's investors regarding the terms of and Defendants' intent to comply with those policies.

[10] Defendants also assert that Plaintiffs' claims that Defendants engaged in *ultra vires* acts must be dismissed for failure to state a claim. As demonstrated in Plaintiffs' Opposition to the Nominal Defendant Hewlett-Packard Company's Motion to Dismiss filed contemporaneously herewith, Plaintiffs have adequately alleged that Defendants engaged in *ultra vires* acts. In addition, Defendants contend that the state law duty of disclosure claim must be dismissed because Plaintiffs have failed to allege adequately that the proxy statements contained false and misleading statements. For the reasons stated in Section II.B.1, *supra*, this contention is incorrect.

1    the LTPC when she was required under that Program's plain terms to forfeit <u>any</u> award
2    thereunder; breached an agreement with HP's shareholders to apply the Policies in accordance
3    with the terms disclosed to them in the Company's proxy materials; and induced Plaintiffs to vote
4    for the director candidates nominated by the Board in three consecutive elections via false and
5    misleading proxy materials. Section 102(b)(7), therefore, is plainly inapplicable. *See California*
6    *Pub. Employees Ret. Sys. v. Coulter,* No. Civ. A. 19191, 2002 WL 31888343, *17 (Del. Ch. Dec.
7    18, 2002) ("Defendants assert that any claim for breach of the duty of care is precluded, pursuant
8    to 8 Del. C. § 102(b)(7), by an exculpatory provision of Lone Star's Certificate of Incorporation.
9    If any surviving claims were based *solely* upon breach of the duty of care and sought solely
10   monetary damages, this argument might have merit. All surviving breach of fiduciary duty claims
11   may implicate the duty of loyalty for which the directors may not be afforded protection under
12   § 102(b)(7), and, in several instances, the remedy sought is not limited to damages. Defendants'
13   motion to dismiss any claims on the basis of an exculpatory provision in Lone Star's Certificate of
14   Incorporation is denied.") (emphasis in original).

15       Moreover, even if HP's § 102(b)(7) provision did insulate Defendants from liability—and
16   it does not—it would be improper procedurally for the Court to consider the existence of such a
17   provision in ruling on Defendants' motion to dismiss. The existence of a § 102(b)(7) provision
18   may only "properly be invoked and applied" in ruling on a motion to dismiss "where the factual
19   basis for a claim *solely* implicates a violation of the duty of care." *Malpiede,* 780 A.2d at 1093
20   (quoting *Emerald Partners v. Berlin,* 726 A.2d 1215, 1224 (Del. Super. Ct. 1999)) (emphasis
21   added in *Malpiede*). Because the factual basis of Plaintiffs' claim implicates much more than a
22   violation of the duty of care, the Court should not consider the existence of HP's § 102(b)(7)
23   provision in ruling on the instant motion to dismiss.

24       In an effort to distract the Court from the fact that HP's § 102(b)(7) provision is
25   inapplicable, Defendants argue that Plaintiffs have failed to allege that Defendants acted in "bad
26   faith" in awarding Fiorina her severance payments. Def.'s Br. at 16. But whether Defendants
27   acted in "bad faith" is irrelevant. Plaintiffs allege that Defendants acted *ultra vires*—in other
28

1  words, utterly beyond their powers—in awarding Fiorina severance well beyond what was

2  permitted under HP's policies. *See, e.g., In re Walt Disney Co. Derivative Litig.,* No. Civ.A.

