1

2

3                                                          **E-FILED on**    3/1/07

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                              SAN JOSE DIVISION

10

11   INDIANA ELECTRICAL WORKERS              No. C-06-01711 RMW
     PENSION TRUST FUND, IBEW; SEIU
12   AFFILIATES' OFFICERS AND EMPLOYEES      ORDER GRANTING DEFENDANTS'
     PENSION PLAN; SEIU NATIONAL             MOTIONS TO DISMISS
13   INDUSTRY PENSION PLAN; and PENSION
     PLAN FOR EMPLOYEES OF SEIU, on behalf   **[Re Docket Nos. 43, 45, 52, 54]**
14   of themselves and all others similarly situated,
     and derivatively on behalf of Hewlett-Packard
15   Company,

16              Plaintiffs,

17        v.

18   PATRICIA C. DUNN, LAWRENCE T.
     BABBIO, RICHARD A. HACKBORN,
19   GEORGE A. KEYWORTH II, ROBERT E.
     KNOWLING, JR., THOMAS PERKINS,
20   ROBERT L. RYAN, LUCILLE SALHANY,
     and CARLETON S. FIORINA,
21
                Defendants,
22
          and
23
     HEWLETT-PACKARD COMPANY,
24
                Nominal Defendant.
25

26

27

28

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    Plaintiffs bring this action alleging that the severance package given to Carleton S. Fiorina

2    ("Fiorina"), former chief executive officer of Hewlett-Packard Company ("HP"), violated HP's plans

3    and policies.  Defendants Patricia C. Dunn, Lawrence T. Babbio, Richard A. Hackborn, George A.

4    Keyworth II, Robert E. Knowling, Jr., Thomas Perkins, Robert L. Ryan and Lucille Salhany

5    ("Director Defendants") move to dismiss plaintiffs' Verified Amended Complaint ("AC") for failure

6    to state a claim and failure to comply with the demand requirements under Fed. R. Civ. P. 23.1 for

7    derivative claims.  Defendant Fiorina moves to dismiss plaintiffs' request to place a constructive

8    trust on $21.4 million of cash payments she received upon termination of her employment from HP.

9    Nominal defendant HP moves to dismiss plaintiffs' derivative counts for failure to make a demand in

10    accordance with Fed. Rule Civ. P. 23.1.  The court has read the moving and opposing briefs and

11    considered the arguments of counsel.  For the reasons set forth below, the court GRANTS

12    defendants' motions to dismiss as follows: (1) count one is dismissed with prejudice; (2) counts two

13    through ten are dismissed with leave to amend; and (3) plaintiffs have twenty days from the date of

14    this order to amend those claims not dismissed with prejudice.

15                                        **I.  BACKGROUND**

16        **A.    Factual Allegations**

17        Upon the completion of the merger of Compaq Computer Corporation ("Compaq") with HP

18    on May 3, 2002, Compaq's former chief executive officer, Michael Capellas joined HP as president.

19    AC ¶ 25.  In November of 2002 Capellas left HP and received approximately $16 million in

20    severance payments.  *Id.* ¶ 26.  In response, HP's shareholders submitted a shareholder proposal

21    pursuant to SEC Rule 14a-8 for inclusion in HP's 2003 proxy statement.  *Id.* ¶ 27.  The proposal

22    urged HP to seek shareholder approval for any future severance agreements with senior executives

23    that provide for payments in excess of 2.99 times the sum of the executive's annual salary plus

24    bonus.  *Id.*  HP shareholders voted to approve the proposal over HP's urging to reject it.  *Id.* ¶ 29.

25        In May 2003 HP adopted the Long Term Performance Cash Program (the "LTPC Program").

26    Under this program, senior management could earn cash payments if HP met certain financial

27    targets over a three year period from the grant date of an award.  *Id.* ¶ 30.  According to the

28    complaint, the earned payments do not vest until three years from the grant date, and continued

United States District Court
For the Northern District of California

employment is a requirement for the payments to vest: "the Employee must remain in the employ of the Company on a continuous, full-time basis through the close of business on the third anniversary of the Grant Date, for such Cash Award to vest, subject to paragraphs 6-9 of this Agreement."[1] *Id.* ¶ 31. HP retained discretion under the LTPC Program to increase or decrease the cash payout for an employee whose employment was terminated prior to vesting due to retirement, disability, death, or a reduction in workforce, "and for exceptional circumstances, except that such payout cannot be increased for Covered Employees as defined in Section 162(m) of the Internal Revenue Code of 1986, as amended." *Id.* ¶ 33 (citing LTPC ¶ 14(c)).

HP's 2004 proxy statement described the LTPC Program as follows: "Generally, if a participant is no longer employed by HP due to being placed in a workplace reduction program, disability, retirement or death, then targeted cash amounts are prorated. In the event of other terminations, any banked amount will be forfeited." *Id.* ¶ 37 (citing HP 2004 proxy statement at 35). Plaintiffs allege that HP changed the description of the LTPC Program in its 2005 proxy statement, after termination of Fiorina's employment, and further allege that the new description directly contradicted the terms of the LTPC. *Id.* ¶ 61. As described in HP's 2005 proxy statement, under the LTPC Program, "if a participant is no longer employed by HP due to involuntary termination, disability, retirement or death, targeted awards are paid subject to certain adjustments. In the event of voluntary terminations, any banked amounts will be forfeited and no payment is made." *Id.* ¶ 60.

On July 18, 2003 HP adopted a Severance Policy that provides:

> HP will seek shareholder approval for future severance agreements, if any, with senior executives that provide specific benefits if any amount exceeding 2.99 times the sum of the executive's current annual base salary plus annual target bonus, in each case as in effect immediately prior to the time of such executive's termination.

*Id.* ¶ 38. This policy was disclosed in HP's 2004, 2005, and 2006 proxy statements.

