1

2

3                                                              **E-FILED on** ___3/28/08___

4

5

6

7                        IN THE UNITED STATES DISTRICT COURT

8                      FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                                  SAN JOSE DIVISION

10

11   INDIANA ELECTRICAL WORKERS              No. C-06-01711 RMW
     PENSION TRUST FUND, IBEW; SEIU
12   AFFILIATES' OFFICERS AND EMPLOYEES      ORDER GRANTING DEFENDANTS'
     PENSION PLAN; SEIU NATIONAL             MOTIONS TO DISMISS SECOND
13   INDUSTRY PENSION PLAN; and PENSION      AMENDED COMPLAINT AND DENYING
     PLAN FOR EMPLOYEES OF SEIU, on behalf   AS MOOT DIRECTOR DEFENDANTS'
14   of themselves and all others similarly situated,   MOTION TO STRIKE
     and derivatively on behalf of Hewlett-Packard
15   Company,                                **[Re Docket Nos. 118, 120, 124, 129]**

16                    Plaintiffs,

17          v.

18   PATRICIA C. DUNN, LAWRENCE T.
     BABBIO, RICHARD A. HACKBORN,
19   GEORGE A. KEYWORTH II, ROBERT E.
     KNOWLING, JR., THOMAS PERKINS,
20   ROBERT L. RYAN, LUCILLE SALHANY,
     and CARLETON S. FIORINA,
21
                      Defendants,
22
            and
23
     HEWLETT-PACKARD COMPANY,
24
                    Nominal Defendant.
25

26          Plaintiffs bring this action alleging that the "severance" package given to Carleton S. Fiorina

27   ("Fiorina"), former chief executive officer of Hewlett-Packard Company ("HP"), violated HP's plans

28

**United States District Court**
For the Northern District of California

and policies.[1]  Nominal defendant HP moves to dismiss plaintiffs' claims in the Verified Second Amended Complaint ("SAC") for failure to make a demand in accordance with Fed. Rule Civ. P. 23.1 as a prerequisite for a derivative claim.  Defendants Patricia C. Dunn, Lawrence T. Babbio, Richard A. Hackborn, George A. Keyworth II, Robert E. Knowling, Jr., Thomas Perkins, Robert L. Ryan and Lucille Salhany ("Director Defendants") move to dismiss plaintiffs' claims for failure to state a claim and failure to comply with the demand requirements under Fed. R. Civ. P. 23.1.  The Director Defendants also move to strike paragraphs 27-35, 93-131, and 150 of the SAC as immaterial and impertinent.  Defendant Fiorina moves to dismiss plaintiffs' request to place a constructive trust on $21.4 million of cash payments she received upon termination of her employment from HP.  Plaintiffs oppose each of defendants' motions.  Plaintiffs also filed an unopposed voluntary dismissal without prejudice of Sari M. Baldauf, Ann O. Baskins, John H. Hammergren, Mark V. Hurd, and Robert P. Wayman pursuant to Fed. R. Civ. P. 41(a) as the SAC names these individuals as defendants but does not assert any claims against them.

The court has read the moving and opposing briefs and considered the arguments of counsel.[2]  For the reasons set forth below, the court: (1) grants defendants' motions to dismiss without leave to amend; and (2) denies Director Defendants' motion to strike as moot.

## I.  BACKGROUND

### A.      Allegations Regarding the Compaq Merger

Plaintiffs allege that beginning in the spring of 2001 HP's board of directors, under Fiorina's leadership, began considering a merger with Compaq Computer Corporation ("Compaq").  SAC ¶ 27.  According to plaintiffs, Fiorina promoted the deal with Compaq, including selling the deal to the board of directors over the vigorous opposition of then-board member Walter Hewlett.  *Id.*  After purportedly selling the board based on assertions that the merger would bring about cost synergies of $2.5 million, Fiorina set about persuading HP shareholders of the benefits of the merger.  *Id.* ¶ 28.

---

[1]      The termination of Ms. Fiorina's employment was involuntary and in consideration for, and as a condition of receiving, the payments she received she released HP from any and all future claims.

[2]      The court has also considered the parties' letter briefs, filed June 19, 20, and 22, 2007 following the June 15, 2007 hearing.

On December 19, 2001 HP filed a presentation to its shareholders with the Securities and Exchange Commission ("SEC") setting forth the same financial projections Fiorina had used to convince the board that the deal was beneficial to HP.  *Id.*  On February 6, 2002 HP mailed the final joint proxy and prospectus soliciting shareholder vote on the merger.  *Id.* ¶ 29.  The proxy contained the same financial projections earlier filed.  *Id.*  The shareholders voted to approve the merger over the vigorous proxy contest launched by Hewlett attacking the validity of the financial projections and the validity of the deal.  *Id.* ¶ 30.  Following the shareholder vote, Hewlett filed a suit in the Delaware Court of Chancery seeking to set aside the vote based upon, *inter alia*, claims that HP had included projected results in its proxy materials that internal company documents strongly suggested could not be achieved.  *Id.* ¶ 31.  After a three day trial, the Delaware court ruled against Hewlett. *Id.*    Following the merger, HP failed to achieve the projected combined results it had disclosed in its proxy.  On February 7, 2005 an article in *Fortune* magazine highlighted HP's failure to meet the projections by a wide margin and calling the merger a failure.  *Id.* ¶ 32.  Plaintiffs allege that, as the article discloses, HP itself never believed those projections were attainable; rather, they were made for the purpose of prevailing in the proxy fight.  *Id.* ¶ 33.

### B.    Allegations Regarding Termination of Fiorina's Employment

Plaintiffs allege that in response to the *Fortune* article, HP terminated Fiorina's employment on February 8, 2005.  According to the complaint, HP paid Fiorina termination benefits valued at over $40 million (included vested options and pension benefits).  *Id.* ¶¶ 62-65.  Plaintiffs allege that HP paid such amounts to Fiorina, including $21.4 million of which purportedly was severance, to make sure that Fiorina kept quiet about the Compaq merger debacle.  *Id.* ¶ 67.

Plaintiffs allege that "[t]o make sure that Fiorina kept quiet about whatever secrets the Company may have been hiding concerning the use of wildly optimistic projections to secure the shareholders' vote in favor of the Compaq merger, Defendants bought her silence with a severance package far in excess of what they were permitted to award her under the express terms of the Company's Severance Policies."  *Id.* ¶ 34.  Plaintiffs' allegations of how Fiorina's termination package exceeds amounts permitted under HP's policies are essentially the same as those set forth in their first amended complaint.  Plaintiffs basically allege that because Fiorina's employment was

1    involuntarily terminated, she was not entitled to any accelerated vesting of payments under HP's

2    Long-Term Performance Cash ("LTPC") Program. *Id.* ¶¶ 42-43. According to plaintiffs, although

3    the LTPC Plan permitted HP to discretionarily increase or decrease payments to employees, Fiorina

4    was not entitled to any discretionary increase because she was a "covered employee" as defined by

5    Internal Revenue Code ("IRC") section 162(m) for the tax year, which is a category of employees

6    specifically barred from receiving a discretionary award under the LTPC Program. *Id.* ¶ 45.