3  15452, 2005 WL 2056651, *34 (Del. Ch. Aug. 9, 2005) ("The purpose of Section 102(b)(7) was

4  to permit shareholders--who are entitled to rely upon directors to discharge their fiduciary duties

5  at all times--to adopt a provision in the certificate of incorporation to exculpate directors from

6  any personal liability for the payment of monetary damages for breaches of their duty of care,

7  but not for duty of loyalty violations, good faith violations and certain other conduct."). In this

8  regard, whether a director complied with his or her fiduciary of care or acted in "bad faith" is

9  completely irrelevant to determining whether certain conduct was illegal under Delaware law as

10  being *ultra vires. See, e.g., Carmody v. Toll Bros., Inc.,* 723 A.2d 1180, 1185 (Del. Ch. 1998)

11  ("The critical issue on this motion is whether a "dead hand" provision in a "poison pill" rights

12  plan is subject to legal challenge on the basis that it is invalid as ultra vires, or as a breach of

13  fiduciary duty, or both.").[11] Because § 102(b)(7) only applies to claims asserting a breach of the

14  duty of care, it has no place in the analysis of claims relating to *ultra vires* acts.

15      **B.      Defendants Are Not Entitled to the Protections of the Business Judgment Rule**

16      Defendants, again ignoring that Plaintiffs have alleged that the Board acted *ultra vires,*

17  erroneously contend that Plaintiffs' state law claims are barred by the business judgment rule.

18  Def.'s Br. at 17. Defendants acknowledge that the Board is not entitled to protection under the

19  business judgment rule if the Amended Complaint "alleges facts that, if proven, would rebut the

20  presumption of business judgment." Def.'s Br. at 18 (citing *Aronson v. Lewis,* 473 A.2d 805, 812

21  (Del. 1984)). By alleging that Defendants violated express provisions of an employee

22  compensation program, Plaintiffs have raised a reasonable doubt that Fiorina's $21.4 million

23  severance payment was the product of a valid exercise of business judgment. *See, e.g., Sanders v.*

24  *Wang,* No. 16640, 1999 WL 1044880 (Del. Ch. Nov. 8, 1999) (by alleging that defendants

25

26  [11]    *See also* Celia R. Taylor, "'A Delicate Interplay': Resolving the Contract and Corporate Law Tension in
    Mergers," 74 Tul. L. Rev. 561 (Dec. 1992) ("*Ultra vires* and corporate fiduciary duty analyses focus on different

27  issues. The former is concerned with the directors' power to take particular actions and defining the universe within
    which the directors must act. Fiduciary duty analysis considers how the power granted directors may or must be

28  exercised.").

1    violated the provisions of a stock option plan, plaintiffs had "raise[d] a reasonable doubt that the
2    share transaction resulted from a valid exercise of business judgment. A[t] a minimum, the
3    plaintiffs have sufficiently alleged facts which, taken as true, show that the [company's] board
4    violated an express KESOP provision limiting the number of shares they were authorized to
5    award."). As such, the business judgment rule is not a bar to Plaintiffs' state law claims.

6              **C.    Plaintiffs Have Stated A Claim for Promissory Fraud**

7              Defendants assert a host of meritless arguments with respect to Plaintiffs' well-plead
8    promissory fraud claim. Specifically, Defendants contend that Plaintiffs (1) have failed to plead
9    that the proxy statements were actually false and misleading; (2) have failed to plead justifiable
10   reliance; and (3) have improperly relied upon group pleading. Defendants are wrong on each
11   count. As discussed above, Plaintiffs sufficiently have plead that the proxy statements were false
12   and misleading. *Supra* Section II.B.1. Defendants' claim that Plaintiffs have not plead justifiable
13   reliance is also baseless. As an initial matter, Defendants improperly posit that the amenability of
14   this claim to class certification—a procedural question not yet before this Court—somehow has
15   bearing on whether the Complaint adequately alleges a claim for promissory fraud. Whether a
16   claim is appropriate for class certification should not be considered in determining whether a
17   plaintiff's individual claim should survive a motion to dismiss. *See, e.g., Weeks v. Bareco Oil Co.*,
18   125 F.2d 84 (7th Cir. 1941) (denying motion to dismiss where plaintiffs had, individually, stated a
19   cause of action against defendants); *Cox v. Hutchinson*, 204 F. Supp. 442, 447 (D. Ind. 1962) ("It
20   does not follow, however, as defendants contend, that the entire action should be summarily
21   dismissed merely because it fails as a class action. Plaintiff has brought his suit individually, as
22   well as on behalf of the classes mentioned, and if he has stated a good of action against the
23   defendants on his own behalf, the same should not be dismissed as to him.").