Effective October 31, 2003 HP adopted a Severance Program for executive officers pursuant

---

[1]     Paragraphs 6-9 address termination of employment due to retirement, disability, death, or a reduction in workforce. *See* Jonathan C. Dickey Decl. Supp. Defs.' Request for Judicial Notice ("Defs.' RJN"), Ex. A at 4-5 (HP Form of Cash Award Agreement). The court takes judicial notice of the HP Form of Cash Award Agreement, which appears to be the form agreement used to grant awards under the LTPC Program, which terms are alleged in the complaint and form in part the basis of plaintiffs' claims. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (A court may consider documents whose authenticity is not contested and on which plaintiff's complaint necessarily relies.).

to which the chief executive officer would receive severance equal to 2.50 the sum of her annual base salary and annual target cash bonus, as in effect just prior to termination of employment. *Id.* Plaintiffs allege that the terms of this Severance Program were described in HP's 2004 and 2005 proxy statements. *Id.* ¶ 42.  Under the Severance Program:

> Any payments under the severance program will be reduced by any cash severance benefit payable to the participant under any other HP plan, program or agreement, including cash amounts payable for the uncompleted portion of employment agreements and prorated cash bonuses under the applicable short-term bonus plan.

*Id.* (citing HP 2005 proxy statement at 40; HP 2006 proxy statement at 50).  However, certain payments, including prorated payments under long-term incentive programs, are not subject to the Severance Program "either because they have been previously earned or accrued or because they are consistent with Company Practices." *Id.* ¶ 72.

On February 8, 2005 HP terminated Fiorina's employment as chief executive officer.  As disclosed in HP's 2005 proxy statement filed February 11, 2005, a severance agreement was negotiated in exchange for a signed release of claims against HP by Fiorina. *Id.* ¶ 50.  As part of the severance agreement Fiorina received, *inter alia*, $21.4 million consisting of (1) a cash payment of $14,000,000 pursuant to the Severance Program; (2) a cash payment of $5,880,000, representing "Fiorina's award for the 2003-2004 program year of the LTPC Program"; and (3) a cash payment of $1,503,700, representing "Fiorina's award for the 2004-2005 program year of the LTPC Program." *Id.* ¶ 51.  Prior to termination of her employment, Fiorina had an annual base salary of $1.4 million and a targeted bonus of $4.2 million. *Id.* ¶ 68.  Therefore, the $14 million cash payment represented 2.5 times her base salary and targeted bonus. *Id.* ¶ 69.  On February 22, 2005 HP disclosed the specific terms of Fiorina's severance agreement in a Form 8-K filed with the Securities and Exchange Commission ("SEC"), with a copy of the severance agreement attached.

### B.    Counts One through Eleven

Plaintiffs' main complaint is that the $7.4 million payment to Fiorina under the LTPC Program was actually a severance payment.  Plaintiff contends this payment was severance because neither the LTPC Program nor "Company Practices" permits any *pro rata* payout prior to the vest date for employees whose employment is terminated involuntarily.  Therefore, the total severance paid to Fiorina total $21.4 million, which exceeds 2.99 times her base salary and targeted bonus.

**United States District Court**
For the Northern District of California

1  Plaintiffs allege that HP violated its severance policy because it did not seek prior shareholder

2  approval for Fiorina's severance package, violated the terms of the LTPC Program by granting

3  Fiorina *pro rata* payouts prior to her vest date, and violated the provisions of the Severance Program

4  by not deducting the purported LTPC payments from the severance computed under the Severance

5  Program.

6       Plaintiffs allege that all counts, except for counts two, three, and four, are brought

7  derivatively on behalf of HP.  The derivative claims involve an alleged violation of § 14(a) of the

8  Securities Exchange Act of 1934 (count one), a breach of the duty of disclosure (count five), *ultra*

9  *vires* acts in violation of the LTPC, the Severance Program, and the Severance Policy (counts six

10  through eight), *ultra vires* acts resulting in director actions being voidable (count nine), corporate

11  waste (count ten), and imposition of a constructive trust against Fiorina (count eleven).

12       Plaintiffs allege that although these counts are brought derivatively, they are excused from

13  the demand requirements of Fed. R. Civ. P. 23.1 because demand would be futile.  Specifically,

14  plaintiffs allege that five of the ten directors at the time the complaint was filed were not

15  independent and, additionally, the alleged acts of the directors were *ultra vires* and therefore not a

16  proper exercise of business judgment.

17       Plaintiffs' purported direct claims are for breach of contract (count two), promissory fraud

18  (count three), and breach of the duty of disclosure (count four).

19                              **II.  ANALYSIS**

20       **A.       Statute of Limitations**

21       Plaintiffs' first count alleges a derivative claim for violation of section 14(a) of the Securities

22  Exchange Act of 1934, 15 U.S.C. § 78n(a).[2]  Plaintiffs argue that HP's proxy statements, filed

23  January 23, 2004, February 11, 2005, and January 23, 2006 contain false and misleading statements

24  because HP never intended to honor its disclosed policies to seek shareholder approval for severance

25

26  [2]       Section 14(a) prohibits the solicitation of proxies in violation of any rules and regulations
    promulgated under the Act.  15 U.S.C. § 78n(a).  Rule 14a-9, which was promulgated pursuant to
27  Section 14(a), further provides that no proxy statement shall contain "any statement which, at the
    time and in the light of the circumstances under which it is made, is false or misleading with respect
28  to any material fact, or which omits to state any material fact necessary in order to make the
    statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

payments in excess of 2.99 times base salary plus bonus and to reduce any payments under the Severance Program by cash severance benefit payments under any other HP plans.  Plaintiffs also allege that HP's proxy statements failed to disclose that severance payments to Fiorina totaled $21.4 million, not $14 million, and included *pro rata* LTPC Program payments in violation of earlier disclosed HP policies that provided for such LTPC Program payments only if employment terminated due to retirement, disability, death, or a reduction in workforce.  AC ¶¶ 107(a), 107(b); ¶¶ 110(a), 110(b); ¶ 112.  Plaintiffs contend that defendants made these misstatements in order to get the shareholders to elect or reelect them as directors, and to approve certain compensation plans presented to the shareholders in connection with those proxy statements.