7         HP's 2004 and 2005 proxy statements described the LTPC Program as banking targeted cash

8    amounts on the participants' behalf until the end of the three-year program period at which time the

9    amounts are either paid out because the financial goals were achieved, or forfeited. *Id.* ¶ 46.

10   Therefore, the proxy explained, payments under the LTPC Program are generally made at the end of

11   the three-year program period. *Id.* Moreover, the 2004 proxy disclosed, "[g]enerally, if a participant

12   is no longer employed by HP due to being placed in a workforce reduction program, disability,

13   retirement or death, then targeted cash amounts are prorated. *In the event of other terminations, any*

14   *banked amounts will be forfeited.*" *Id.* ¶ 47 (emphasis in original). However, HP's 2005 proxy

15   statement, filed after Fiorina had been paid her employment termination benefits, disclosed that "if a

16   participant is no longer employed by HP due to involuntary termination, disability, retirement or

17   death, targeted awards are paid subject to certain adjustments. *In the event of voluntary*

18   *terminations, any banked amounts will be forfeited and no payment is made.*" *Id.* ¶ 72 (emphasis in

19   original). Plaintiffs submit that the board was without power to waive the forfeiture provisions of

20   the LTPC because the stock administrator's general power to set the terms of awards under the 2000

21   Stock Plan was expressly limited by the terms of the LTPC. *Id.* ¶ 74.

22        Plaintiffs allege that because Fiorina was not entitled to any LTPC Program payouts, the

23   accelerated LTPC payments made to her were, in reality, severance payments. Therefore, plaintiffs

24   allege, the total severance paid to Fiorina exceeds 2.99 times her salary and bonus and, therefore,

25   prior shareholder approval was required. On July 18, 2003 HP had adopted a severance policy that

26   provides that "HP will seek stockholder approval for future severance agreements, if any, with

27   senior executives that provide specific benefits in an amount exceeding 2.99 times the sum of the

28   executives' current annual base salary plus annual target bonus." *Id.* ¶ 48. Plaintiffs allege that HP's

United States District Court
For the Northern District of California

1  adoption of this policy was in response to shareholder approval of a shareholder proposal following

2  an excessive severance package payout to the former chief executive officer of Compaq and

3  president of HP after the merger. *Id.* ¶ 52. This severance policy was disclosed in HP's 2004, 2005,

4  and 2006 proxy statements.

5  　　Plaintiffs allege that had HP not adopted the severance policy and disclosed such policy in its

6  2004, 2005, and 2006 proxy statements, or had disclosed that it never intended to follow such

7  policy, shareholders (1) would not have voted to elect or re-elect the directors now on the board, (2)

8  would not have voted in favor of increasing the number of shares set aside for issuance to HP

9  employees under HP's 2004 Stock Incentive Plan or 2004 Employee Stock Purchase Plan, (3) would

10 not have voted in favor of adoption of the 2005 Pay-for-Results Plan, an employee performance and

11 bonus plan, and (4) would not have voted against certain shareholder proposals related to the

12 election of directors and forfeiture of bonuses. *Id.* ¶¶ 53-57. Plaintiffs assert that the shares voted to

13 be set aside for the 2004 Stock Incentive Plan and 2004 Employee Stock Purchase Plan totaled 255

14 million shares or 9% of HP's outstanding common shares, which diluted shareholder holdings. *Id.* ¶

15 55. Plaintiffs contend that HP knew at the time it adopted the LTPC and the severance policy that it

16 had no intention to abide by such policies.

17 　　HP's severance policy also excludes certain payments from being considered "severance."

18 These include "payments of prorated bonuses or prorated long-term incentive payments that are

19 consistent with Company Practices" and "acceleration of the vesting of stock options, stock

20 appreciation rights, restricted stock or long-term cash incentives that is consistent with Company

21 Practices." *Id.* ¶ 87. Plaintiffs allege that payment of accelerated or prorated LTPC amounts to

22 Fiorina could not have been consistent with Company Practices because the discretionary increase of

23 any LTPC payment for an employee who was involuntary terminated was "expressly forbidden." *Id.*

24 ¶ 90.

25 　　Additional background information, including allegations of the specific provisions of the

26 compensation and severance plans at issue, are set forth in the court's March 1, 2007 Order.

27

28

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**C.     Allegations Regarding Boardroom Leak Investigation**

As set forth in plaintiffs' complaint, on January 24, 2005, an article in the *Wall Street Journal* disclosed some issues that were discussed at the board's annual planning meeting. *Id.* ¶ 93. Dunn, then-chairwoman of the board, initiated an investigation into what she believed to be a boardroom leak of confidential information to the press. *Id.* Dunn and the board purportedly utilized various techniques in attempts to identify the person responsible for the information leak, including use of outside counsel and outside security investigation firms to assist in determining the identity of the person disclosing confidential information from board meetings. *Id.* ¶¶ 94-98. In connection with the investigation, Dunn and others utilized techniques such as pretexting, which involves impersonating another person, including use of the person's social security number in order to obtain their private phone records. *Id.* ¶ 99. Other techniques included sending phony "tracer" emails to a journalist, physical surveillance of the area where board meetings were held, following a board member to an out-of-town meeting, spying on a board member at his residence, and rooting through trash cans. *Id.* ¶¶ 99-104.

These investigations led to the identification of director Keyworth as the source of the leaks to the press and resulted ultimately in the attempted ouster of Keyworth and his subsequent resignation. Thereafter, Dunn disclosed the identity of the director who had leaked information as well as the detailed surveillance techniques used in the investigation to the rest of the board. A huge fight ensued. Director Perkins resigned on the spot and insisted that the decision of whether to oust director Keyworth was up to the shareholders, not the board. *Id.* ¶¶ 106-07. Although the reasons for Perkins resignation should have been publicly disclosed in HP's form 8-K filing with the SEC, HP did not disclose the specific reasons for his resignation, noting only that he had a disagreement with the company. *Id.* ¶ 109. On September 6, 2006 news of the surveillance and pretexting were publicized in a *Wall Street Journal* article. *Id.* ¶ 117. HP amended its form 8-K to disclose the details surrounding Perkins's resignation. HP also announced that the California Attorney General had contacted it regarding the investigation techniques and that the SEC had contacted it about the initial 8-K filing disclosing Perkins's resignation. *Id.* ¶ 118.

1    On September 12, 2006 HP announced Dunn's resignation.  It also announced that it had

2    been contacted by the Congressional Committee on Energy and Commerce for records and

3    information regarding the investigation.  *Id.* ¶¶ 120-21.  Later that month, HP's general counsel and

4    its director of ethics both resigned.  Dunn and the director of ethics were later indicted by the

5    California Attorney General's office for conspiracy, wire fraud, illegal use of computer data, and

6    identity theft.  *Id.* ¶ 125. The Attorney General also brought charges of unfair business practices

7    against HP, which HP settled in December of 2006.  *Id.* ¶ 127.