24           In any event, questions of individual reliance do not predominate where, as here,
25   Defendants made the exact same representations to each member of the class. *See, e.g., In re*
26   *DaimlerChrysler AG Sec. Litig.,* 216 F.R.D. 291, 300 (D. Del. 2003) ("As the Court has discussed
27   in the context of the commonality requirement, *common questions of law and fact involving*

28   PLAINTIFFS' MEMORANDUM OF LAW IN              20
     OPPOSITION TO DIRECTOR DEFENDANTS' MOTION TO
     DISMISS PLAINTIFFS' VERIFIED AMENDED COMPLAINT
     CASE NO: C06-01711 RMW

1  *violations of the securities laws based upon misrepresentations and omissions made uniformly to*
2  *the entire class exist in this lawsuit and predominate over any individual questions of reliance that*
3  *may exist.* Accordingly, the Court concludes that Lead Plaintiffs have established this requirement
4  of class certification.") (emphasis added); *In re MDC Holdings Sec. Litig.,* 754 F. Supp. 785, 806-
5  07 (S.D. Cal. 1990) ("As noted, the court is persuaded by Touche's challenges that the complaint
6  does not adequately plead facts that would entitle plaintiffs to invoke a presumption of reliance.
7  Nonetheless, it does not necessarily follow that class certification is inappropriate. The issue is
8  whether the individual questions concerning reliance would predominate over the common
9  questions of the suit. In this case, numerous common questions of fact and law exist. Plaintiffs
10 have alleged a common course of wrongdoing based on the same misrepresentations. As this
11 court found in Lubin, 'it would defy common sense to find that class certification is defeated by
12 the possibility of individual questions appertaining to one of the elements of one of the case's
13 causes of action.'"). Accordingly, even if the purported amenability of Plaintiffs' promissory
14 fraud claim to class certification were a proper basis for dismissal of this claim—and it is not—
15 individual questions of reliance do not predominate where, as here, Plaintiffs all relied on the
16 exact same misrepresentations. Plaintiffs have plead reliance.

17 Finally, Defendants contend that the promissory fraud claim should be dismissed because
18 Plaintiffs failed to separately plead the fraudulent acts of each defendants. This contention is
19 utterly without merit. Plaintiffs' promissory fraud claim is premised on the false disclosures in
20 HP's proxy statements – which are group published documents. It is well-established that the
21 "'group published information' presumption allows plaintiffs to rely upon a presumption that the
22 allegedly false and misleading group published information complained of is the collective action
23 of officers and directors." *In re Secure Computing Corp., Sec. Litig.,* 120 F. Supp. 2d 810, 821-22
24 (N.D. Cal. 2000) (internal quotations omitted).

25 **D.    Plaintiffs Have Stated Claims for *Ultra Vires* Actions**

26 Defendants falsely contend that Plaintiffs have not stated claims for *ultra vires* actions,
27 unduly focusing on the distinction between "void" and "voidable" actions in an effort to distract

28

1    this Court from that the fact that the Delaware Court of Chancery recognizes that where, as here,

2    a board of directors makes compensation decisions in plain violation of companies policies, the

3    board acts *ultra vires*.  In *Coulter*, plaintiffs alleged that the board of Lone Star Steakhouse &

4    Saloon, Inc. ("Lone Star") acted *ultra vires* by repricing stock options without obtaining the

5    shareholder approval required under the options' underlying plan.  The court found that the

6    board acted *ultra vires* by failing to obtain shareholder approval as required under the plan:

7          It appears undisputed that the repricings were conducted under the options plan
           without additional shareholder approval . . .  Thus, plaintiff alleges with
8          particularity that repricing of directors' options in 1997 and 1999 was *ultra vires*.
           Any action of the board that falls outside the rather broad scope of its authority is
9          not entitled to the protection of the business judgment rule and demand is
           excused.
10
     *Coulter*, 2002 WL 31888343, at *11 (emphasis added).  Here, as in *Coulter*, Plaintiffs allege that
11
     the Board acted *ultra vires* by awarding severance in plain contravention of the limits set by the
12
     Policies.  *Coulter* makes clear that Plaintiffs are not required, as Defendants self-servingly
13
     suggest, to plead "an act which the corporation could not accomplish, no matter how
14
     undertaken." Def.'s Br. at 21.  Rather, the Delaware Court of Chancery recognizes that actions
15
     taken in violation of company policies are *ultra vires*.  Plaintiffs' allegations that Defendants
16
     violated the Policies in connection with Fiorina's severance are sufficient to state claims for *ultra*
17
     *vires* actions.
18
                      E.      **The Breach of Contract Claim Is Adequately Stated**
19
           Defendants falsely contend that Plaintiffs' breach of contract claim must be dismissed
20
     because "[a]s a matter of law, a board *policy,* such as the Severance Policy at issue here, is not an
21
     irrevocable, binding commitment . . ." Def.'s Br. at 22 (emphasis added).  Defendants' argument
22
     ignores that, under the facts as plead in the Plaintiffs' Amended Complaint—which must be
23
     taken as true for purposes of ruling on the instant motion to dismiss (*see, e.g., Zelman v. JDS*
24
     *Uniphase Corp.*, 376 F. Supp. 2d 956, 964 (N.D. Cal. 2005))—Defendants adopted the Policies
25
     in an attempt to secure the shareholders' continued votes in their favor. ¶ 42.  Such allegations
26
     of bargained-for exchange, which must be accepted as true in ruling on the instant motion to
27

28   PLAINTIFFS' MEMORANDUM OF LAW IN            22
     OPPOSITION TO DIRECTOR DEFENDANTS' MOTION TO
     DISMISS PLAINTIFFS' VERIFIED AMENDED COMPLAINT
     CASE NO:  C06-01711 RMW

1  dismiss, are sufficient to allege the existence of a binding contract. *See, e.g., Unisuper Ltd. v.*

2  *News Corp.,* No. 1699-N, 2005 WL 3529317 (Del. Ch. Nov. 7, 2005).

3  Defendants' self-serving contention that a company policy cannot give rise to contract

4  liability "as a matter of law" is simply wrong. To the contrary, a recent Delaware Court of

5  Chancery decision imposed contract liability on a board of directors under circumstances

6  remarkably similar to those at issue. In *News Corporation,* a group of institutional shareholders

7  brought claims against News Corporation ("News Corp") for, among other things, breach of

8  contract. Plaintiffs alleged that News Corp had agreed, through statements made in a press

9  release, in a letter to shareholders, and in conversations with plaintiffs' representatives, to submit

10  any proposed extensions of a poison pill in place at News Corp to a shareholder vote, yet

11  nonetheless extended the poison pill without first obtaining the required shareholder approval.

12  The court denied News Corp's motion to dismiss the breach of contract claim, noting:

13      If the board has the power to adopt resolutions (or policies), then the power to
        rescind resolutions (policies) must reside with the board as well. An equally
14      strong principle is that: If a board enters into a contract to adopt and keep in place
        a resolution (or a policy) that others justifiably rely upon to their detriment, that
15      contract may be enforceable, without regard to whether resolutions (or policies)
        are typically revocable by the board at will.
16
    *Id.* at *5 (emphasis added). That Defendants would typically have the power to amend the
17
    Policies under general principles of Delaware corporate law does not immunize them from
18
    liability where, as here, Defendants agreed to apply the Policies in accordance with the terms
19
    disclosed in the Company's proxy materials in exchange for Plaintiffs' votes. Accordingly,
20
    Plaintiffs have stated a claim for breach of contract.
21
                    **F.    Plaintiffs Have Adequately Stated A Waste Claim**
22
        Defendants allege that Plaintiffs have failed to state a claim for waste, again erroneously
23
    casting Plaintiffs' claim as a challenge to the mere size of Fiorina's severance. Plaintiffs' claims
24
    are based not on the sheer size of Fiorina's severance but on the fact that the Board awarded
25
    severance in clear violation of the terms of the Policies as disclosed in the Company's proxy
26
    statements. Accordingly, that the Delaware courts have dismissed waste claims that were
27
    premised on naked challenge to the size of a compensation package is unavailing. *See, e.g.,*
28