The director defendants argue that plaintiffs' § 14(a) claims are barred by the statute of limitations because the claims were first filed more than one year after HP's first public disclosures of the terms of Fiorina's severance agreement.  "Litigation instituted pursuant to § 10(b) and Rule 10b-5 . . . must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364 (1991).  Courts have adopted this same limitations period for claims under § 14(a).  *See Westinghouse Elec. Corp. v. Franklin*, 993 F.2d 349, 353 (3d Cir. 1993); *Ceres Partners v. GEL Assocs.*, 918 F.2d 349, 353 (2d Cir. 1990).  The basis for plaintiffs' § 14(a) claims is that the severance agreement negotiated with Fiorina contained a severance payout that renders HP's disclosures in its 2004, 2005, and 2006 proxy statements false and misleading.  HP terminated Fiorina's employment on February 8, 2005, filed its proxy statement containing details of Fiorina's severance and benefits package on February 11, 2005, and filed SEC form 8-K with a copy of the severance agreement and release attached on February 22, 2005.  Plaintiffs filed their complaint on March 6, 2006.  Plaintiffs argue that they did not discover their § 14(a) claim until March 16, 2005 when Patricia Dunn, in responding to a shareholder question at HP's 2005 annual meeting, referred to the entire $21.4 million payment to Fiorina as "severance."  AC ¶ 50.[3]

---

[3]   Specifically, plaintiffs allege that they first learned that the cash payments under the LTPC Program were "severance" payments during the March 16, 2005 annual shareholders meeting during which defendant Dunn, in responding to a shareholder question, stated: "The first [question] was on severance and what was the basis for – the number – $21.4 million payment to Carly Fiorina as

United States District Court
For the Northern District of California

The statute of limitations for claims is triggered "when the plaintiff has actual knowledge of the fraud or knowledge of facts sufficient to put a reasonable person on notice." *In re Syntex Corp. Securities Litig.*, 855 F. Supp. 1086, 1099 (N.D. Cal. 1994) (referring to the statute of limitations for claims under section 10b-5) (citing *Davis v. Birr, Wilson & Co., Inc.*, 839 F.2d 1369, 1370 (9th Cir.1988)) (additional citations omitted). Here, the premise of plaintiffs' argument is that the $7.4 million paid under the LPTC Program is really severance because HP manipulated and violated the policies of the LPTC Program and the Severance Program in order to give Fiorina a payout under the LPTC Program. Plaintiffs' argument that they were not put on inquiry notice until defendant Dunn referred to the $7.4 million as "severance" in responding to a shareholder question is unpersuasive. A reading of plaintiffs' complaint indicates that all of the facts that form the basis of plaintiffs' argument were disclosed in the 2004 proxy statement, 2005 proxy statement, and the February 22, 2005 form 8-K, which included a copy of the severance agreement and Fiorina's release of claims.

Plaintiffs allege that the 2004 proxy statement described the LPTC Program as precluding *pro rata* payout from the LPTC program except where employment is terminated due to retirement, death, disability, or a reduction in workforce. The 2005 proxy statement disclosed that Fiorina was being paid prior to the completion of the applicable three year vesting period. Specifically, HP disclosed that Fiorina received $5,880,000 for the 2003-2004 program year and $1,503,700 for the 2004-2005 program year. The detailed terms of Fiorina's severance agreement were described in the 2005 proxy statement and a copy of the severance agreement was publicly disclosed on February 22, 2005. These filings together disclosed facts sufficient to place a reasonable person on notice that Fiorina received *pro rata* payments under the LPTC Program even though the termination of her employment was involuntary. In other words, assuming the truth of plaintiffs' allegations, the disclosure of payments to Fiorina under the LPTC Program itself gave notice that HP had violated

severance." AC ¶ 50.

ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS—06-01711 RMW
SPT                                                                  7

1    the terms of the LPTC Program, as previously disclosed by HP.  Because plaintiffs' § 14(a) claim

2    was filed more than one year after these disclosures, it is time barred.[4]

3        **B.      Demand Requirement**

4        Defendants argue that plaintiffs' derivative claims (counts one and counts five through

5    eleven) should be dismissed for failure to make demand on the 2006 board of directors or on HP, or

6    to allege futility of demand pursuant to Rule 23.1.  "A shareholder seeking to vindicate the interests

7    of a corporation through a derivative suit must first demand action from the corporation's directors

8    or plead with particularity the reasons why such demand would have been futile."  *In re Silicon*

9    *Graphics Inc. Securities Litig.*, 183 F.3d 970, 989-90 (9th Cir. 1999) (citing Fed. R. Civ. P. 23.1).

10   The circumstances which make a demand futile are established by the laws of the state in which the

11   corporation is incorporated.  *Id.* at 990.  HP is incorporated in Delaware.  Under Delaware law, there

12   is a presumption of independence.  *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984) (overruled on

13   other grounds).  "To show futility under Delaware law, a plaintiff must allege particularized facts

14   creating a reasonable doubt that (1) the directors are disinterested and independent, or (2) the

15   challenged transaction was otherwise the product of a valid exercise of business judgment."  *In re*

16   *Silicon Graphics*, 183 F.3d at 990 (citation omitted).  Essentially, "where officers and directors are

17   under an influence which sterilizes their discretion, they cannot be considered proper persons to

18   conduct litigation on behalf of the corporation."  *Aronson*, 473 A.2d at 814.  However,

19   "[s]peculation on motives for undertaking corporate action are [sic] wholly insufficient to establish a

20   case of demand dismissal."  *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 356 (Del. Ch. 1998)

21   (reversed on other grounds by *Brehm v. Eisner*, 746 A.2d 244, 248 (Del. 2000)).