8    Plaintiffs allege that the investigation into the boardroom leaks was launched as an effort by

9    HP to prevent the investing public from learning the truth regarding the Compaq merger and the

10   board's attempt to buy Fiorina's silence regarding the merger.  *Id.* ¶ 150.  According to plaintiffs, the

11   director defendants' decision to launch the investigation was motivated by their personal desire to

12   cover up their own wrongdoing in connection with the Compaq merger and Fiorina's termination

13   benefits.  *Id.*

14   **D.    Plaintiffs' Asserted Claims**

15   In their complaint, plaintiffs assert ten claims: (1) Direct Claim for Breach of Contract; (2)

16   Direct Claim for Promissory Fraud; (3) Direct Claim for Breach of the Duty of Disclosure; (4)

17   Derivative Claim for Breach of the Duty of Disclosure; (5) Derivative Claim for Ultra Vires Acts

18   (Violation of LTPC Plan); (6) Derivative Claim for Ultra Vires Acts (Violation of Severance

19   Program); (7) Derivative Claim for Ultra Vires Acts (Violation of Severance Policy); (8) Derivative

20   Claim for Ultra Vires Acts (Void Acts as Directors); (9) Derivative Claim for Breach of Fiduciary

21   Duty (Corporate Waste); and (10) Derivative Claim for the Imposition of a Constructive Trust.  The

22   direct claims in Counts I through III are brought purportedly on behalf of a class consisting of:

23       Shareholders of Hewlett-Packard Company who owned stock of HP as of the record
         date, and continued to hold such stock through the meeting date, for the Company's
24       2004, 2005 and/or 2006 annual meetings, or any of them (2004: 1/20/04-3/17/04;
         2005: 1/18/05-3/16/05; 2006: 1/17/06-5/15/06).  Excluded from the Class are
25       Defendants, as well as their affiliates or assigns.

26   *Id.* ¶ 132.

27

28

## II. ANALYSIS

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. Dismissal can be based on the "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988). When evaluating a Rule 12(b)(6) motion, the court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Barron v. Reich*, 13 F.3d 1370, 1374 (9th Cir. 1994). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions." *Bell Atlantic Corp. v. Twombly*, 530 U.S. __, 127 S. Ct. 1955, 1964-65 (2007) (citations and edit marks omitted). Moreover, "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Id.* (citations omitted). The court is not required to accept conclusory legal allegations "cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).

### A.    Demand Requirement

Defendants argue that plaintiffs' derivative claims in Counts IV through X should be dismissed for failure to make demand on the board of directors in place at the time of the amended complaint[3] or on HP, or to allege futility of demand pursuant to Rule 23.1. Defendants further contend that Counts I through III, although styled as direct claims, are essentially derivative claims and should be similarly dismissed. As was set forth in this court's March 1, 2007 Order Granting Defendants' Motions to Dismiss ("Mar. 1, 2007 Order"), "[a] shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile." *In re Silicon Graphics Inc. Securities Litig.*, 183 F.3d 970, 989-90 (9th Cir. 1999) (citing Fed. R. Civ. P.

---

[3]    The parties do not dispute that the board of directors to whom demand should be directed is the board in place at the time the SAC was filed. *See Braddock v. Zimmerman*, 906 A.2d 776, 786 (Del. 2006).

23.1).  The circumstances which make a demand futile are established by the laws of the state in which the corporation is incorporated.  *Id.* at 990.  HP is incorporated in Delaware.

"To show futility under Delaware law, a plaintiff must allege particularized facts creating a reasonable doubt that (1) the directors are disinterested and independent, or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."  *In re Silicon Graphics*, 183 F.3d at 990 (citation omitted).  Under Delaware law, there is a presumption of independence.  *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984) (overruled on other grounds).  Essentially, "where officers and directors are under an influence which sterilizes their discretion, they cannot be considered proper persons to conduct litigation on behalf of the corporation."  *Aronson*, 473 A.2d at 814.  However, "[s]peculation on motives for undertaking corporate action are [sic] wholly insufficient to establish a case of demand dismissal."  *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 356 (Del. Ch. 1998) (reversed on other grounds by *Brehm v. Eisner*, 746 A.2d 244, 248 (Del. 2000)).

At the time the SAC was filed, HP's board included the following eight directors: Babbio, Baldauf,  Hackborn, Hammergren, Hurd, Ryan, Salhany, and Thompson.[4]  SAC ¶ 148.  Thus, plaintiffs must allege particularized facts creating a reasonable doubt that at least four directors are disinterested and independent.  *See In re Limited, Inc.*, 2002 WL 537692, *7 (Del. Ch. 2002) ("[W]here the challenged actions are those of a board consisting of an even number of directors, plaintiffs meet their burden of demonstrating the futility of making demand on the board by showing that half of the board was either interested or not independent.").

### 1.    Disinterested and Independent

Plaintiffs argue that defendants Babbio, Hackborn, Ryan, and Salhany are not disinterested and independent.  "In order to show lack of independence, the complaint of a stockholder-plaintiff must create a reasonable doubt that a director is not so beholden to an interested director . . . that his or her discretion would be sterilized."  *Id.* (citation and internal quotations omitted).  Here, plaintiffs

---

[4]    Plaintiffs also alleged that Wayman was on the board at the time the SAC was filed but HP noted in its motion that Wayman was not on the board at the time.  Plaintiffs do not dispute this point in opposition.  For purposes of this order, the court assumes that Wayman was not on the board at the time of the SAC.

**United States District Court**
For the Northern District of California

1  contend these four directors were also on the board which approved Fiorina's severance and benefits

2  package in an attempt to buy Fiorina's silence regarding the Compaq merger.[5]  SAC ¶ 149.

3  However, as the *Brehm* court noted, "[i]t is no answer to say that demand is necessarily futile

4  because (a) the directors would have to sue themselves, thereby placing the conduct of the litigation

5  in hostile hands, or (b) that they approved the underlying transaction.  746 A.2d at 257 n.34 (citation

6  and internal quotations omitted).

7          Plaintiffs contend that their allegations amount to more than an assertion that the directors

8  would have to sue themselves because they allege that these directors are personally interested in the

9  severance and benefits package paid to Fiorina because the payment was made expressly to ensure

10 Fiorina's silence as part of the cover up of the directors' own wrongdoing in connection with the

11 Compaq merger.  *Id.*  In addressing the inquiry into directorial independence and disinterestedness,

12 "the court reviews the factual allegations to decide whether they raise a reasonable doubt, as a

13 threshold matter, that the protections of the business judgment rule are available to the board."

14 *Aronson*, 473 A.2d at 814-15.

15         Plaintiffs' complaint alleges that Fiorina led the efforts to ensure the approval of the Compaq

16 merger by the board and by the shareholders.  As alleged, she "sold" the deal to the board of

17 directors by using "wildly optimistic projections."  She then used the same projections to "sell" the

18 deal to the shareholders.  The shareholders approved the merger in face of a vigorous opposition by

19 then- director Hewlett who, among other things, strongly questioned the projections provided to the

20 shareholders.  Shortly after the merger received shareholder approval by a narrow margin, Hewlett

21 challenged the merger in Delaware court substantially on the basis that the disclosed projections of

22 the cost savings, synergies, revenues, earnings, and earnings per share of the combined company

23 were not supported by the companies' internal financial data.  After a three day trial, the Delaware

24 court ruled against Hewlett.  As alleged, almost three years after the merger, after HP significantly

25 missed all of the projections, an article in *Fortune* was published announcing the immense failure of

26

27 [5]      Plaintiffs allege in the SAC that defendants Babbio, Hackborn, Hammergren, Ryan, Salhany, and Wayman were not disinterested and independent because they were on the board approving

28 Fiorina's severance and benefits package, but argue in their opposition that only Babbio, Ryan, Salhany, and Hackborn are not disinterested and independent.  *See* SAC ¶ 149.

the HP-Compaq merger.  The article noted that the financial results of the post-merger company were substantially below the initial projections, that Fiorina could not recall the source of the projections she had utilized to "sell" the deal to the board and the shareholders, and suggested that the projections probably could not have been reasonably based on sound financial data.