1  *Brehm v. Eisner,* 746 A.2d 244, 252 (Del. 2000) (upholding severance package challenged as
2  corporate waste and explicitly noting that "Ovitz and Disney had negotiated for that severance
3  payment at the time they initially contracted in 1995, and in the end the payout to Ovitz did not
4  exceed the 1995 contractual benefits"). In fact, the Delaware courts have upheld claims for
5  corporate waste where, as here, compensation was awarded in violation of corporate policies.
6  *See, e.g., Sanders v. Wang,* No. 166640, 1999 WL 1944880 (Del. Ch. Nov. 8, 1999) (finding
7  that plaintiffs had stated a claim for corporate waste where the board issued shares in excess of
8  the amount permissible under the governing employee stock option plan). HP's own Policies
9  clearly delineated the circumstances under which a departing employee was required to forfeit
10  amounts otherwise due under the LTPC. Because Fiorina was required to forfeit <u>any</u> payments
11  under the plain terms of the LTPC, the Board's decision to award her $7.4 million under the
12  Program amounts to waste.

13  Moreover, Defendants' contention that Fiorina's agreement to sign a general waiver as a
14  condition to receiving her severance "undermines any possible argument that the transaction"
15  (Def.'s Br. at 24) was waste is unavailing. The Delaware courts recognize that the adequacy of
16  consideration is a question of fact inappropriate for resolution at this stage of the action. *See,*
17  *e.g., Michelson v. Duncan,* 407 A.2d 211, 223 (Del. 1979) (holding that summary judgment was
18  "inappropriate on the issue of waste of corporate assets" because material issues of fact
19  concerning the existence of consideration existed). Accordingly, that Defendants may have
20  created a question of fact is not sufficient to warrant the dismissal of Plaintiffs' waste claim.

21       **G.    Plaintiffs Have Stated a Claim for Breach of Duty of Disclosure**

22  Plaintiffs have stated a claim for breach of duty of disclosure. Defendants correctly note
23  that "[t]o survive a motion to dismiss, the plaintiff's complaint must allege the facts that are
24  missing from a statement, identify those facts, state why these facts meet the materiality
25  standard, and how the omission caused injury." Def.'s Br. at 24. However, Defendants falsely
26  contend that Plaintiffs have failed to satisfy the materiality and injury requirements of their
27  breach of duty of disclosure claim. *Id.* at 24. Defendants are wrong on both counts.

28

The Company's proxy statements were replete with false and misleading statements concerning the Policies and the Board's intention to comply therewith. Moreover, the Amended Complaint plainly alleges that the shareholders considered these statements important in deciding how to vote. ¶¶ 43; 121; 128; 136; 142; 143-145; 153-155. This is sufficient to demonstrate that the false and misleading statements were "material." *See, e.g., Rosser v. New Valley Corp.,* No. 17272, 2000 WL 1206677, *3 (Del. Ch. Aug. 5, 2000) ("A fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.") (citing *Loudon v. Archer-Daniels-Midland, Co.,* 700 A.2d 135, 143 (Del. Super. Ct. 1997); *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del. Super. Ct. 1985)).

In addition, Plaintiffs allege that they were "deprived of the opportunity to cast a fully informed vote on the matters considered at the Company's 2004, 2005 and 2006 annual meetings." ¶ 146. This sufficiently plead injury. *See, e.g., Thorpe v. CERBCO, Inc.,* Civ. A. No. 11713, 1993 WL 35967, *2 (Del. Ch. Jan. 26, 1993) ("The right to vote stock is the individual right of the legal owner of stock. When the board of directors wrongfully interferes with or wrongfully impairs that right it violates individual rights of stockholders.") (emphasis added).