22       **1.      Disinterested and Independent**

23       Plaintiffs allege that reasonable doubt exists as to the independence of five of the ten

24   directors of the board at the time the complaint was filed.  In determining whether directors are

25   disinterested and independent, the question is "were they incapable, due to personal interest or

27   [4]     Defendants also argue that plaintiffs' § 14(a) claim should be dismissed for failure to satisfy
     the demand requirements of Rule 23.1 and for failure to state a claim.  Rule 23.1's requirements as to
28   plaintiffs' derivative claims are discussed in section B, *infra*.  Because the court finds that plaintiffs'
     § 14(a) claim is time barred, it does not reach defendants' Rule 12(b)(6) contentions.

**United States District Court**
For the Northern District of California

1   domination and control, of objectively evaluating a demand, if made, that the Board assert the

2   corporation's claims that are raised by plaintiffs or otherwise remedy the alleged injury?" *Brehm*,

3   746 A.2d at 257.  The issue of independence is "a fact-specific determination made in the context of

4   a particular case." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040,

5   1049-50 (Del. 2004).  A court considers the answer to two questions: "independent from whom and

6   independent for what purpose?" *Id.*  "In order to show lack of independence, the complaint of a

7   stockholder-plaintiff must create a reasonable doubt that a director is not so beholden to an

8   interested director . . . that his or her discretion would be sterilized." *Id.* (citation and internal

9   quotations omitted).  In addition, as the *Brehm* court noted, "[i]t is no answer to say that demand is

10  necessarily futile because (a) the directors would have to sue themselves, thereby placing the

11  conduct of the litigation in hostile hands, or (b) that they approved the underlying transaction.  746

12  A.2d at 257 n.34 (citation and internal quotations omitted).

13          In *Brehm*, the Delaware Supreme Court affirmed that as a matter of law Michael Eisner,

14  chairman and chief executive officer of Walt Disney Co. ("Disney"), was disinterested when he

15  approved a lucrative employment agreement for his long-time friend, Michael S. Ovitz, incoming

16  president of Disney.  *Id.* at 257.  The plaintiffs alleged that the compensation and termination

17  provisions were extravagant and wasteful and that the directors' approval was a breach of fiduciary

18  duty.  *Id.* at 248-49.  The court reasoned that plaintiffs' allegations did not create a reasonable doubt

19  that Eisner was interested in maximizing Ovitz's compensation at Disney's and its shareholder's

20  expense.  *Id.* at 257.  Eisner owned several million options to purchase Disney stock, and therefore it

21  would not be in his economic interest to cause Disney to unnecessarily issue millions of additional

22  options to Ovitz diluting his holdings.  *Id.*  In addition, the approval of Ovitz's lucrative

23  compensation package would and did draw negative attention to Eisner's own performance and

24  compensation.  *Id.*  Similarly, the court concluded that "[n]othing alleged by [p]laintiffs generates a

25  reasonable inference that Eisner would benefit personally from allowing Ovitz to leave Disney

26  without good cause."  *Id.* at 257-58.

27          Plaintiffs allege only that the five directors lack independence.  Plaintiffs make no

28  allegations as to how the directors were other than disinterested in Fiorina's severance package.  As

ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS—06-01711 RMW
SPT                                                    9

noted above, plaintiffs bear the burden of setting forth particularized allegations that create a reasonable doubt as to the directors' independence *and* disinterestedness.  Here, plaintiffs have made no allegations that any of the directors has any personal interest in or may derive any personal benefit from approval of Fiorina's severance agreement or any payments under the LTPC Program. *See, e.g., Bergstein v. Texas Internat'l Co.*, 453 A.2d 467, 471 (Del. Ch. 1982) (finding that directors were not disinterested because they would benefit financially from the plan approved by them). Moreover, as discussed below, plaintiffs' allegations purporting to create a reasonable doubt as to the independence of certain directors are insufficient under Delaware law.

The *Brehm* court's reasoning is instructive in considering plaintiffs' allegations that certain directors lack independence.  Here, plaintiffs allege that directors Hurd and Wayman are both employees of HP and, therefore, are not independent.  Plaintiffs' lone allegation that Hurd and Wayman lack independence because they are employees of HP is insufficient to create a reasonable doubt that Hurd and Wayman would approve an excessive severance package to Fiorina in violation of HP policies.  *Compare Stewart*, 845 A.2d at 1044-45 (a director's "position as an officer and inside director, *together with the substantial compensation she receives from the company*, raised a reasonable doubt as to her ability objectively to consider demand") (emphasis added).  Approval of an excessive severance package would not be in HP's economic interest, although it might be in Fiorina's interest.  Plaintiffs make no allegations that Hurd and Wayman are dependent on Fiorina or subject to her domination and control such that would cause them to be unable to objectively evaluate a demand regarding the propriety of Fiorina's severance agreement.  *See, e.g., Stewart*, 845 A.2d at 1050 ("[S]ome professional or personal friendships, which may border on or even exceed familial loyalty and closeness, may raise a reasonable doubt whether a director can appropriately consider demand.") (citing and adopting the lower court's conclusion).

Similarly, plaintiffs' allegations that directors Babbio, Keyworth, and Ryan have relationships with companies that do business with HP is insufficient.  Specifically, plaintiffs allege that director Babbio has been Verizon's Vice Chairman and President since 2000.  Babbio receives several million in annual compensation and bonuses and holds performance shares and restricted shares in Verizon worth approximately $6.5 million.  AC ¶ 96.  Plaintiffs further allege that HP and

Verizon have an ongoing business relationship because Verizon partners with HP "for certain critical aspects of its business, including providing the infrastructure necessary for its business customers to create and operate call centers." *Id.* ¶ 97.  Plaintiffs allege that "HP's continued assistance to Verizon enables Babbio to continue to earn his lavish compensation" and Babbio "is unlikely to take actions that impede this success." *Id.*  Plaintiffs contend there is reasonable doubt as to director Ryan's independence because until March 2005 he was the chief financial officer and senior vice president of Medtronic, a company that "has provided services to HP." *Id.* ¶ 99. Plaintiffs contend that because Ryan continues to hold significant amounts of Medtronic stock, he "is unlikely to take any actions that could impede Medtronic's continued ability to do business with HP." *Id.*  In addition, plaintiffs assert that because Ryan is on the board of General Mills, and General Mills does substantial business with HP, including operating its entire global enterprise on HP systems, Ryan's independence is further compromised.