Assuming these allegations to be true and viewing them in the light most favorable to plaintiffs, the court does not find that they support plaintiffs' proposed inference that the directors who approved Fiorina's severance and benefits package were concerned of their own alleged wrongdoing in connection with the failed Compaq merger, that they were afraid Fiorina would disclose these purported wrongdoings, and that the severance and benefits package was paid to keep Fiorina silent regarding the failed Compaq merger.  While plaintiffs allege in detail Fiorina's involvement in using the "wildly optimistic" projections to obtain board and shareholder approvals for the merger, the allegations do not point to the particular wrongdoings on the part of the individual directors that would have needed to be concealed at the time the board approved Fiorina's severance and benefits package.  That the board had approved the merger relying upon the overly optimistic projections was clearly public information at least since the merger.  Moreover, although plaintiffs assert that defendants knew that the projections were allegedly not based on sound financial data and would never be achieved, the shareholders at the time approved the merger despite Hewlett's proxy fight arguing that those projections were inaccurate and wrong.  Further, as plaintiffs allege, a Delaware court rejected the theory that the shareholder approval of the merger was obtained via false and misleading financial projections.  Based on these allegations, the court is not persuaded that a reasonable inference may be drawn that directors Babbio, Hackborn, Ryan, and Salhany approved Fiorina's severance and benefits package for the purpose of covering up any particular wrongdoing on their part in connection with the Compaq merger.  *See In re Walt Disney Co. Deriv. Litig.*, 731 A.2d at 356 ("Speculation on motives for undertaking corporate action are [sic] wholly insufficient to establish a case of demand dismissal.").

Citing the Third Circuit's opinion in *In re Tower Air, Inc.*, 416 F.3d 229, 237 (3d Cir. 2005), plaintiffs argue that plaintiffs need not plead specific facts as required by Rule 8 of the Delaware Chancery Court, but that only the notice pleading standard of Fed. R. Civ. P. 8 applies.  However, as

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

the court stated in its March 1, 2007 Order, the standard applied by this court is the pleading standard required by Delaware law to excuse the demand requirement for a company incorporated in Delaware.  As the Ninth Circuit made clear in *In re Silicon Graphics Inc. Securities Litig.*, 183 F.3d 970, 989-90 (9th Cir. 1999), pursuant to Fed. R. Civ. P. 23.1, the circumstances which make a demand futile are established by the laws of the state in which the corporation is incorporated. Plaintiffs do not dispute that HP is incorporated in Delaware and cannot dispute that Delaware law applies as to whether futility has been adequately pleaded by plaintiffs.  Moreover, the Ninth Circuit held in *Silicon Graphics* that "[t]o show futility under Delaware law, a plaintiff must allege *particularized facts* creating a reasonable doubt that (1) the directors are disinterested and independent, or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."  183 F.3d at 990 (emphasis added) (citation omitted); *see also Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993) (Where the board that would be considering the demand also made the business decision being challenged, a plaintiff may show futility under *Aronson*, by alleging *particularized facts* creating a reasonable doubt that (1) the directors are disinterested and independent, or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.) (citation omitted).

Plaintiffs also argue that they need not plead facts demonstrating a "substantial likelihood" of personal liability for the alleged wrongdoing.  *See* Pls.' Opp'n at 16:17-21.  They contend that the inquiry ends once they have alleged that defendants approved "an interested" director transaction such that the protections of the business judgment rule are not applicable to a majority of the directors.  *Id.*  The court agrees that where the allegations support a conclusion that the directors engaged in self-interested transactions or self-dealing, futility is established under either an objective or a subjective standard.  *See Aronson*, 473 A.2d at 815.  However, where the allegations do not support an inference that the directors engaged in self-interested transactions but, rather, are alleged to not be disinterested and independent on the basis of the threat of personal liability, the proper inquiry under Delaware law is whether a transaction is so egregious on its face that a substantial likelihood of director liability exists.  *See id.* (holding that "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the

United States District Court
For the Northern District of California

1   independence or disinterestedness of directors, although in rare cases a transaction may be so

2   egregious on its face that board approval cannot meet the test of business judgment, and a substantial

3   likelihood of director liability therefore exists").  In any event, for the reasons discussed above, the

4   court does not find that plaintiffs' allegations support a conclusion that the directors' approval of

5   Fiorina's severance and benefits package was a self-interested transaction.

6       Plaintiffs also allege in the SAC that Babbio, Hackborn, Hammergren, Hurd, Ryan, Salhany,

7   and Wayman are not disinterested and independent because they were each on the board of directors

8   at the time HP decided to launch an illegal investigation into suspected boardroom leaks.[6]  Plaintiffs

9   contend that the purpose of the investigation was to prevent the investing public from "learning the

10  truth regarding both the Compaq merger and the Board's attempt to buy Fiorina's silence regarding

11  that merger with an improper and *ultra vires* severance package."  SAC ¶ 150.  According to

12  plaintiffs' allegations, these defendants' decision to launch the investigation was self-interested

13  because it was motivated by their desire to cover up "their own wrongdoing in connection with the

14  Compaq merger and Fiorina's severance."  *Id.*  Instituting a derivative action "could have revealed

15  Defendants' intentional wrongdoing—subjecting them to a host of unwelcome problems, including

16  the threat of potential criminal liability—Defendants' interest in making sure that their own

17  misdeeds remained undiscovered prevents Defendants from considering Plaintiffs' demand on its

18  corporate merits."  *Id.*

19      Applying the standards set forth above, the court finds that plaintiffs' allegations, taken

20  together and viewed in the light most favorable to plaintiffs, do not give rise to a reasonable

21  inference that the directors' launch of the investigation was for the purpose of covering up their own

22  purported wrongdoing in connection with the Compaq merger or the alleged cover up of "hush

23  money" to Fiorina.  As set forth in the SAC, the boardroom investigation commenced after

24  confidential business matters discussed in HP's board's annual planning meeting were leaked to the

25  press.  However, although the complaint alleges that the board sought to discover and prevent such

---

[6]     Although defendants argue that plaintiffs expressly disavowed the investigation allegations
as a basis for demand futility as to plaintiffs' derivative claims regarding Fiorina's severance and
benefits package in their reply brief on their motion to file a proposed second amended complaint,
*see* Docket No. 97, the court will address the issues on the merits.

**United States District Court**
For the Northern District of California

leaks, there are no factual allegations showing that a purpose of their investigation was to prevent information about the Compaq merger or Fiorina's severance and benefits package as opposed to merely preventing any unauthorized disclosure of matters discussed in a private board meeting.