## CONCLUSION

For the reasons set forth herein, Plaintiffs respectfully request that Defendants' Motion to Dismiss be denied in its entirety.

Dated: September 25, 2006

ANDERLINI, FINKELSTEIN
EMERICK & SMOOT

By _Merrill Emerick_

Merrill G. Emerick
400 South El Camino Real, Ste. 700
San Mateo, California 94402
Tel: (650) 348-0102
Fax: (650) 348-0962

GRANT & EISENHOFER, P.A.
Jay W. Eisenhofer
Sidney S. Liebesman
Michael J. Barry
Chase Manhattan Centre
1201 N. Market Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100

*Attorneys for Plaintiffs*

ANDERLINI, FINKELSTEIN, EMERICK & SMOOT
Merrill G. Emerick (Bar. No. 117248)
400 South El Camino Real, Suite 700
San Mateo, California 94402
Tel: (650) 348-0102
Fax: (650) 348-0962

GRANT & EISENHOFER PA
Jay W. Eisenhofer
Sidney S. Liebesman
Michael J. Barry
Chase Manhattan Centre
1201 N. Market Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| INDIANA ELECTRICAL WORKERS PENSION TRUST FUND, IBEW; SEIU AFFILIATES' OFFICERS AND EMPLOYEES PENSION PLAN; SEIU NATIONAL INDUSTRY PENSION FUND; and PENSION PLAN FOR EMPLOYEES OF SEIU, on behalf of themselves and all others similarly situated, and derivatively on behalf of Hewlett-Packard Company, <br><br> Plaintiffs, <br><br> v. <br><br> PATRICIA C. DUNN, LAWRENCE T. BABBIO, RICHARD A. HACKBORN, GEORGE A. KEYWORTH II, ROBERT E. KNOWLING, JR., THOMAS PERKINS, ROBERT L. RYAN, LUCILLE SALHANY, and CARLETON S. FIORINA, <br><br> Defendants. <br><br> And <br><br> HEWLETT-PACKARD COMPANY, <br><br> Nominal Defendant. | Case No.: C06-01711 RMW <br><br> **CERTIFICATE OF SERVICE** <br><br> CLASS ACTION |

CERTIFICATE OF SERVICE
Case No. C06-01711 RMW

I certify that on September 25, 2006, the attached PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE DIRECTOR DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' VERIFIED AMENDED COMPLAINT and this CERTIFICATE OF SERVICE were served on the parties listed below via First Class U.S. Mail.

*Merrill Emerick*

Merrill G. Emerick

Dean J. Kitchens, Esquire
GIBSON DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
*Counsel to Patricia C. Dunn, Lawrence T. Babbio, Richard A. Hackborn, George A. Keyworth II, Robert E. Knowling, Jr., Thomas Perkins, Robert L. Ryan and Lucille Salhany*

Steven M. Schatz, Esquire
Boris Feldman, Esquire
Gideon A. Schor, Esquire
Bahram Seyedin-Noor, Esquire
WILSON SONSINI GOODRICH & ROSATI, PC
650 Page Mill Road
Palo Alto, CA 94304
*Counsel to Hewlett-Packard Company*

Jonathan C. Dickey, Esquire
Jayesh Hines-Shah, Esquire
Jeffrey A. Minnery, Esquire
GIBSON DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA 94304
*Counsel to Patricia C. Dunn, Lawrence T. Babbio, Richard A. Hackborn, George A. Keyworth II, Robert E. Knowling, Jr., Thomas Perkins, Robert L. Ryan and Lucille Salhany*

David E. Kendall, Esquire
Beth Stewart, Esquire
WILLIAMS & CONNOLLY LLP
725 Twelfth Street NW
Washington, D.C. 20005
*Counsel to Carleton S. Fiorina*

Christopher C. Kearney, Esquire
Laurie Carr Mims, Esquire
KEKER & VAN NEST, LLP
710 Sansome Street
San Francisco, CA 94111
*Counsel to Carleton S. Fiorina*