However, plaintiffs' allegations are not particularized.  For example, although plaintiffs allege generally that Ryan has a relationship as a shareholder and former executive of Medtronic, they do not allege how this relationship creates an influence that would affect Ryan's ability to exercise his directorial discretion objectively as to plaintiffs' demand.  "[I]n the demand-futile context a plaintiff charging domination and control of one or more directors must allege particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling." *Aronson*, 473 A.2d at 816.  Taken together, plaintiffs' allegations do not show, or even create a reasonable doubt, that Babbio and Ryan would be unable to objectively evaluate a demand asserting that the payments to Fiorina exceed what is permitted under HP's plans. *See also Stewart*, 845 A.2d at 1050 ("[T]o render a director unable to consider demand, a relationship must be of a bias-producing nature. Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence.").  If anything, these relationships tend to support a conclusion that Babbio and Ryan would be likely to act in the best interest of HP to further HP's success, and thereby the success of the other companies they serve. Further, although directors Babbio, Keyworth, and Ryan are also defendants in this action, as the

**United States District Court**
For the Northern District of California

*Aronson* court noted, it is not the case that "any board approval of a challenged transaction automatically connotes 'hostile interest' and 'guilty participation' by directors, or some other form of sterilizing influence upon them."  473 A.2d at 814.

Finally, plaintiffs allege that there is reasonable doubt as to Keyworth's independence because he is the chairman and a senior fellow of a non-profit entity which depends in part on donations from HP for its continued success.  AC ¶ 98.  However, this general allegation does not create reasonable doubt that Keyworth is subject to personal interest or dominion and control that would affect his ability to consider plaintiffs' demand that the payments to Fiorina exceed what is permitted under HP's plans.  As is the case with Babbio and Ryan, Keyworth's relationship with the non-profit entity would suggest that Keyworth would act in the best interest of HP rather than Fiorina.

### 2.      The Business Judgment Rule

The second prong of the *Aronson* test considers whether the challenged transaction was the product of an otherwise valid exercise of business judgment.  *In re Silicon Graphics*, 183 F.3d at 990.  It is an inquiry into "the substantive nature of the challenged transaction and the board's approval thereof."  *Aronson*, 473 A.2d at 814.  The review is a fact-based one.  *Id.* at 815.  Plaintiffs must allege facts sufficient to rebut a presumption that the decision was a result of a valid exercise of business judgment.  *Id.* at 812.  Board actions that are deemed *ultra vires* are not entitled to the protection of the business judgment rule.  *Cal. Pub. Employees' Ret. Sys. v. Coulter*, 2002 WL 31888343, *11 (Del. Ch. 2002) ("*Coulter*").  Here, plaintiffs assert the directors acted *ultra vires* because pursuant to the terms of the LTPC, the directors did not have the authority to pay cash awards to an involuntarily terminated employee prior to her vest date.  *Ultra vires* acts are those acts which a corporation cannot, in any case, lawfully accomplish.  *Harbor Finance Partners v. Huizenga*, 751 A.2d 879, 896 (Del. Ch. 1999).  It is unclear whether corporate acts that are merely voidable, *i.e.*, acts that may be ratified by subsequent shareholder approval, may nevertheless be considered *ultra vires* acts.  In the 2002 *Coulter* opinion, the Delaware Chancery Court concluded that the board's repricing of options without shareholder approval was *ultra vires* because the stock option plan provided that any change in exercise price of options required shareholder approval.

2002 WL 31888343 at *11.  The court concluded the act was *ultra vires* even though it might be considered voidable rather than void.  However, in a 2005 decision, the Delaware Chancery Court held that *ultra vires* acts are "illegal acts or acts beyond the authority of the corporation" or, in other words, not merely voidable acts, but void acts.  *Nevins v. Bryan*, 885 A.2d 233, 245 (Del. Ch. 2005).

Regardless, plaintiffs have not alleged that HP's award of LTPC payments to Fiorina prior to her vest date constitutes an *ultra vires* act under either the standard in *Nevins* or in *Coulter* because the alleged facts do not support the conclusion that the directors acted beyond their authority. Plaintiffs' claims rely on their assertion that a pay out of any LTPC amounts to an employee whose employment is involuntarily terminated prior to the vest date violates the express provisions of the LTPC Program to.  However, plaintiffs do not allege that there is no corporate authority permitting adjustment of payouts under the LTPC Program, notwithstanding that the Program terms indicate that in general, involuntary termination of employment prior to the vest date results in forfeiture of the award.  The LTPC provides that HP may in its discretion increase or decrease payouts under the LTPC for "exceptional circumstances."[5]  In addition, HP's 2000 Stock Plan permits the Plan Administrator to accelerate the vesting and to waive forfeiture restrictions of any award under the plan, including Cash Awards.  Defs.' RJN, Ex. B at 1, 5, 14.[6]  Plaintiffs also do not allege that shareholder approval is needed to exercise such corporate discretion under the Stock Plan or the

---

[5]    Although plaintiffs contend that the LTPC expressly excludes any increase or decrease in payouts to a "Covered Employee" as defined in § 162(m) of the Internal Revenue Code of 1986, as amended, Fiorina does not appear to be a "Covered Employee" as defined in § 162(m) at the time of the payout.  Under § 162(m), a "Covered Employee" includes "any individual who, on the last day of the taxable year is . . . the chief executive officer of the corporation or acting in such capacity."  26 C.F.R. § 1.162-27(c)(2)(i).  Because "Covered Employee" status under § 162(m) is measured as of the last day of the taxable year and the payout to Fiorina was made in connection with termination of her services as chief executive officer prior to October 31, 2005, the last day of the applicable tax year, Fiorina could not be a "Covered Employee."