Moreover, although the complaint alleges that the board authorized an investigation to discover the source of the leaks, the allegations indicate no board member other than Dunn was aware of the particular investigation methodologies, such as the illegal or unethical techniques, that were employed until Dunn disclosed them to the full board at the board meeting on May 18, 2006. Indeed, the directors at the time and their families were among the main targets of the surveillance and investigatory techniques employed. After Dunn's revelation, "[a] huge fight ensued" and at least director Perkins voiced his outrage with the surveillance. There are no allegations that any of the directors, other than Dunn, were involved in the improper techniques employed. Subsequently, Dunn was indicted along with HP's then-director of ethics and several employees of the outside security firms utilized by HP. Although Hurd testified before the Congressional Committee on Energy and Commerce, plaintiffs allege that he "made no attempt to defend the investigation, admitting that the tactics employed were wrong and unjustified." SAC ¶ 123. The court cannot reasonably infer from these allegations that directors Babbio, Hackborn, Hammergren, Hurd, Ryan, Salhany, and Wayman launched the investigation to cover up their alleged wrongdoings with regard to the Compaq merger and the approval of Fiorina's severance and benefits package or that these directors could not entertain a demand request for fear of exposing themselves to potential criminal or other liability. And, as discussed *supra* § A, plaintiffs' allegations do not give rise to a reasonable inference that Fiorina's severance and benefits package was approved for the purpose of buying her silence as to defendants' alleged wrongdoing.

### 2.      The Business Judgment Rule

The second prong of the *Aronson* test considers whether the challenged transaction was the product of an otherwise valid exercise of business judgment. *In re Silicon Graphics*, 183 F.3d at 990. It is an inquiry into "the substantive nature of the challenged transaction and the board's approval thereof." *Aronson*, 473 A.2d at 814. The review is a fact-based one. *Id.* at 815. Plaintiffs must allege facts sufficient to rebut a presumption that the decision was a result of a valid exercise

of business judgment. *Id.* at 812.  Here, plaintiffs argue that they have rebutted the presumption of the business judgment rule because (1) the board violated the express provisions of an employee compensation program, (2) they have alleged facts showing that the board sought to buy Fiorina's silence with an *ultra vires* severance package, and (3) plaintiffs have expressly challenged defendants' motives for awarding Fiorina the severance and benefits package.

### a.    Violation of Terms of Compensation Program

Plaintiffs first argue that the directors did not have discretion to modify payments under the LTPC to an involuntarily-terminated employee.  However, plaintiffs advance primarily the same arguments and allegations as before this court in defendants' motion to dismiss the first amended complaint.  As the court held in the March 1, 2007 Order, the LTPC provides that HP may in its discretion increase or decrease payouts under the LTPC for "exceptional circumstances."  In addition, HP's 2000 Stock Plan permits the Plan Administrator to accelerate the vesting and to waive forfeiture restrictions of any award under the plan, including Cash Awards. *Id.* at 13:13-16.

Plaintiffs further argue that regardless of whether the directors might have authority to discretionarily adjust payments under the LTPC, such discretion could not be exercised in Fiorina's favor because she was a "covered employee" within IRC § 162(m).  As the court noted before, although plaintiffs contend that the LTPC expressly excludes any increase or decrease in payouts to a "Covered Employee" as defined in § 162(m) of the Internal Revenue Code of 1986, as amended, Fiorina does not appear to have been a "Covered Employee" as defined in § 162(m) at the time of the payout.  March 1, 2007 Order at 13 n.5.  Section 162(m)(3) provides:

> Covered employee.--For purposes of this subsection, the term "covered employee" means any employee of the taxpayer if--
>
> (A) as of the close of the taxable year, such employee is the chief executive officer of the taxpayer or is an individual acting in such a capacity, or
>
> (B) the total compensation of such employee for the taxable year is required to be reported to shareholders under the Securities Exchange Act of 1934 by reason of such employee being among the 4 highest compensated officers for the taxable year (other than the chief executive officer).

IRC § 162(m)(3).  Plaintiffs argue that Fiorina was a covered employee for the 2005 tax year

1   because even if she was not the chief executive officer at the end of the tax year, she was otherwise

2   one of the four highest compensated officers for that year pursuant to relevant regulations.

3        As the Director Defendants argue, under the relevant Internal Revenue Service ("IRS") and

4   SEC regulations, Fiorina does not fall within the definition "covered employee" under either IRC

5   § 162(m)(3)(A) or (B).  The parties agree that whether an individual is a covered employee is

6   determined by reference to 26 C.F.R. § 1.162-27, which provides that:

7        A covered employee means any individual who, *on the last day of the taxable year*,
         is--

8        (A) The chief executive officer of the corporation or is acting in such capacity; or

9
         (B) Among the four highest compensated officers (other than the chief executive
10       officer).

11  26 C.F.R. § 1.162-27(c)(2)(I) (emphasis added).  Thus, under the regulations promulgated by the

12  IRS, it appears that a covered employee must be either the chief executive officer or one of the

13  highest compensated officers measured as of the last day of the taxable year.  Fiorina was not an

14  employee (or officer) as of the last day of the taxable year and, therefore, not the chief executive

15  officer or one of the four highest compensated officers as of that date.

16       As the parties note, § 1.162-27 also provides that "[w]hether an individual is . . . an officer

17  described in paragraph (c)(2)(i)(B) of this section is determined pursuant to the executive

18  compensation disclosure rules under the Exchange Act."  The executive compensation disclosure

19  rules promulgated under the Securities Exchange Act are set forth in 17 C.F.R. § 229.402(a)(3).

20  Under those rules, the determination of "highest compensated officers" may include "individuals for

21  whom disclosure would have been provided [as one of the registrant's four most highly compensated

22  executive officers] but for the fact that the individual was not serving as an executive officer of the

23  registrant at the end of the last completed fiscal year."  17 C.F.R. § 229.402(a)(3)(iii).  The

24  instructions to § 229.402 in 2005 provide that the determination of which executive officers were

25  most highly compensated "shall be made by reference to total annual salary and bonus for the last

26  completed fiscal year."  17 C.F.R. § 229.402 Instr. to Item 402(a)(3).  As defendants argue, based on

27  these instructions, Fiorina was not one of the four most highly compensated officers (other than the

28  chief executive officer) for the 2005 tax year.  *See* Pls.' Opp'n Fiorina's Mot. at 5:13-21 (setting forth

ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS SECOND AMENDED COMPLAINT AND DENYING AS MOOT
DIRECTOR DEFENDANTS' MOTION TO STRIKE—06-01711 RMW
SPT                                            16

compensation table in HP's 2006 Proxy); Director Defs.' Req. Judicial Notice, Ex. N (2006 Proxy).[7]

Although plaintiffs argue that inclusion of the $7.4 million LTPC payment as a bonus would make

Fiorina the second highest paid officer, under the applicable rules, payments under plans such as the

LTPC plan are not classified as a bonus for the purpose of the compensation table disclosures. *See*

17 C.F.R. § 229.402(a)(7)(3)[8]; § 229.402(b)(2)(iv)(C)[9] & Instr. 4[10] thereof.[11]

### b.    *Ultra Vires* Acts

Board actions that are deemed *ultra vires* are not entitled to the protection of the business

judgment rule. *Cal. Pub. Employees' Ret. Sys. v. Coulter*, 2002 WL 31888343, *11 (Del. Ch. 2002)