[6]    The court grants defendants' request for judicial notice of the HP 2000 Stock Plan. Defendants assert that provisions in the HP 2000 Stock Plan, which also applies to HP LTPC Cash Awards, refute plaintiffs' argument that pre-vesting payouts of LTPC awards are limited to situations where employment is terminated due to retirement, disability, death, or reduction in workforce.  The court agrees that the 2000 Stock Plan includes a provision that describes the Plan Administrator's discretion with respect to Cash Awards, including acceleration of vesting and waiver of forfeiture restrictions.  *See Hotel Employees and Restaurant Employees Local 2 v. Vista Inn Management Co.*, 393 F. Supp. 2d 972, 979 (N.D. Cal. 2005) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (holding that a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if it is dispositive of plaintiff's claims)).

1  LTPC Program.[7]  Thus, the act of awarding Fiorina LTPC payments prior to her vest date is within

2  corporate authority and not *ultra vires*.

3        Similarly, plaintiffs' allegation that HP failed to deduct Fiorina's LTPC payments from the

4  severance amount under the Severance Program does not constitute an action outside HP's corporate

5  authority.  As disclosed by HP, certain payouts are not subject to HP's Severance Policy, "either

6  because they have been previously earned or accrued by the employee or because they are consistent

7  with Company Practices," including "payments of prorated portions of bonuses or prorated portions

8  of long-term incentive payments that are consistent with Company Practices."  *See* Defs.' RJN, Ex.

9  D at 41 (2004 Proxy Statement).  Because HP has discretion to exclude certain payments from its

10  Severance Policy, the act of excluding such payments cannot be considered *ultra vires*.

11        Moreover, plaintiffs' allegations do not otherwise rebut the presumption that defendants'

12  authorization of Fiorina's severance and benefits package was other than an exercise of business

13  judgment.  Under the second prong, demand may be excused if plaintiffs' allegations "raise a

14  reasonable doubt that the [b]oard was well-informed, careful and rational" in approving Fiorina's

15  severance and benefit package.  *See In re Walt Disney Co. Deriv. Litig.*, 731 A.2d at 361 (reversed

16  on other grounds).  Under Delaware law, absent allegations of fraud, the "deference to directors'

17  business judgment is particularly broad in matters of executive compensation."  *Id.* at 362 (citing

18  *Haber v. Bell*, 465 A.2d 353, 359 (Del. Ch. 1983)).  In sum, plaintiffs' allegations are insufficient to

19  rebut the presumption of the business judgment rule under Delaware law.

20      **C.**    **Direct Claims**

21        Plaintiffs aver that their second, third, and fourth claims are "direct claims."  Compl. ¶¶ 126,

22  131, 138.  Defendants argue that these claims are really derivative claims and should be dismissed

23  for failure to make demand or allege futility of demand.

24      **1.**    **Counts Two and Three**

25        Counts two and three allege breach of contract and promissory fraud, respectively.  The

26  underlying premise for both of these counts is that defendants' Severance Policy represents a

27  promise that shareholders would be entitled to approve any proposed severance payment that

28

---

[7]      There is also no allegation that the LTPC Program itself required shareholder approval.

**United States District Court**
For the Northern District of California

exceeds 2.99 times the employee's annual base salary plus bonus.  The distinction of whether a claim

is derivative or direct "depends upon the nature of the wrong alleged and the relief, if any, which

could result if plaintiff were to prevail."  *Grimes v. Donaldson, Lufkin, & Jenrette, Inc.*, 673 A.2d

1207, 1213 (Del. 1996) (overruled on other grounds by *Brehm*, 746 A.2d at 253-54) (citations and

internal quotation marks omitted).  The Delaware Supreme Court clarified the proper test for

determining whether a claim is direct or derivative in *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*,

845 A.2d 1031 (Del. 2004).  Specifically, the court disapproved of the so called "special injury" test

articulated in prior Delaware case law.[8]  The court held that "[t]he analysis must be based solely on

the following questions: Who suffered the alleged harm—the corporation or the suing stockholder

individually—and who would receive the benefit of the recovery or other remedy?"  *Id.* at 1035.  In

determining whether it is the corporation or the suing stockholder who suffered the alleged harm, the

court is to "look[] at the body of the complaint and consider[] the nature of the wrong alleged and

the relief requested" and ask "has the plaintiff demonstrated that he or she can prevail without

showing an injury to the corporation?"  *Id.* at 1036.

At oral argument, plaintiffs argued that, under *Tooley*, their second and third claims for relief

are direct claims.  Applying the test set forth in *Tooley*, this court looks to the body of plaintiffs'

complaint in order to consider the nature of the wrong alleged and the relief requested.  Plaintiffs'

basic contention underlying their second and third claim is that defendants promised HP

shareholders that they would be given a vote on any proposed severance payment that exceeds 2.99

times the employees annual base salary plus bonus, but failed to honor such promise when they

awarded Fiorina her severance package without first seeking or obtaining shareholder approval.[9]

---

[8]      *See Elster v. Am. Airlines, Inc.*, 100 A.2d 219 (1953); *Bokat v. Getty Oil Co.*, 262 A.2d 246 (1970); *Moran v. Household Intern'l Inc.*, 490 A.2d 1059 (1985); *Lipton v. News Intern'l Plc.*, 514 A.2d 1075 (1986); *In re Tri-Star Pictures, Inc. Litig.*, 634 A.2d 319 (1993).