("*Coulter*"). As this court set forth in its March 1, 2007 Order, *ultra vires* acts are those acts which a

corporation cannot, in any case, lawfully accomplish. *Harbor Finance Partners v. Huizenga*, 751

A.2d 879, 896 (Del. Ch. 1999). It is unclear whether corporate acts that are merely voidable, *i.e.*,

acts that may be ratified by subsequent shareholder approval, may nevertheless be considered *ultra*

*vires* acts. *Compare Michelson v. Duncan*, 407 A.2d 211, 218-19 (Del. 1979) (noting that voidable

---

[7]    The court hereby grants defendants' request to take judicial notice of the 2006 proxy statement filed with the SEC. *See* Fed. R. Evid. 201(d). On a motion to dismiss, a court may take judicial notice of SEC filings upon which plaintiff's complaint relies. *See In re Silicon Graphics*, 183 F.3d at 986. The 2006 proxy statement is attached to the Decl. of Jonathan C. Dickey Supp. Defs.' Req. Judicial Notice, Ex. N-1 at 37, filed August 24, 2006, Docket Nos. 47-50.

[8]    Section 229.402(a)(7)(3) provides: "The term long-term incentive plan means any plan providing compensation intended to serve as incentive for performance to occur over a period longer than one fiscal year, whether such performance is measured by reference to financial performance of the registrant or an affiliate, the registrant's stock price, or any other measure, but excluding restricted stock, stock option and SAR plans."

[9]    Section 229.402(b)(2)(iv)(C) provides: "The dollar value of all payouts pursuant to long-term incentive plans ("LTIPs") as defined in paragraph (a)(7)(iii) of this item (column (h))."

[10]    These instructions provide: "If any specified performance target, goal or condition to payout was waived with respect to any amount included in LTIP payouts reported in column (h), the registrant shall so state in a footnote to column (h)."

[11]    Plaintiffs point out that HP did not classify the LTPC payment to Fiorina in column (h) as an LTIP payment. In HP's 2006 Proxy Statement, the LTPC payment to Fiorina is included in column (i), other compensation. Although plaintiffs may be correct that the payment was not included as an LTIP payment because awards under the LTPC Program are pursuant to HP's Stock Plan and therefore not within § 229.402's definition of "LTIP," such exclusion does not render the payment a bonus that should be included for purposes of determining which executive officers were most highly compensated. In other words, that it is not a LTIP payout does not mean it falls within the definition of "bonus" under § 229.402.

**United States District Court**
For the Northern District of California

acts are distinguished from acts which are *ultra vires*) *with Coulter*, 2002 WL 31888343 at *11. In the 2002 *Coulter* opinion, the Delaware Chancery Court concluded that the board's repricing of options without shareholder approval was *ultra vires* because the stock option plan provided that any change in exercise price of options required shareholder approval. 2002 WL 31888343 at *11.[12] The court concluded the act was *ultra vires* even though it might be considered voidable rather than void. However, in a 2005 decision, the Delaware Chancery Court held that *ultra vires* acts are "illegal acts or acts beyond the authority of the corporation" or, in other words, not merely voidable acts, but void acts. *Nevins v. Bryan*, 885 A.2d 233, 245 (Del. Ch. 2005).

In the March 1, 2007 Order, the court found that plaintiffs' FAC had not alleged that HP's award of LTPC payments to Fiorina prior to her vest date constitutes an *ultra vires* act under either the standard in *Nevins* or in *Coulter* because the alleged facts do not support the conclusion that the directors acted beyond their authority. In other words, whether the act is void or merely voidable was irrelevant because plaintiffs' allegations fail to meet either definition. Here, plaintiffs argue that whether defendants' conduct was *ultra vires* turns on whether HP sought shareholder approval for the $21.4 million payment to Fiorina. However, as this court has noted before, this argument presupposes that the LTPC payments are severance payments, which in turn presupposes that the board did not have discretion to make the LTPC payments to Fiorina. Plaintiffs have not alleged facts supporting that the LTPC payments constituted severance. Further, because plaintiffs' allegations do not support a finding that HP had no authority to make the LTPC payment to Fiorina (i.e., the transaction is void) or that prior shareholder approval is needed for the LTPC payment (i.e., the transaction is voidable), the allegations do not support a finding that the transaction was *ultra vires*.

---

[12]    Plaintiffs argue that *Coulter* supports their position because in *Coulter* the court held that the directors' conduct was *ultra vires* because the operative plan did not give the directors authority to reprice options. Pls.' Opp'n HP's Mot. at 9:17-23. However, this is not the entire holding of *Coulter*. As the court noted in the March 1, 2007 Order, the *Coulter* court held that the directors' conduct was *ultra vires* because the operative plan required *shareholder approval* in order for there to be a reprice of stock options. Thus, the court's holding did not merely turn on whether the plan language permitted the conduct at issue. Notably, where shareholder approval is required, the board's failure to obtain the requisite approval merely makes the conduct voidable. By contrast, if the conduct is outside the permitted authority of the corporation irrespective of whether there is shareholder approval, the conduct is void. *See Harbor Finance Partners*, 751 A.2d at 895-96 & n.58.

United States District Court
For the Northern District of California

1   As the court concluded in the March 1, 2007 Order, based on the terms of the LTPC Program

2   and the Stock Plan, the act of awarding Fiorina LTPC payments prior to her vest date is within

3   corporate authority and not *ultra vires* because the allegations do not support that shareholder

4   approval is needed to exercise such corporate discretion under the Stock Plan or the LTPC Program.

5   *Id.* at 13:16-14:2.  Although plaintiffs argue that the express terms of the LTPC render the general

6   provisions of the Stock Plan inapplicable, as defendants correctly argue, the LTPC Agreement

7   incorporates the terms of the Stock Plan by reference.  HP's proxy disclosures provide: "Awards

8   under the LTPC Program were made pursuant to the Hewlett-Packard Company 2000 Stock Plan,

9   which was approved by HP shareowners."  *See, e.g.*, Dir. Defs.' Req. Judicial Notice Supp. Mot.

10   Dismiss SAC ("Dir. Defs.' RJN"), Ex. D (2004 Proxy Statement) at 36.[13]  In any event, plaintiffs do

11   not point to any language in the LTPC that renders the general discretion retained by the company

12   under the Stock Plan (pursuant to which the LTPC was implemented) inapplicable to LTPC awards.

13   The court does not find that the mere adoption of the LTPC creates a reasonable inference that the

14   provisions of the Stock Plan are no longer applicable to LTPC awards as plaintiffs argue, or that HP

15   is without authority under the plans to issue a discretionary LTPC award.

16   Similarly, plaintiffs' allegation that HP failed to deduct Fiorina's LTPC payments from the

17   severance amount under the Severance Program does not constitute an action outside HP's corporate

18   authority because, as disclosed by HP, certain payouts are not subject to HP's Severance Policy,

19   "either because they have been previously earned or accrued by the employee or because they are

20   consistent with Company Practices," including "payments of prorated portions of bonuses or

21   prorated portions of long-term incentive payments that are consistent with Company Practices."  *Id.*

22   at 14:3-10.  Plaintiffs argue that the mere fact that the directors had to exercise discretion to award

23   the LTPC payment to Fiorina means the payment could not have been "consistent with Company

24   Practices" (and therefore could not be excluded by the plain terms of the severance policy).  At

25   minimum, plaintiffs contend, under the standard for Rule 12(b)(6) motions, the fact that the directors

26   had to exercise discretion to award the LTPC payment raises a reasonable inference that the payment

27

28   [13]   The court grants defendants' request for judicial notice with respect to the 2004 proxy
statement filed with the SEC for the reasons set forth in *supra* note 6.