[9]      Plaintiffs also contend that defendants falsely promised plaintiffs and other shareholders that it would not award a CEO severance package in excess of 2.5 times the base salary plus bonus in order to induce them to elect defendants as directors, vote for compensation and benefits related proposals proposed by them, and vote against shareholder proposals.  Compl. ¶ 133.  However, as plaintiffs' allegations show, HP only announced that it had adopted a Severance Plan under which the CEO is *entitled* to 2.5 times her annual base salary plus target cash bonus.  *Id.* ¶ 39.  This alleged promise cannot be reasonably read to mean that the CEO may not receive any severance in addition to the amount she is entitled to under the Severance Plan.

United States District Court
For the Northern District of California

Compl. ¶¶ 127, 129, 132, 134,135.  Plaintiffs allege that defendants made such promise to induce the shareholders to elect them to the board, vote in favor of other compensation and benefits proposals by the board, and vote against proposals opposed by the board and, had plaintiffs known that defendants did not intend to honor their promise, plaintiffs would not have voted in favor of electing such board members, voted in favor of board proposals, or voted against proposals opposed by the board.  Compl. ¶¶ 127-128, 136.

Accepting plaintiffs' allegations as true for purposes of this motion to dismiss, the purported wrong nevertheless appears to be one that injures the corporation.  Although plaintiffs argue that they have been injured because they were not given their right to vote, the nature of their claims is essentially mismanagement of corporate assets and derivative in nature.  "Suits against management for waste resulting from excessive payments of corporate funds (whether made to individual defendants or to third parties) do not affect contractual rights of shareholders associated with the ownership of common stock . . . ."  *Kramer v. W. Pacific Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988); *see also Tooley*, 845 A.2d at 1038 ("The claim in *Kramer* was essentially for mismanagement of corporate assets.  Therefore, we found the claims to be derivative.  That was the correct outcome.").

Plaintiffs cite *Thorpe v. CERBCO*, 1993 WL 35967, *2 (Del. Ch. 1993), for the proposition that Delaware law "recognize[s] that a shareholder who has been denied his right to corporate suffrage has suffered an independent injury for purposes of determining whether an action is direct or derivative."[10]  Interference with the shareholders' right to vote may represent a separate contractual injury in certain instances.  *See Lipton*, 514 A.2d at 1079 (disapproved of on other grounds by *Tooley*, 845 A.2d at 1038-39).  However, the present action is distinguishable from both *Thorpe* and *Lipton*.  *Thorpe* involved allegations that false and misleading information in proxy disclosures resulted in shareholder approval of an amendment to CERBCO, Inc.'s certificate of incorporation authorizing a recapitalization that ultimately gave defendants voting control over the company.  1993 WL 35967 at *1.  In *Lipton*, 514 A.2d at 1078, management of the defendant

---

[10]     Although *Thorpe* is an unpublished opinion, it appears that the Delaware Supreme Court Rules and the Delaware Chancery Court Rules permit citation to unpublished opinions.  *See* Del. Supr. Ct. R. 93(c); Del. Ch. Ct. R. 171(h).

ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS—06-01711 RMW
SPT                                                          16

corporation acquired veto power over any change in management, thereby effectively removing the shareholders' right to vote.  The court concluded that the shareholders could bring a direct claim for the board's actions.[11]  *Id.*  Here, plaintiffs have not alleged that defendants acted to infringe on their right to vote.  Instead, they allege that the LTPC payments to Fiorina should have been characterized as severance such that a shareholders' right to vote would have been triggered.  In addition, even if defendants' alleged acts were construed as a denial of HP shareholders' right to vote, plaintiffs' allegations do not satisfy the second *Tooley* prong.

Under the second prong of *Tooley*, in order to maintain a direct claim, stockholders must show that they will receive the benefit of any recovery or other remedy.  *Tooley*, 845 A.2d at 1033; *see also In re J.P. Morgan Chase & Co. Shareholder Litig.*, 906 A.2d 808, 819 (Del. Ch. 2005).  Here, plaintiffs do not allege facts showing that they will benefit from the remedy.  Rather, the nature of any relief that might be granted for these claims supports the conclusion that these claims are derivative and not direct.  "Delaware courts have long recognized that actions charging mismanagement which depress[] the value of stock [allege] a wrong to the corporation; i.e., the stockholders collectively, to be enforced by a derivative action."  *Kramer*, 546 A.2d at 353.  Had the shareholders voted against any of the severance or benefits given to Fiorina, the denied amounts would accrue to the corporation, not directly to any shareholder.  Here, plaintiffs seek, *inter alia*, imposition of a constructive trust on the alleged improper $21.4 million payment to Fiorina.  Such relief, if granted, would result in the return of the $21.4 million to HP, not directly to any shareholder.  Likewise, if plaintiffs were successful in a claim that certain HP compensation and benefits plans should be rescinded because HP shareholders would not have voted to approve those plans had they known HP would not seek shareholder approval for Fiorina's package, any remedy would be directed to the corporation.  Because plaintiffs' allegations for their second and third claims do not meet the test set forth in *Tooley*, the court concludes that counts two and three do not state direct claims.

---

[11]     Although *Tooley* expressly disapproved of the special injury test utilized by the *Lipton* court in concluding that the shareholders had a direct claim, the *Tooley* court noted that the *Lipton* court "could have reached the same correct result by simply concluding that the manipulation directly and individually harmed the stockholders, without injuring the corporation."  845 A.2d at 1038.