United States District Court
For the Northern District of California

was not consistent with Company Practices. The court is not persuaded that the use of discretion is a fact that plausibly suggests a decision is not consistent with prior practices even if viewed in the light most favorable to plaintiffs. *See Bell Atlantic Corp.*, 127 S. Ct. at 1960 (holding that a Rule 8 complaint must allege "enough facts to state a claim to relief that is plausible on its face" to avoid dismissal under Rule 12(b)(6)). In any event, plaintiffs' allegations do not create a reasonable inference that HP was without authority to issue a discretionary award under the LTPC such that the payment was *ultra vires*.

Plaintiffs further suggested at oral argument that the LTPC payments to Fiorina must be considered *ultra vires* because the board would otherwise be allowed "discretion to define every payment given on termination as bonus payments . . . not subject to [HP's] severance policy." Further, plaintiffs submit, *any* extra payment given on termination is subject to the severance policy. However, the board's exercise of discretion in this case does not appear to be an attempt to classify an arbitrary payment at termination of employment as a LTPC payment in order to avoid the terms of the Severance Policy. As set forth in the form 8-K disclosure of Fiorina's severance and benefits package, the LTPC payout consists of the 2003 LTPC amount at target of $5,880,000 and the 2004 LTPC payout at target, prorated for the number of whole months of active service during the performance period, of $1,502,700[14]. *See* Dir. Defs.' RJN, Ex. F (Feb. 22, 2005 form 8-K) at Ex. 99.1.[15] These amounts correspond to HP's 2004, 2005, and 2006 proxy disclosures (filed January 22, 2004, February 11, 2005, and January 24, 2006, respectively). *See id.*, Ex. D (2004 Proxy Statement) at 35-36; Ex. E (2005 Proxy Statement) at 34-35[16]; Ex. N (2006 Proxy Statement) at 43-45). The target payouts used to determine the LTPC award given to Fiorina were specifically granted to Fiorina in March 2003 and March 2004 as disclosed in the 2004 and 2005 proxy statements. *See id.*, Ex. D at 48; Ex. E at 46-47. Thus, the payments classified as LTPC payments

[14] As disclosed in the form 8-K filing, the prorated award was derived by prorating the target award of $6,010,800 by 9/36 for nine months of active service as to the 2004 award.

[15] The court grants defendants' request for judicial notice with respect to the February 22, 2005 form 8-K filed with the SEC for the reasons set forth in *supra* note 6.

[16] The court grants defendants' request for judicial notice with respect to the 2005 proxy statement filed with the SEC for the reasons set forth in *supra* note 6.

United States District Court
For the Northern District of California

to Fiorina represent acceleration or proration of amounts granted pursuant to the LTPC Program, rather than cash payments arbitrarily classified as LTPC payouts in order to avoid the Severance Policy. As discussed above, the HP board has authority and discretion to waive forfeiture and accelerate or prorate awards under the LTPC program and such discretionary awards of long-term incentive payments are, by the terms of HP's Severance Program, excluded from the Severance Policy.

### c.   Defendants' Alleged Motives

Plaintiffs argue that because their SAC challenges defendants' motives in approving Fiorina's severance and benefits package, they have alleged facts giving rise to a reasonable inference that defendants' actions are not protected by the business judgment rule. Demand may be excused if plaintiffs' allegations "raise a reasonable doubt that the [b]oard was well-informed, careful and rational" in approving Fiorina's severance and benefit package. *See In re Walt Disney Co. Deriv. Litig.*, 731 A.2d at 361 (reversed on other grounds). Under Delaware law, absent allegations of fraud, the "deference to directors' business judgment is particularly broad in matters of executive compensation." *Id.* at 362 (citing *Haber v. Bell*, 465 A.2d 353, 359 (Del. Ch. 1983)). Here, plaintiffs argue that they have alleged that the board's approval was motivated by the directors' desire to keep Fiorina from disclosing the directors' purported wrongdoing in connection with the Compaq merger. However, as discussed in *supra* § A, plaintiffs' allegations do not create a plausible inference suggesting the severance and benefits package was "hush money."

### B.   Direct Claims

Plaintiffs have styled their first, second, and third claims as "direct claims." Defendants argue that these claims are really derivative claims and should be dismissed for failure to make demand or allege futility of demand. Count one asserts a claim for breach of contract, count two asserts promissory fraud, and count three asserts a breach of the duty to disclose. Plaintiffs assert that these claims are direct because they allege that (1) HP's false and misleading statements in the 2004, 2005, and 2006 proxy statements deprived the shareholders of the opportunity to cast fully informed votes on matters submitted for shareholder vote in those proxies; (2) but for the false and misleading statements about submitting severance packages over a certain amount to shareholder

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

vote, the shareholders would not have approved the reservation of an additional 225 million shares for the HP Employee Stock Incentive Plan or the Employee Stock Purchase Plan, which diluted the shareholders holdings; and (3) the complained of false and misleading statements were material to shareholders' voting on the matters submitted in the 2004, 2005, and 2006 proxies.

The distinction of whether a claim is derivative or direct "depends upon the nature of the wrong alleged and the relief, if any, which could result if plaintiff were to prevail." *Grimes v. Donaldson, Lufkin, & Jenrette, Inc.*, 673 A.2d 1207, 1213 (Del. 1996) (overruled on other grounds by *Brehm*, 746 A.2d at 253-54) (citations and internal quotation marks omitted). The Delaware Supreme Court clarified the proper test for determining whether a claim is direct or derivative in *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004). Specifically, the court disapproved of the so called "special injury" test articulated in prior Delaware case law.[17] The court held that "[t]he analysis must be based solely on the following questions: Who suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy?" *Id.* at 1035. In determining whether it is the corporation or the suing stockholder who suffered the alleged harm, the court is to "look[] at the body of the complaint and consider[] the nature of the wrong alleged and the relief requested" and ask "has the plaintiff demonstrated that he or she can prevail without showing an injury to the corporation?" *Id.* at 1036.

In the March 1, 2007 Order, the court concluded that plaintiffs' claims were derivative because (1) plaintiffs had not pled facts to support an interference with their right to vote and (2) plaintiffs' allegations do not support an inference that the alleged misstatements directly relate to the matters for which their vote was solicited.

Although plaintiffs have now clarified that they assert interference with their right to vote via false and misleading statements regarding the severance policy and program, plaintiffs' argument of interference relies upon the premise that the disclosures regarding the severance policy and program were false when made. However, for the reasons discussed above, the court does not conclude that

---

[17] *See Elster v. Am. Airlines, Inc.*, 100 A.2d 219 (1953); *Bokat v. Getty Oil Co.*, 262 A.2d 246 (1970); *Moran v. Household Intern'l Inc.*, 490 A.2d 1059 (1985); *Lipton v. News Intern'l Plc.*, 514 A.2d 1075 (1986); *In re Tri-Star Pictures, Inc. Litig.*, 634 A.2d 319 (1993).