### 2.   **Count Four**

Plaintiffs' fourth count alleges that defendants breached their fiduciary duty to disclose because HP did not disclose in its 2004, 2005, and 2006 proxy statements that it never intended to honor the Severance Policy or provisions of the Severance Program and that an employee's whose employment is involuntarily terminated does not always forfeit her unvested LTPC award. "'[D]irectors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action.'"   *Abrons v. Maree*, 911 A.2d 805, 812 (Del. Ch. 2006) (quoting *Shell Petroleum, Inc. v. Smith*, 660 A.2d 112, 114 (Del. 1992)).   The directors' have a duty to disclose "in a non-misleading manner all material facts that bear on" the matters for which the shareholders' vote is sought.   *In re PNB Holding Co. Shareholders Litig.*, 2006 WL 2403999, *15 (Del. Ch. 2006).   "A fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."   *Abrons*, 911 A.2d at 813 (citation and internal quotations omitted).   "Consistent and redundant facts do not alter the total mix of information, nor are insignificant details and reasonable assumptions material."   *Id.*

Here, plaintiffs allege that HP shareholders were harmed because they were "deprived of the opportunity to cast a fully informed vote on the matters considered at [HP's] 2004, 2005 and 2006 annual meetings."   Compl. ¶ 146.   Essentially, they contend that they would not have elected directors nominated by the board, approved HP proposals recommended by the board, or agreed with the board's recommendations to vote against certain shareholder proposals had they known of the alleged misstatements and omissions in the proxy statements.   Plaintiffs contend that the affected shareholder votes relate to (1) the election of the directors nominated by HP, (2) the approval of the 2004 Stock Incentive Plan and the issuance of additional shares for the HP Employee Stock Purchase Plan, (3) the approval of the HP 2005 Pay-for-Results Plan, and (4) the rejection of shareholder proposals requiring election of directors by affirmative vote of the majority of cast votes and requesting adoption of a corporate policy to recoup bonuses and performance pay based on financials that are later restated.   AC ¶¶ 43-47.

However, plaintiffs' factual allegations do not show that the shareholders' right to vote have

ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS—06-01711 RMW
SPT                                                                                         18

been denied or impaired as required by *Tooley*.  Plaintiffs' allegations do not support a finding that the purported misstatements and omissions were material to the particular matters on which shareholders voted.  In particular, plaintiffs have not sufficiently alleged how the matters voted on involve the LTPC Program, the Severance Policy, or the Severance Program to which the purported misstatements and omissions relate.[12]  Plaintiffs' allegations do not show how the alleged misrepresentations and omissions are material facts that bear on the particular matters for which the shareholders' vote was sought.  Thus, plaintiffs have failed to allege a claim that the purported misstatements and omissions constitute a separate and independent injury to the shareholders' right to vote under the first prong in *Tooley*.  In addition, it is unclear from plaintiffs' allegations what relief is sought and that any relief sought would benefit the shareholders directly rather than the corporation.

> **D.**     **Fiorina's Motion to Dismiss**

Defendant Fiorina moves to dismiss plaintiffs' request to place a constructive trust on the $21.4 million paid by HP to her and in her possession.  Fiorina argues that because plaintiffs' substantive claims fail for the reasons set forth in the motions filed by the director defendants and HP, in which Fiorina joins, there cannot be any imposition of a constructive trust remedy.  Because the court dismisses plaintiffs' substantive claims in counts one through ten, there is no basis to impose a constructive trust.

> **E.**     **Leave to Amend**

As defendants note, plaintiffs have amended their complaint once.  Nevertheless, Fed. R. Civ. P. 15(a)'s edict that "leave shall be freely given when justice so requires" is "to be applied with extreme liberality."  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (quoting *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (citations omitted)).  Absent prejudice or a strong showing of undue delay, bad faith, dilatory motive, repeated

---

[12]     Plaintiffs allege that proxy statements (1) failed to disclose that HP retained discretion to authorize payments that are otherwise precluded under the LTPC Program, (2) failed to disclose that HP never intended to follow its Severance Policy, (3) failed to disclose that it never intended to be restricted by the limits set in its Severance Program, (4) concealed that the LTPC payments to Fiorina were expressly barred by the LTPC Program terms, (5) concealed that the LTPC payments were actually severance payments, and (6) falsely disclosed in the 2005 proxy statement that LTPC payments that are unvested would be forfeited only if an employee left voluntarily.  AC ¶¶ 137-140.

**United States District Court**
For the Northern District of California

1   failure to cure deficiencies by amendment, or futility of amendment, "there exists a presumption

2   under Rule 15(a) in favor of granting leave to amend." *Eminence Capital*, 316 F.3d at 1052.

3   Plaintiffs have twenty days from the date of this order to amend those claims that have not been

4   dismissed with prejudice.

### III.  ORDER

6   For the foregoing reasons, the court GRANTS defendants' motions to dismiss as follows:

7   1.   Count one is dismissed with prejudice;

8   2.   Counts two through ten are dismissed with leave to amend; and

9   3.   Plaintiffs have twenty days from the date of this order to amend counts two through

10  ten.

12  DATED:   3/1/2007

*Ronald M Whyte*

RONALD M. WHYTE
United States District Judge

**United States District Court**
For the Northern District of California

1

**Notice of this document has been electronically sent to:**

2

**Counsel for Plaintiffs:**

3

Merrill G. Emerick                           memerick@afelaw.com

4

**Counsel for Defendants:**

5

Jonathan C. Dickey                           jdickey@gibsondunn.com
6    Jayesh Sanatkumar Hines-Shah             jhinesshah@gibsondunn.com
     Jeffrey A Minnery                        jminnery@gibsondunn.com
7    Christopher C. Kearney                   ckearney@kvn.com
     Laurie Carr Mims                         lmims@kvn.com
8    Boris Feldman                            boris.feldman@wsgr.com
     Steven M. Schatz                         sschatz@wsgr.com
9    Bahram Seyedin-Noor                      bnoor@wsgr.com

10

Counsel are responsible for distributing copies of this document to co-counsel that have not
11   registered for e-filing under the court's CM/ECF program.

12

13   **Dated:**        3/1/07                              SPT
                                                **Chambers of Judge Whyte**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS—06-01711 RMW
SPT                                          21