**United States District Court**
For the Northern District of California

plaintiffs' allegations support a reasonable inference that the disclosures were false and misleading.[18] In particular, the allegations do not show that the payments to Fiorina violated the severance policy or that the provision requiring payments of severance in excess of certain amounts was required to be submitted for prior approval by the shareholders.[19]

Second, plaintiffs allege that HP's adoption of a severance policy that puts to shareholder vote proposed severance packages in excess of a certain multiplier of the employee's salary and bonus was material and important to the shareholder. As alleged, the policy originated from a successful shareholder proposal. Nevertheless, although the pleadings support a conclusion that the severance policy was important to the shareholders when it was adopted in 2003, plaintiffs' allegations do not plausibly suggest that the policy is directly material to decisions regarding election of directors, authorization of additional shares for the Employee Stock Incentive Plan, and authorization of the employee Pay-for-Results plan. In other words, while plaintiffs submit their assertion that the severance policy is material to these shareholder decisions, plaintiffs assert no factual basis that the vote on the other matters were based in part on HP's adoption and continued adherence to the severance policy.[20] *See Abrons v. Maree*, 911 A.2d 805, 813 (Del. Ch. 2006) ("A fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.") (citation and internal quotations omitted). In any event, whether the policy was material to the voting decisions also depends on whether the policy was false and misleading when made which, as noted above, has not been adequately pleaded.

---

[18]     Moreover, allegations of fraud must comply with the pleading requirements of Fed. R. Civ. P. 9(b).

[19]     In addition, as defendants argue, the public disclosure of Fiorina's severance and benefits package on February 22, 2005 provided disclosure of HP's LTPC payment to Fiorina prior to the annual meetings for 2005 and 2006. Thus, the information that HP paid LTPC payments to Fiorina despite her status as an employee who had been involuntarily terminated prior to her vest date on LTPC payments was information available to the shareholders.

[20]     As noted in the March 1, 2007 Order addressing plaintiffs' assertion that their right to cast a fully informed vote was interfered with, plaintiffs have not sufficiently alleged how the matters voted on involve the LTPC Program, the Severance Policy, or the Severance Program to which the purported misstatements and omissions relate. Plaintiffs' allegations do not show how the alleged misrepresentations and omissions are material facts that bear on the particular matters for which the shareholders' vote was sought.

ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS SECOND AMENDED COMPLAINT AND DENYING AS MOOT DIRECTOR DEFENDANTS' MOTION TO STRIKE—06-01711 RMW
SPT                                        23

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nor is the second *Tooley* prong satisfied.  Under the second prong of *Tooley*, in order to maintain a direct claim, stockholders must show that they will receive the benefit of any recovery or other remedy.  *Tooley*, 845 A.2d at 1033; *see also In re J.P. Morgan Chase & Co. Shareholder Litig.*, 906 A.2d 808, 819 (Del. Ch. 2005).  Plaintiffs now allege that they seek a declaration that HP made false and incomplete disclosures in the 2004, 2005, and 2006 proxy statements, rescission of the 2004 stock incentive plan and the reservation of additional shares for issuance under that plan, rescission of the Pay-for-Results Plan, and monetary damages for any dilution they may have suffered to the extent the additional shares reserved for issuance under the stock incentive plan were actually issued.  However, as the court stated in the March 1, 2007 Order, if plaintiffs were successful in a claim that certain HP compensation and benefits plans should be rescinded because HP shareholders would not have voted to approve those plans had they known HP would not seek shareholder approval for Fiorina's package, any remedy would be directed to the corporation.  In addition, an allegation that all shareholders' holdings were diluted through the improperly-induced favorable vote to increase shares for the stock incentive plan is considered a wrong to the corporation.  *See Kramer v. W. Pacific Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988) ("Delaware courts have long recognized that actions charging mismanagement which depress[] the value of stock [allege] a wrong to the corporation; i.e., the stockholders collectively, to be enforced by a derivative action.").

## C.  Fiorina's Motion to Dismiss

Defendant Fiorina moves to dismiss plaintiffs' request to place a constructive trust on the $21.4 million paid by HP to her and in her possession.  Fiorina argues that because plaintiffs' substantive claims fail for the reasons set forth in the motions filed by the director defendants and HP, in which Fiorina joins, there cannot be any imposition of a constructive trust remedy.  Because the court dismisses plaintiffs' substantive claims in counts one through ten, there is no basis to impose a constructive trust.

## D.  Dismissal With Prejudice

Plaintiffs have had several opportunities to successfully plead their case, and it does not

appear that they can successfully do so.  Accordingly, the Second Amended Complaint is dismissed with prejudice.

**E.    Motion to Strike**

The Director Defendants also move to strike paragraphs 27-35, 93-131, and 150 of the SAC as immaterial and impertinent allegations pursuant to Fed. R. Civ. P. 12(f).  These paragraphs set forth plaintiffs' allegations regarding the boardroom leaks and the subsequent investigation.  In addition, paragraphs 128-131 set forth allegations that certain of the directors sold shares while in possession of material non-public information—namely, the investigative techniques employed as part of the boardroom leak investigation.  Here, plaintiffs have asserted that the investigation into the boardroom leaks supports their argument that demand upon the board is futile for their derivative claims.  "Rule 12(f) motions to strike are generally not granted unless it is clear that the matter sought to be stricken could have no possible bearing on the subject matter of the litigation.  Any doubt concerning the import of the allegations to be stricken weighs in favor of denying the motion to strike."  *White v. Hansen*, 2005 WL 1806367, *14 (N.D. Cal. 2005) (internal quotes and citation omitted).  However, since the court grants the motion to dismiss, the motion to strike is moot.

**III.  ORDER**

For the foregoing reasons, the court:

1.    Grants defendants' motions to dismiss; and

2.    Denies Director Defendants' motion to strike as moot.

DATED:    _____3/28/08_____

_Ronald M Whyte_

RONALD M. WHYTE
United States District Judge

ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS SECOND AMENDED COMPLAINT AND DENYING AS MOOT DIRECTOR DEFENDANTS' MOTION TO STRIKE—06-01711 RMW
SPT

**United States District Court**
For the Northern District of California

**United States District Court**
**For the Northern District of California**

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiffs:**

| | |
|---|---|
| Merrill G. Emerick | memerick@afelaw.com |
| Michael J. Barry | mbarry@gelaw.com |

**Counsel for Defendants:**

| | |
|---|---|
| Jonathan C. Dickey | jdickey@gibsondunn.com |
| Jayesh Sanatkumar Hines-Shah | jhinesshah@gibsondunn.com |
| Jeffrey A Minnery | jminnery@gibsondunn.com |
| Christopher C. Kearney | ckearney@kvn.com |
| Laurie Carr Mims | lmims@kvn.com |
| Boris Feldman | boris.feldman@wsgr.com |
| Steven M. Schatz | sschatz@wsgr.com |
| Bahram Seyedin-Noor | bnoor@wsgr.com |

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:** _____3/28/08_____          _____/s/ MAG_____
                                                    **Chambers of Judge Whyte**